Lisa Boyd
807 Kansas Ave.
Walsenburg, CO 81089
(785) 259-9328
lisa.r.boyd@gmail.com

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

| | | |
|---|---|---|
| Lisa Boyd, | ) | Case No. |
| Plaintiff | ) | |
| | ) | 16-4106-SAC-KGS |
| V. | ) | |
| | ) | |
| City of Victoria, Kansas | ) | |
| Ellis County, Kansas | ) | |
| Mary Pfeifer, | ) | |
| Cole Dinkel, | ) | |
| Wilmer Dinkel, | ) | |
| Ryan Mauch, | ) | |
| Curtis Unrein, | ) | |
| Sheriff Ed Harbin, and | ) | |
| Unknown Ellis County, Kansas employee, | ) | |
| | ) | |
| Defendants | ) | |

## RESPONSE TO DEFENDANT CITY OF VICTORIA'S MOTION FOR SUMMARY JUDGMENT AND MEMORANDUM IN SUPPORT

COMES NOW Plaintiff and for her Response to Motion for Summary Judgment and

Memorandum in Support states as follows:

## RESPONSE TO STATEMENT OF UNCONTROVERTED FACTS

1. Uncontroverted.

2. Uncontroverted.

3. Uncontroverted.

4. Uncontroverted.

5. Uncontroverted.

6. Uncontroverted.  Plaintiff has limited if any recollection at present of the incident, but acknowledges that it is something that could have happened.

7. Uncontroverted.  Plaintiff has limited if any recollection at present of the incident, but acknowledges that it is something that could have happened.

8. Uncontroverted.  Plaintiff has limited if any recollection at present of the incident, but acknowledges that it is something that could have happened.

9. Uncontroverted.  Plaintiff has limited if any recollection at present of the incident, but acknowledges that it is something that could have happened.

10. Uncontroverted.  Plaintiff has limited if any recollection at present of the incident, but acknowledges that it is something that could have happened.

11. Uncontroverted.  Plaintiff has limited if any recollection at present of the incident, but acknowledges that it is something that could have happened.

12. Uncontroverted.  Plaintiff has limited if any recollection at present of the incident, but acknowledges that it is something that could have happened.

13. Uncontroverted.  Plaintiff has limited if any recollection at present of the incident, but acknowledges that it is something that could have happened.

14. Uncontroverted.  Plaintiff has limited if any recollection at present of the incident, but acknowledges that it is something that could have happened.

15. Uncontroverted.  Plaintiff has limited if any recollection at present of the incident, but acknowledges that it is something that could have happened.

16. Uncontroverted.  Plaintiff has limited if any recollection at present of the incident, but acknowledges that it is something that could have happened.

17. Uncontroverted.  Plaintiff has limited if any recollection at present of the incident, but acknowledges that it is something that could have happened.

18. Controverted.   The Plaintiff does not enter other persons residences without permission as a matter of course.  **(Plaintiff's Affidavit – Exhibit A)**

19. Controverted.   Plaintiff contacted Chief Dinkel in regard to an identify theft in 2008.  **(Plaintiff's Affidavit – Exhibit A)  Plaintiff cannot present facts essential to justify her opposition absent adequate time to obtain affidavits or take discovery and so states pursuant to Rule  FRCP 56(d).**

20. Uncontroverted.

21.  Controverted.   Plaintiff has proof this is not correct in  in the form of two emails to business who accepted the stolen debit card  parties , wherein plaintiff refers to requests for help from Plaintiff to the Victoria Police Department, including that they make a police report and obtain a subpoena.   Plaintiff's states a desire to pursue criminally the person who had committed the identity theft.  **Copies of the emails are attached hereto as Exhibits B and C.**  Plaintiff complained of this lack of police assistance some months later  to the Kansas attorney general.  **A copy of Plaintiff's letters, written in February and March, 2013 to the Kansas Attorney General addressing this and other  matters  is attached hereto as Exhibits D through J.**

22.  Controverted.   Plaintiff told Chief Dinkel that the person who illegally used the debit card, also used it to buy a domain name for ostensibly a porn website.  This activity was not intended to buy a domain for use, but to send the Plaintiff a message of sorts.   The proof of this is obvious because no one would buy a domain with a stolen credit card that intended to actually use.   Plaintiff felt personally threatened by this occurance, and expressed that to Chief Dinkel.  The VPD continued to refuse to request a subpoena to get Sunflower Bank to release information and to open their own investigation.   Plaintiff made specific reference to this porn site purchase in the email to  FileSonic, a business with whom Plaintiff's stolen debit card was used.  **The Plaintiff's e-mail to File Sonic is attached hereto as Exhibit B**.  Further documented in a lettter to the Kansas  Attorney General **attached hereto as Exhibit I**, the

Police report #12-25 dated 2-13-2013 and supplemented 4-1-2013 attached hereto as exhibit JJ. The report contains language apparently entered by Chief Dinkel which gives an excuse for their failure to pursue the  theft complaint and is evidence that the they refused to pursue complaints made in response to the debit card theft, a copy of which Police Report Number 12-25 is attached hereto as **Exhibit E.  Plaintiff cannot present facts essential to justify her opposition absent adequate time to obtain affidavits or take discovery and so states pursuant to Rule  FRCP 56(d).**

23.  Controverted to the extent that there was anything wrong with Plaintiff refusing to leave "Sara's"  hair salon.  Plaintiff and her daughter Sara  have since its inception been jointly involved in some capacity in the operation of the Salon.  Sara left twice abruptly for many months and Plaintiff, as Sara's partner, hired another beautician at Plaintiff's financial loss to provide those services in Sara's long absences.   At the time of the incident referred to in this paragraph, Plaintiff's name was on the salon license, on the lease, and Plaintiff had the right to be present on the property.  Any dispute that might have been occuring was a civil matter between business co-owners.   Plaintiff voluntarily left the premisis anyway to avoid further conflict.  Mothers and daughters frequently have issues.  Plaintiff asks the Court to take Judicial Notice  of this fact.  The Salon license for that tiome period was under Tresses, LLC and is a matter of public record. **Plaintiff cannot present facts essential to justify her opposition absent adequate time to obtain affidavits or take discovery and so states pursuant to Rule FRCP 56(d).**

24.  Uncontroverted.

25. Uncontroverted.  **(Plaintiff's Affidavit – Exhibit A)**

26.  Controverted to the extent that this hardly seems credible because what would they do if city hall was hit by a tornado?

27. Uncontroverted.

28. Uncontroverted.

29. Uncontroverted.

30.  Controverted.  Plaintiff made many requests to see all of the ordinances, not just one at a time.

Defendant Mary Pfeifer was entirely resistant to that request.  Plaintiff made contact with the

city's attorney who advised that I would be allowed to view the ordinances.  Plaintiff  went in

again to be advised that Defendant Pfeifer didn't have a place I could sit to look at them, and

she didn't have time to supervise me.  On the next request,  Plaintiff received the same rebuff.

Plaintiff objected to Defendant Pfeifer's obvious refusal to comply with their own attorney's

instructions.  Plaintiff did not intend to make the city employees feel afraid and behaved in what

she  believed to be a reasonable manner.  Defendant Pfeifer  indicated she believed otherwise

and asked Plaintiff to leave.    Defendant Pfeifer threatened to call police and did call police

before Plaintiff had time to leave the buildling.  Plaintiff's evidence is by her affidavit, from the

city attorney as soon as discovery can be had, and from the letter to the AG complaining of all

this.  **Plaintiff cannot present facts essential to justify her opposition absent adequate time

to obtain affidavits or take discovery and so states pursuant to Rule  FRCP 56(d).

(Plaintiff's Affidavit – Exhibit A) (Plaintiff's email to the Kansas  Attorney General

attached hereto as Exhibit D, page 1).**

31.  Controverted.  **(Plaintiff's Affidavit – Exhibit A)**

32.  Controverted.  **(Plaintiff's Affidavit – Exhibit A)**

33.  Controverted to the extent that Plaintiff's behavior was alarming.  Plaintiff believes the

assistant referred to may be deceased and believes that offering evidence as to that persons state

of mind seems inappropriate. **(Plaintiff's Affidavit – Exhibit A)**

34.  Controverted to the extent that Plaintiff's behavior was frightening.  Plaintiff would

characterize her own behavior as "determined not to be bullied and /or intimidated out of

demanding to see the ordinances. " **(Plaintiff's Affidavit – Exhibit A)**

35.   Controverted  in part.  Officer Mauch stopped the Plaintiff several blocks away from the city office on Cathedral Street in front of the church in full sun.  Plaintiff recalls the temperature was in excess of 100 degrees.  It was at this arrest that Plaintiff was locked in the Police pickup without air conditioning for some long length of time while Defendant Mauch conferred with at least Defendant Dinkel on the phone.**(Plaintiff's Affidavit – Exhibit A)  Plaintiff cannot present facts essential to justify her opposition absent adequate time to obtain affidavits or take discovery and so states pursuant to Rule  FRCP 56(d).**

36.  Controverted **(Plaintiff's Affidavit – Exhibit A)**

37. Uncontroverted.

38. Uncontroverted except that Fedelis is spelled "Fidelis."

39. Controverted.  After the Plaintiff informed Robert Bentham that Defendant Mary Dinkel had once again refused to allow her to see the ordinances, Robert Bentham took it upon himself to paint, choose and compose the message and erect the sign.   Robert Bentham's motives are unknown.  Plaintiff allowed it in the hopes that the city employees would confer again with their attorney who would advise them that there was such a thing as the U.S. Constitution that they should abide by and that they should stop denying Plaintiff access to the city ordiances.  Plaintiff does not know why Robert Bentham erected the sign.  Plaintiff allowed it to happen because Robert Bentham does mainly as he wishes and Plaintiff didn't often attempt attempt to intervene unless his actions were harmful.  Once it was done, Plaintiff  allowed it to continue, thinking perhaps some good could come of it, as in encouraging the city officials to recognize the constitutional rights of the Victoria citizenry, and stop depriving the Plaintiff of her constitutional right to see the laws by which she was governed. **(Plaintiff's Affidavit – Exhibit A) ( Plaintiff's letters to the Kansas  Attorney General attached hereto as Exhibit D though J).**

40.  Uncontroverted.

41. Uncontroverted.

42. Uncontroverted.

43. Uncontroverted.

44.  Controverted to the extent that the statement appears to place Chief Dinkel there alone.  Also in attendance were Ryan Mauch, Mayor Unrein , and the neighbor Jeff Dorweiler.  Dorzweiler left midway through the conversation.   There is a photograph to prove this, a copy of which is attached hereto as **Exhibit  F.      (Plaintiff's Affidavit – Exhibit A)  Plaintiff cannot present facts essential to justify her opposition absent adequate time to obtain affidavits or take discovery and so states pursuant to Rule  FRCP 56(d).**

45.  Uncontroverted.

46. Controverted.  Plaintiff does not recall every word uttered, but Plaintiff never felt that she was disliked by the entire town.  Plaintiff did have some friends there.   Plaintiff did state that she had difficulaty finding employment and so did her disabled veteran boyfriend Robert.  Plaintiff complained that the town did not do anything to help its veterans.   Most of Plaintiff's conflict was with the city officials.   It was the Mayor who advised Plaintiff that 99% of the town was Catholic, and if I wanted to be liked the sign wasn't helping.  **(Plaintiff's Affidavit – Exhibit A) (Plaintiff's letters to the Kansas  Attorney General attached hereto as Exhibit D through J)**

47. Controverted.  Chief Dinkel stated that many residents were angry and had expressed an intent to harm both Robert Bentham and Plaintiff, and claimed that her was there to protect us.  Chief Dinkel refused to say who he was there specifically to protect us from.  **(Plaintiff's Affidavit – Exhibit A)   (Plaintiff's letters to the Kansas  Attorney General attached hereto as Exhibit D through J) (Police Report 12-243 – Attached hereto as Exhibit "PP")**

48. Controverted to the extent that Plaintiff's neighbor had any reason to fear harassment.  Plaintiff has known the identity of the caller since the day of the incident as she was the only person who

could have seen what was reported to have been witnessed. Plaintiff has never confronted or addressed the issue in any way with Kelly, the neighbor, so Plaintiff's evidence of this is the absence of any actual harassment. **(Plaintiff's Affidavit – Exhibit A) Plaintiff cannot present facts essential to justify her opposition absent adequate time to obtain affidavits or take discovery and so states pursuant to Rule FRCP 56(d).**

49. Controverted.    Plaintiff may have pointed out that the city could get sued for stepping on Plaintiff's first amendment rights. **(Plaintiff's Affidavit – Exhibit A)**

50. Controverted. Plaintiff may have pointed out that the city could get sued for stepping on Plaintiff's first amendment rights. **(Plaintiff's Affidavit – Exhibit A) Plaintiff cannot present facts essential to justify her opposition absent adequate time to obtain affidavits or take discovery and so states pursuant to Rule FRCP 56(d).**

51. Controverted. **(Plaintiff's Affidavit – Exhibit A) Plaintiff cannot present facts essential to justify her opposition absent adequate time to obtain affidavits or take discovery and so states pursuant to Rule FRCP 56(d).**

52. Uncontroverted.

53. Uncontroverted.

54. Controverted. Plaintiff did not tell the city council member or Mayor Unrein to tell Ottley anything. Plantiff may have contacted them with concerns about Defendant Mary Pfeifer's family's involvement in interference with relations between me and the salon's landlord, Mark Ottley. Plaintiff may have requested some kind of supportive reference that Plaintiff did not seem like a destructive person as they had witnessed Plaintiff not destroying things for the ten or more years that Plaintiff had lived there.**(Plaintiff's Affidavit – Exhibit A) Plaintiff cannot present facts essential to justify her opposition absent adequate time to obtain affidavits or take discovery and so states pursuant to Rule FRCP 56(d).**

55. Uncontrovered.

56.  Controverted to the extent of Defendant Dinkel's motivation for being there.  Plaintiff

perceived Chief Dinkel's reason for being there was to intimidate the Plaintiff into taking the

sign down.  Plaintiff recalls that Defendant Mauch was there at least part way through the and at

the end of the conversation.  **(Plaintiff's Affidavit – Exhibit A) Plaintiff cannot present facts**

**essential to justify her opposition absent adequate time to obtain affidavits or take**

**discovery and so states pursuant to Rule  FRCP 56(d).**

57. Uncontroverted.

58. Uncontroverted.

59. Uncontroverted.  Plaintiff recalls that Chief Dinkel's last words were "thats the smartest thing

you ever did" after Plaintiff put the sign down to end the standoff, give in to Defendant Dinkel's

intimidation  and allow for the unbothered passing of the homecoming homecomers.

**(Plaintiff's Affidavit – Exhibit A)**

60.  Plaintiff notes this paragraph appears to be misnumbered as "62".   Controverted to the extent

that the threats to which Plaintiff may have been referring  were communicated to the Plaintiff

by Chief Dinkel,  several days before, in the presence of Defendants Mauch  and Unrein., and

neighbor Jeff Dorzweiler. **(Plaintiff's Affidavit – Exhibit A) Plaintiff cannot present facts**

**essential to justify her opposition absent adequate time to obtain affidavits or take**

**discovery and so states pursuant to Rule  FRCP 56(d).**

61. Controverted to the extent that Chief Dinkel did say that Bentham and I had been threatened.

**(Plaintiff's Affidavit – Exhibit A) (Plaintiff's letters to the Kansas  Attorney General**

**attached hereto as Exhibit D) Plaintiff cannot present facts essential to justify her**

**opposition absent adequate time to obtain affidavits or take discovery and so states**

**pursuant to Rule  FRCP 56(d).**

62. Controverted that Plaintiff asked Jan Brungardt to tell Ottley that Plaintiff was a "good person".

**(Plaintiff's Affidavit – Exhibit A) Plaintiff cannot present facts essential to justify her**

**opposition absent adequate time to obtain affidavits or take discovery and so states**

**pursuant to Rule  FRCP 56(d).**

63. Controverted to the extent that Plaintiff did not say she was "using its name to get back at people in the community."   **(Plaintiff's Affidavit – Exhibit A) Plaintiff cannot present facts essential to justify her opposition absent adequate time to obtain affidavits or take discovery and so states pursuant to Rule  FRCP 56(d).**

64.  Uncontroverted.  First Amendment freedom of expression .  Plaintiff's performance art was trying to get point across that I had been taken advantage of by certain of the church's members.

65. Controverted.  Jan Brungardt must have misunderstood Plaintiff.  Plaintiff owns lots of dogs so that she does not feel the need to and does not own a gun . **(Plaintiff's Affidavit – Exhibit A) Plaintiff cannot present facts essential to justify her opposition absent adequate time to obtain affidavits or take discovery and so states pursuant to Rule  FRCP 56(d).**

66. Uncontroverted.

67. Uncontroverted.

68. Controverted.  At approximately 3 a.m., Chief Dinkel announced that he had to sleep.  Bentham showed up at Plaintiff's residence a little before dawn.  Chief Dinkel had not had much of an opportunity to sleep by then and Plaintiff felt it would be unkind to disturb him at 6 a.m.  Upon learning that Chief Dinkel was awake, Plaintiff notified him that Bentham had returned.  The disrespectful characterization of the failure to report Bentham's return is indicative of the City's general attitude toward the Plaintiff. **(Plaintiff's Affidavit – Exhibit A) Plaintiff cannot present facts essential to justify her opposition absent adequate time to obtain affidavits or take discovery and so states pursuant to Rule  FRCP 56(d). Police Report 13-144) Attached hereto as Exhibit RR.**

69. Uncontroverted that Chief Dinkel received that report.  Chief Dinkel failed to mention several important facts such that the reporter had dumped an inoperable vehicle in my yard and was

refusing to move it. **(Plaintiff's Affidavit – Exhibit A). Police Report 13-176 Attached hereto as Exhibit SS.**

70. Uncontroverted.

71. Controverted to the extent that it assumes poverty is necessarily disorderly. Plaintiff is in the habit of stepping outrside to speak with people so that her dogs don't ram the door or jump on them. Plaintiff has been living on very little income for many years and uses boxer shorts for summer shorts because they are inexpensive. They cover everything. Use of the term "underwear" by Chief Dinkel in his official report, while technically correct, is misleading because it is going to be interpreted by most persons as a very skimpy pieces of nylon. Long t-shirts and boxer shorts is common summer attire in the lower classes of Victoria. The fact that the City would make something out of my poor person's attire is evidence of their general attitude of disrespect and contempt for the Plaintiff. **(Plaintiff's Affidavit – Exhibit A).**

72. Uncontroverted.

73. Uncontroverted.

74. Controverted to the extent that Plaintiff requested that Gabriel be taken into custody. **(Plaintiff's Affidavit – Exhibit A).**

75. Uncontroverted.

76. Uncontroverted.

77. Uncontroverted.

78. Controverted to the extent that the ordinance does not define weeds or ornamental plants adequately and is overbroad, and most of the yards in Victoria are in violation of Chief Dinkel's interpretation of the ordinance for most of the summer. **(Plaintiff's Affidavit – Exhibit A). Plaintiff cannot present facts essential to justify her opposition absent adequate time to obtain affidavits or take discovery and so states pursuant to Rule FRCP 56(d).**

79. Uncontroverted

80. Uncontroverted.

81. Uncontroverted.

82. Uncontroverted.

83. Controverted to the extent that Plaintiff does not recall stating that "**all**" the citizens of Victoria were nazis. **(Plaintiff's Affidavit – Exhibit A).**

84. Uncontroverted.

85. Uncontroverted that Chief Dinkel received calls.  Controverted that the rest occurred.

86. Uncontroverted that Chief Dinkel received calls.  Controverted that Plaintiff yelled obscenities "at" the juveniles. **(Plaintiff's Affidavit – Exhibit A).**

87. Uncontroverted .

88. Uncontroverted.

89. Uncontroverted.

90.  Controverted to the extent it implies that Plaintiff did not realize tire was on curb.  Chief Dinkel motioned Plaintiff to stop and there was no opportunity to correct the parking after that. The fact that Chief Dinkel makes it out otherwise is evidence of is disingenuousness.

   **(Plaintiff's Affidavit – Exhibit A).**

91. Uncontroverted.

92. Controverted.  Plaintiff was in pain and in need of medical help and was generally distraught.

   **(Plaintiff's Affidavit – Exhibit A).**

93. Uncontroverted.

94. Uncontroverted.

95. Uncontroverted.

96. Uncontroverted.

97. Uncontroverted.

98. Uncontroverted.

99. Uncontroverted.

100.      Uncontroverted.  But Chief Dinkel fails to mention I had to agree to pay for medical

treatment. **(Plaintiff's Affidavit – Exhibit A).**

101.      Uncontroverted.  Plaintiff also had to agree to pay for other medical treatment.

**(Plaintiff's Affidavit – Exhibit A).**

102.      Uncontroverted.

103.      Uncontroverted.   Plaintiff was also treated for her emergency level blood pressure.

**(Plaintiff's Affidavit – Exhibit A). Plaintiff cannot present facts essential to justify her**

**opposition absent adequate time to obtain affidavits or take discovery and so states**

**pursuant to Rule  FRCP 56(d).**

104.      Uncontroverted.

105.      Uncontroverted.

106.      Uncontroverted.

107.      Uncontroverted.

108.      Controverted.  Chief Dinkel states in various police reports that he invites reporters to let

him know whatever they had to say about me. **(Plaintiff's Affidavit – Exhibit A).**

109.      Controverted.  Plaintiff is alleging that Chief Dinkel was looking for a reason to arrest

the Plaintiff in order to make her leave town again.  Plaintiff's complaints to the AG were in part

an attempt to quiet  the city's harassment activities, which existed.   **(Plaintiff's Affidavit –**

**Exhibit A).(Plaintiff's letters to the Kansas  Attorney General attached hereto as Exhibit**

**D).**

110.      Controverted.  **(Plaintiff's Affidavit – Exhibit A). Plaintiff cannot present facts**

**essential to justify her opposition absent adequate time to obtain affidavits or take**

**discovery and so states pursuant to Rule  FRCP 56(d).**

111.      Controverted.  Plaintiff's yard was cited on numerous occasions when many others who

technically in violation of Defendant Dinkel's interpretation of the ordinance was not.  Plaintiff

will need to discover of how many citations were issued in summer of 2013 and to whom.

**(Plaintiff's Affidavit – Exhibit A) (Plaintiff's letters to the Kansas  Attorney General**

**attached hereto as Exhibit D through J)  Plaintiff cannot present facts essential to justify**

**her opposition absent adequate time to obtain affidavits or take discovery and so states**

**pursuant to Rule  FRCP 56(d).**

112.	Controverted.  **(Plaintiff's Affidavit – Exhibit A). Plaintiff cannot present facts**

**essential to justify her opposition absent adequate time to obtain affidavits or take**

**discovery and so states pursuant to Rule  FRCP 56(d).**

113.	Controverted.  **(Plaintiff's Affidavit – Exhibit A). Plaintiff cannot present facts**

**essential to justify her opposition absent adequate time to obtain affidavits or take**

**discovery and so states pursuant to Rule  FRCP 56(d).**

114.	Controverted.  At the Ellis County Courthouse, after Defendant Dinkel testified at

Plaintiff's driver's license review hearing, Plaintiff hugged the Defendant Dinkel.  Plaintiff told

the Defendant that she wasn't angry with him, but that she believed he and some of the other

city employees had tried to run her off at the behest of the mayor and some others.  That

Plaintiff had been harmed by that, including resulting harm to her eyesight.  That the whole

thing had been very stressful and financially devastataing, and that the city owed her

compensation.  Plaintiff stated that she thought the older generation of Defendants and other

influential Victoria people had more to do with it than the younger ones, and that the younger

ones got put out front.  Plaintiff did not say that the city defendants had done no wrong.  Just

that Plaintiff didn't hold any personal animosity.  **(Plaintiff's Affidavit – Exhibit A).**


STATEMENT OF ADDITIONAL MATERIAL FACTS

115.  In a police report filed as the result of an incident in 2013,  Chief Cole Dinkel describes

Plaintiff's long term live- in boyfriend Robert Bentham as an alcoholic, a suspected drug abuser, a criminal with a record for burglary and theft.  He describes Plaintiff as an alcoholic with mental "issues".  Chief Dinkel cites these facts as reasons why he would not allow Plaintiff  to dissuade Gabriels' mother, Sara,  from driving off with Gabriel  in a fury.    Plaintiff was aware that her daughter was extremely upset over a problem she was having with Gabriel's father in Salina.  Plaintiff knew that Sara was too angry and upset to be driving, so to protect Gabriel, Plaintiff tried to get her her to wait until she was calmer.  Instead, she called Chief Dinkel.  Chief Dinkel ignored my concerns about her driving capacity, and  instead maligned me in his police report and stated that I was an alcoholic and person with serious mental issues.  He ignored my legitimate fear for Gabriel's safetly and allowed Sara to transport him ninety miles to Salina.  .I am gratetful that nothing tragic occurred that day.  **Police Report  #13-202.**

116.  The situation described in paragraph 115 was typical of most  of my interactions with the Victoria city officials.  They typically sided with whomever I had a conflict with.    That included my daughter Sara and my long term live in boyfriend, Robert.  **(Plaintiff's Affidavit – Exhibit A).  Police report #13-202.**

117.  Plaintiff met Robert Bentham in a counseling group in 1993 shortly after he returned from the Persian Gulf War.  Plaintiff heard Bentham tell of horrible war experiences that seemed to be disturbing him to a great degree.  Plaintiff believed that Robert Bentham was suffering from PTSD.  Plaintiff perhaps did not soon enough realize that Bentham also  had a long criminal history and some personality issues.  Those personality issues drove Bentham to employ several techniques of maintaining control in his  relationships, including "gaslighting", and the use of other persons  (flying monkey's) for  manipulating his relationships.     Gaslighting is  a method of gaining control in a relationship by making the other person question their own sanity, and also making other family members question the victim's mental state.    The use of these techniques take their toll on anyone over the years, as they did on Plaintiff.  Plaintiff took Robert Bentham's bait on any number of occasions and

must have appeared frequently upset.   Defendant Dinkel has no basis however, for his assertion in the police report that Plaintiff has  mental issues of sufficient kind and severity to present a danger to Plaintiff's grandson.  **(Plaintiff's Affidavit – Exhibit A), Plaintiff cannot present facts essential to fully document this paragraph  absent adequate time to obtain affidavits or take discovery and so states pursuant to Rule  FRCP 56(d).**

118.   Defendant Dinkel describes Plaintiff as alcoholic.  Plaintiff never drank before age 50 , in the early years because she was married to  a chronic alcholic.  Plaintiff's mother suffered from severe cardiac issues beginning at her age 40.  She had a triple bypass and then many angioplasties.  Plaintiff began having cardiac symptoms at about age 45.  Plaintiff was prescribed Vasotec by Dr. Fisher at Hays Medical Center.  After a few years, Plaintiff elected to stop taking heart medication and use alcohol instead.  Plaintiff consumes between 2 and 4 ounces of alcohol per day.  Plaintiff has had no further heart issues since adopting this practice for the past ten years.  Plaintiff believes her alchohol use to be healthful and considers Chief's Dinkel's judgment of her as alcoholic to be insulting, but not suprising.  Chief Dinkel portrays the Plaintiff in the worst possible light whenever possible.  **(Plaintiff's Affidavit – Exhibit A), Plaintiff cannot present facts essential to fully document this paragraph  absent adequate time to obtain affidavits or take discovery and so states pursuant to Rule  FRCP 56(d).**

119.   A holistic reading of the police reports made over the years reveals the degree to which the city officials were biased against the Plaintiff.  In problem after problem, dispute after dispute, the vast majority of which were directly caused by Robert Bentham and his friends, no one is confronted or arrested or pressured except for the Plaintiff.  Plaintiff got the yard tickets, the tickets for Robert's junk car in the yard,  for domestic disturbances, for dogs out, and water on, and trailers dangerously parked (by Robert).  Defendant Dinkel never confronted Robert about any of these things for reasons only Defendant Dinkel can explain.  Plaintiff believes that it is to avoid conflict between Chief Dinkel and Robert's stepfather, Kenneth Brungardt.  **(Plaintiff's Affidavit – Exhibit A), The police reports are included herewith as Exhibits AA-ZZ.**

120.  In 2013 Plaintiff decided she'd had all she could take in Kansas for awhile and purchased a residence in Colorado.  Robert Bentham agreed to move with her and attempt to find employment in Colorado.  Over the winter, Robert Bentham became very depressed in Colorado and returned to Kansas to help his step father, Kenneth Brungardt  work on his farm residence in the Spring of 2014. Plaintiff had not yet decided to sell the residence in Victoria and no action had been taken to permanantly move full time from Victoria by the Plaintiff.   Plaintiff does not like summers in Kansas, but misses her grandson and was intending to stay in Kansas part of the time after 2014.  In the Spring of 2014,  Robert had agreed with Plaintiff to live in and work on  house of Plaintiff's in Victoria since it needed repair and was nearly empty.   Robert had agreed to share part of his wages from working for his stepfather with the Plaintiff.  Plaintiff never received any money from Robert.  Robert didn't seem to actually be working on the house.  Plaintiff traveled to Kansas to move things along.  Within a couple of weeks of her arrival, in early June of 2014,  Defendant Dinkel presented plaintiff with the yard citation and had Defendant Mauch issue another one for Robert's junk car.  Plaintiff failed  to bring adequate blood pressure pills and had run out.  Plaintiff told Defendant Dinkel about that problem when he came to confront her about the yard.  At every visit, Plaintiff explained that she shouldn't be doing yard work in the heat because of her blood pressure issue and lack of medication.  A couple of days later when Plaintiff was arrested for DUI. Plaintiff told Defendant Dinkel about her blood pressure issue  and the need for medical treatment, as the blood pressure was aggravated by the intense tooth pain.  Plaintiff believed she was in danger of having a stroke.   Defendant Dinkel ignored those statements and pretended that they never happened.  There is no  mention on the DUI police report of the impacted tooth or blood pressure complaint.  although there is a space on the report form where that information is supposed to be reported.  Defendant Dinkel could have summoned an ambulance to the scene to evaluate the plaintiff instead of making her wait an  additional 3 hours for treatment, but he did not have enough respect or concern  for the Plaintiff to do so.  Later at the Sheriff's office, Defendant Dinkel refused to transport Plaintiff to the emergency room for medical treatment unless Plaintiff

agreed to pay for the treatment.   Plaintiff was trying to decide what to do about that problem when

Defendant Dinkel informed Plaintiff she had failed the breathalyzer, but was allowed to get a blood test

from a place of her own choosing.  Plaintiff saw this as an opportunity for a ride to the emergency room

for medical treatment with no further argument from Chief Dinkel. **(Plaintiff's Affidavit – Exhibit A),**

**Plaintiff cannot present facts essential to fully document this paragraph  absent adequate time to**

**obtain affidavits or take discovery and so states pursuant to Rule  FRCP 56(d).**

121. On the way to the emergency room,  the dash cam video was turned on by Chief Dinkel.  Plaintiff

can be seen on Disc #2 provided by the City to Plaintiff, mailed to the clerk on the date of this filing,

and referred as Exhibit BBB.  On the video, Plaintiff is holding her jaw and complaining of pain.

Plaintiff had the following conversation with the Defendant Cole Dinkel on June 19, 2014, in the police

car.    On the compact disc, Exhibit BBB, recording of  the transport of the Plaintiff to the Emergency

Room from the Sheriff's office, the following was said by Plaintiff and Defendant Dinkel., starting at

minute 6:00 on the CD:

Plaintiff: "Oh, my teeth hurt so bad"

Chief  Dinkel:  "Just so you understand, you are no longer.....this is not, ...this is all yours, correct?  Just

so you understand that?

Plaintiff: "Mm Hmm.  I got lotsa medical bills, Cole, Dont you worry...they know just what to do with

them too.  They got all kinds of grants, federal assistance....Do they look they are hurting?   Look over

there..."

Chief Dinkel:  " That's not the point!

Plaintiff: " Oh, that is the point."

Chief Dinkel:  "What would happen if nobody ever paid their bills?  Where would that assistance come

from?

Plaintiff: " Needs to all be single payer anyway"

Chief Dinkel: "Nobody ever pays"

Plaintiff:  "Then it would be single payer which we should have had instead of Obamacare.  But thats okay...."

122. The conversation transcribed in paragraph 121 above is  in direct contradiction to Chief Dinkel's testimony in Plaintiff's  Driver's License Suspension Review hearing, which is a matter of public record of which Plaintiff asks the Court to take Judicial Notice.    Chief Dinkel testified there and in his affidavit in this case that the Plaintiff never asked for medical care prior to arriving at Hays Medical Center.  This is evidence that Chief Dinkel committed perjury, and made an overt attempt to cover up the fact of making the  demand that Plaintiff agreed to pay for whatever medical treatment she received.  The fact that he did lie about this also tends to prove that he may have collaberated with someone in the sheriff's office to destroy more evidence of the same wrongdoing, namely, refusing to transport me for necessary medical treatment unless I agreed to pay for it.  If the recording in the DUI check lane had not been somehow destroyed it would have contained a lengthy discussion between Plaintiff and Defendant Dinkel as to her need for medical treatment and his refusal to provide it unless Plaintiff agreed to pay for it. **(Plaintiff's Affidavit – Exhibit A), Plaintiff cannot present facts essential to fully document this paragraph  absent adequate time to obtain affidavits or take discovery and so states pursuant to Rule  FRCP 56(d).**

123.   A few weeks after Plaintiff's DUI arrest , Plaintiff contacted Chief Dinkel and stated that the audio from the Sheriff's office wherein he refused transportation for medical treatment absent guarantee of payment by the Plaintiff was going to cause problems for him as it was clearly unethical for him to do that,  and that the city was in fact the responsible party to pay the bill. **(Plaintiff's Affidavit – Exhibit A), Plaintiff cannot present facts essential to fully document this paragraph  absent adequate time to obtain affidavits or take discovery and so states pursuant to Rule  FRCP 56(d).**

124.   Plaintiff then set out to secure the audio, and was advised by the Sheriff's office sometime later that the audio had been destroyed in an equipment malfunction. **(Plaintiff's Affidavit – Exhibit A), Plaintiff cannot present facts essential to fully document this paragraph  absent adequate time to**

**obtain affidavits or take discovery and so states pursuant to Rule FRCP 56(d).**

125.  A representative of the equipment manufacturer told Plaintiff that he was skeptical that the equipment had malfunctioned and encouraged plaintiff to find out who had access to the equipment's administrator functions.  The representative told Plaintiff that they routinely told installers not to give the administrative authority to Law Enforcement for the reason that this type of data destruction could occur but would be undetectable. **((Plaintiff's Affidavit – Exhibit A), Plaintiff cannot present facts essential to fully document this paragraph  absent adequate time to obtain affidavits or take discovery and so states pursuant to Rule FRCP 56(d).**

122.  Plaintiff requested an investigation of the incident and report from Sheriff Harbin which was promised but never delivered.  **(Plaintiff's Affidavit – Exhibit A), Plaintiff cannot present facts essential to fully document this paragraph  absent adequate time to obtain affidavits or take discovery and so states pursuant to Rule FRCP 56(d).**

123.  Plaintiff made repeated requests at city hall to view the city ordinances in their entirety and was repeatedly refused access.  Plaintiff requested that the city's attorney, Don Hoffman, instruct the Defendant Mary Pfeiffer that she should allow the Plaintiff to view the ordinances, and he said he would do that.  Defendant Mary Pfeiffer then began insisting that she didn't have time. **(Plaintiff's Affidavit – Exhibit A) (Plaintiff's letters to the Kansas Attorney General attached hereto as Exhibit D-J) .  Plaintiff cannot present facts essential to fully document this paragraph  absent adequate time to obtain affidavits or take discovery and so states pursuant to Rule FRCP 56(d).**

124.  The stated usual practice that is described in Defendant Pfeiffer's affidavit of presenting one ordinance at a time after a request for a specific ordinance  is not an adequate method of making the ordinances available for public inspection now or then.   These practices with regard to the ordinances are current and ongoing . **(Plaintiff's Affidavit – Exhibit A), Plaintiff cannot present facts essential to fully document this paragraph  absent adequate time to obtain affidavits or take discovery and so states pursuant to Rule FRCP 56(d).**

124.  Plaintiff's complaints of harrassment over the St. Fidelis sign incident, trailer parking,  bindweed eradication crimes and other matters which occurred during 2012 and 2013 were put in writing and sent to the Attorney General's office and are the best record Plaintiff has of these incidents. **Plaintiff will be requesting dash cam video of the sign incident in discovery. (Plaintiff's letters to the Kansas Attorney General attached hereto as Exhibit D through J) (Plaintiff's Affidavit – Exhibit A), Plaintiff cannot present facts essential to fully document this paragraph  absent adequate time to obtain affidavits or take discovery and so states pursuant to Rule  FRCP 56(d).**

125. The police reports provided to Plaintiff by the City are attached here in order  as Exhibits AA-ZZ. They all have the case numbers on the face of the document and can be identified with the case number. The police reports are included to show that the Plaintiff was most often confronted  with problems having to do with the residence by the Victoria Defendants as opposed to Robert Bentham who was also a resident at the house in Victoria with Plaintiff until 2013, and then by himself for the most part as a resident from 2014 until October of 2016.  The police reports show that the Victoria Police expected Plaintiff to deal with even thought Robert Bentham was the primary cause of most of the problems and had at least equal responsibility.for whatever went on at the residence.   This is to demonstrate the city defendant's bias against the Plaintiff.  Many of these incidents were the result of calls made by Robert Bentham and by Plaintiff's daughter  Sara to report the Plaintiff  to Police for failing to do what they wanted.    Both Bentham and Plaintiff's daughter Sara frequently attempted to control the Plaintiff by threatening to call the police if Plaintiff didn't do their bidding, and often did, just to prove they would. This family dynamic resulted in some impolite behavior toward anyone within earshot on the part of the Plaintiff.

**Into the Weeds.**

126.  On June 17, 2014 , within two years from Plaintiff's filing of this lawsuit,  Defendant Cole Dinkel issued to the Plaintiff a citation for violation of Victoria City Code 8-401., the city ordinance having to

do with weeds .   **(Exhibit R)**.  In the week prior,  Defendant Dinkel verbally told Plaintiff of a May 31,

2014 letter from the city which had been personally delivered to Robert Bentham

warning of the same.   Since that time, Plaintiff had been working on the yard to the best of her ability.

Plaintiff did not have a lawn mower or weed eater, as Bentham had been in charge of the property for

the previous two years, and had not bothered to maintain the yard equipment.    The only equipment

Plaintiff had available to work on the problem was a shovel.  Plaintiff did her best to cooperate with the

city's lawn manicuring standards, in spite of the unclear language of the ordinance.  Plaintiff had long

objected that her yard was not violative of the ordinance, as her growth exceeding twelve inches were

wildflowers, specifically Blue Flax, Echinachea, and Yellow Coneflowers.  Plaintiff planted these

wildflowers together with buffalo and blue grama grass as an attempt to conserve water and create a

colorful yard.  Cutting these flowers prematurely results in their death and non reseeding.  Plaintiff had

all of these items planted in the two foot strip between the sidewalk and the street and elsewhere in the

yard.  These flowers can grow as much as 18 inches high.  Plaintiff typically removed any volunteer

sunflowers as their heights of six feet or more can block driver's vision of the adjoining streets.  Despite

the questionable nature of the city's definitions of weeds, Plaintiff did her best to keep her yard within

reason as long as she was there.   Defendant Dinkell decribes as "bizarre" **(Police report #13-184 pg.**

**1)** Plaintiff's placement of these deeply rooted plants in the strip adjoining the street for the reason that

they resolved a washout problem  with the northwest corner of the lot. As rainwater ran down 10th

street, it took a left at the intersection with Cathedral, swirled in an eddy at the corner and hit the two

foot strip with enough force to wash it out for several feet, sometimes to a depth of a foot or more.

Plaintiff's plants there had a real function, which presumably lifted from the category of "weed".

Defendant Dinkel had no answer for this, or for his insistance on keeping all vegetation  in the yard

shorter than a foot, so he disparaged the Plaintiff in his police report, stating that the notion that the

plants might hold the soil was "very bizarre". He must have felt this was proof of his  notion fueled that

Plaintiff had a serious mental illness.  Defendant Dinkel stated in his police report that Plaintiff

objected to being cited when many of her neighhbors had not been, as they were in violation of the ordinance as interpreted by Defendant Dinkel.   Defendant Dinkel described this objection as a "rant", which was typical of his pejorative treatment of Plaintiff in all his writings.   In his report, Defendnat Dinkel details the visits that were made by him and  Defendant Mauch over the yard issue.   At each of these visits, Plaintiff asked Defendants Dinkel and Mauch for mercy, and explained to both that she had run out of blood pressure medication, it was extremely hot, Plaintiff didn't have the equipment to properly do the job, and that having to work in 100 degree heat in those conditions was inviting a stroke.  Plaintiff was essesntially begging Defendants Mauch and Dinkel to declare her yard good enough for now.   Plaintiff explained to Defendant Dinkel that she had at least one minor stroke, resulting in temporary blindness in one eye, and which led to Plaintiff's hypertension diagnosis for which blood medication was prescribed.  Defendant Dinkel seemed unfazed by this request, and continued to insist that Plaintiff's yard be brought to his exacting standards.   Plaintiff continued to attempt to bring her yard into Defendant Dinkel's idea of compliance with the ordinance.  On June 17, 2014, Defendant Ryan Mauch came to Plaintiff's house to issue another citation, this one for possessing an antique car belonging to Robert Bentham, which Bentham had placed in the back yard. While visiting with Mauch, Plaintiff asked him if he thought the yard was done well enough.   Plaintiff repeated her blood pressure and stroke concerns to Mauch and pointed to the extensive work she had done since arriving there.   Defendant Mauch told Plaintiff that he thought it was good enough. Defendant Dinkel stopped by later, and told Plaintiff that in spite of what Mauch had told here, that the vegetation along the street was still "too high" and that the wildflowers would all have to be cut down at that stage of the their development and therefore destroyed.  Plaintiff asked Defendant Mauch to let Defendant Dinkel know that he had told Plaintiff the yard was thinned enough.  Defendant Mauch responded and said, and Plaintiff can quote him from memory, that "I just got told that I am not the Health  and Safety Officer!".   This interaction between Plaintiff and Defendant Dinkel demonstrates the bias, animosity and targeting that Plaintiff was subjected to by Defendant Dinkel.  No mention of

Plaintiff's complaints of blood pressure issues are contained in any of Defendant Dinkel's reports, on the police report in the regard to the weeds, or in the DUI case which happened two days later, when Plaintiff had still been unable to acquire any blood pressure medication due to the demands of the Defendant Dinkel about her yard.    After the delivery of the May 31, 2014 warning letter to Boyd delivered by Mauch to Robert Bentham, no demands were made of  him for any action on the yard that he was in possession of for the previous two years.  This is one more example of the fact that the Defendant Dinkel would confront Plaintiff over matters which Robert Bentham should have been asked to rectify.  Citing Plaintiff over the car belonging to Bentham  was another blatant example of this fact. Plaintiff, upon being given the opportunity to actually read the ordinance that she was charged under, and the letter that had been delivered to Bentham, noted that the penalty for complying with the weed ordinance was that if it was not rectified in  a reasonable time, the city would go in and clean up the lot to its satisfaction, and then send the Plaintiff a bill for the work done.  Prior to that, Plaintiff was under the impression that the city was empowered to make a criminal charge or a big fine.  Plaintiff inquired of theDefendant Dinkel why, in light of her health and crazy veteran issues, they didn't just mow down the wildflowers  themselves and send her a bill.  This exchange occurred in the same conversation where Plaintiff informed Defendant Dinkel that his statements at the Sheriff's office regarding his refusal to transport her for medical treatment, and which Plaintiff believed was captured on the Sheriff's office DUI checklane audio/video, could cause him some problems.  With regard to mowing the lot, The Defendand Dinkel responded that they weren't going to "do it that way " and that Plaintiff was expected to deal with the vegetation issues  herself from Colorado, even though Bentham was using the house as a residence.      Two years later, Plaintiff demanded that Bentham vacate the residence, and in October of 2016, Bentham got a job and moved.   **(Plaintiff's letters to the Kansas  Attorney General attached hereto as Exhibit D through J) (Plaintiff's Affidavit – Exhibit A), Plaintiff cannot present facts essential to fully document this paragraph  absent adequate time to obtain affidavits or take discovery and so states pursuant to Rule  FRCP 56(d).**

127.  Plaintiff mailed by certified mail a demand letter to the city which gave written notice to the city of Victoria pursuant to K.S.A. 12-105b(d) on February 1, 2016.  The letter is contains a typo and is misdated as Feb. 1, 2015.  After receiving no response to the letter which satisfied the statutory requirements, Plaintiff sent a more concise and less wordy letter dated June 7, 2016 covering the same claims.  The February 1, 2016 letter was considered by Plaintiff to allow the required  time for the city to consider her claims prior to filing suit.  **(Plaintiff's Affidavit – Exhibit A),  Letter to City of Victoria – Exhibit N, and Letter to City of Victoria  Exhibit O.**

128.  Defendant Cole Dinkel had a conversation with Chris Rogers on about June 18, 2016, wherein Chief Dinkel told Chris Rogers that plaintiff was a bad person and that Rogers shouldn't be her house or help her.  **(Plaintiff's Affidavit – Exhibit A) Plaintiff cannot present facts essential to fully document this paragraph  absent adequate time to obtain affidavits or take discovery and so states pursuant to Rule  FRCP 56(d).**

ARGUMENT

### A notice of claim was timely filed

Plaintiff mailed by certified mail a demand letter to the city which gave written notice to the city of Victoria pursuant to K.S.A. 12-105b(d) on February 1, 2016.  The letter  contains a typo and is misdated as Feb. 1, 2015.   The certified mail receipt shows the correct date.  After receiving no response to the letter which satisfied the statutory requirements, Plaintiff sent a more concise and less wordy letter dated June 7, 2016 covering the same claims.  The February 1, 2016 letter was sent in time to fully comply with the statute and the Court has subject matter jurisdiction over the state law claims herein.

### This lawsuit was timely filed

Defendant Cole Dinkel's defamatory activities were on going as as of late June, 2016.  One example is the Chris Roger's traffic stop wherein Chief Dinkel told Rogers that Plaintiff was a "bad person" and that he shouldn't be helping her.  This conversation occurred approximately June 18, 2016.

Plaintiff was in Kansas for two or three weeks before June 19, 2014 and had several interactions with police in that time period.  In addition to the conversation with Rogers, Plaintiff was confronted about the yard and presented with tickets for the yard and the junk car between June 16, 2014 and June 19, 2014.  These confrontations were motivated by a desire to  harass and intimidate the  the Plaintiff to force her go back to Colorado, which was  a violation of Plaintiff's civil rights.   The Defendants did not confront the primary resident, Robert Bentham, about these issues, but only the Plaintiff in an ongoing demonstration that only Plaintiff would be held responsible for problems at the residence, and Bentham could do as he pleased.  These  incidents occurred with the statutes of limitations and are not time barred .   These dates and incidents are documented with city letters, tickets, and ordinances attached hereto as Plaintiff's **Exhibits  P, Q, R, S and T. (Plaintiff's Affidavit – Exhibit A).**

Defendants argue that the fact of a conspiracy among the Defendants does not toll the statutes of limitations on the federal claims because the conspiracy's purpose was realized more than 2 years before the case was filed, that no bad act occurred with 2 years of the filing of the case, and that Plaintiff failed to state a claim of conspiracy.  Plaintiff never had or demonstrated an intention to leave Victoria forever.   Plaintiff's house there  was never sold and is not presently listed for sale.    Many acts in furtherance of the conspiracy occurred after June 16, 2014 as described in the preceeding paragraph. The fact of the conspiracy was alleged in Plaintiff's complaint herein and a claim was plainly stated. **(Plaintiff's Affidavit – Exhibit A), Plaintiff cannot present facts essential to fully document this paragraph  absent adequate time to obtain affidavits or take discovery and so states pursuant to Rule  FRCP 56(d).**

Defendants state that the DUI arrest on June 19, 2014 involved no unconstitutional act by the Defendants.  Plaintiff alleged many unconstitutional acts in relation to that arrest, including refusal to transport plaintiff for medical care absent agreement plaintiff to pay for it, failure to advise plaintiff of her right to consult with an attorney after she completed a breathalyzer test, the fact the arrest was motivated by an unlawful purpose, among others.   Just because a person  is in fact guilty of a crime

does not excuse the defendants from violating Plaintiff's civil rights in the process of processing the criminal event, and does not make those violations acceptable or inactionable. **(Plaintiff's Affidavit – Exhibit A), Plaintiff cannot present facts essential to fully document this paragraph absent adequate time to obtain affidavits or take discovery and so states pursuant to Rule FRCP 56(d).**

### Plaintiff was harmed and alleged harm by Defendants' unlawful acts

Plaintiff's was harmed by Defendant's failure to advise of the right to consult with attorney between the breathalyzer and the blood test because Plaintiff lost the opportunity to bond out of jail that night.  By the time she was finally returned to the Sheriff's office, Plaintiff's son wasn't answering his phone for the evening.   Plaintiff experienced loss of vision due to that jail visit, from high blood pressure damage to her eyesight in addition to a lot of pain.  .  Plainitff had trauma due to her incarceration with a violent person.  Defendant Dinkel failed to fill a script provided at the ER for blood pressure meds and did not give the Discharge summary to the Jail personnel, which might have alleviated Plaintiff's blood pressure spikes.  Plaintiff was harmed by the Defendan'ts unlawful behavior, and her claim so stated.**(Plaintiff's Affidavit – Exhibit A), Plaintiff cannot present facts essential to fully document this paragraph absent adequate time to obtain affidavits or take discovery and so states pursuant to Rule FRCP 56(d).**

Defendants herein were clearly acting under color of law and within the scope of their employment.  Defendant Dinkel arrested the Plaintiff within the scope of his employment , and while holding Plaintiff a prisoner, refused to transport her for medical care.  It was his job to do so, and he failed to do so.  Defendant Mary Pfeifer's emloyment requires her to help people see ordinances. Refusing to perform that duty is clearly within the scope of her employment.  Everything that Plaintiff complains of was done or not done by the Defendants who were acting within the scope of their employment and under "color of law".  Defendants arguments along these lines simply ignore what the defendants were doing when they were doing it. **(Plaintiff's Affidavit – Exhibit A), Plaintiff cannot present facts essential to fully document this paragraph absent adequate time to obtain affidavits**

or take discovery and so states pursuant to Rule  FRCP 56(d).

## Freedom of Religion and Speech

The free exercise that defendant's denied the Plaintiff was the right to not have any religion and to be critical of the local church.   A bit of performace art done by the plaintiff carrying a cross in front of the church to symbolize Plaintiff's undue responsbility for a veteran was seen as heretical and noted as evidence of some type of wrongdoing by Defendant Dinkel.  Defendant Dinkel asked the person who told him of the cross bearing  to fill out a witness statement.  (**Page 2, Police Report 12-244**). Defendant Dinkel evidentally felt he needed to protect the church from any type of sacriligious comment.  Chief Dinkel and others had a very strong angry reaction to the yard sign.  Dinkel's statements that he was there to protect me were disingenous and did not match his apparent anger level. Plaintiff felt threatened and removed the sign.  Upon removing the sign, Defendant Dinkel stated that it was the "smartest thing she ever did", implying that having a sign critical of the church was not smart. Defendant Dinkel made a value judgment about my statement concerning religion in the course of his duties.  That violated Plaintiffs constitutionally protected speech and religious expression.

**(Plaintiff's Exhibit E)  (Plaintiff's Affidavit – Exhibit A), Plaintiff cannot present facts essential to fully document this paragraph  absent adequate time to obtain affidavits or take discovery and so states pursuant to Rule  FRCP 56(d).**

## Freedom of the Press

A citizen can't publish what a citizen can't see.  A citizen of Victoria, Kansas cannot see the city ordinances without them pre screened or designated as necessary to be seen by the city clerk.  The practices desribed by Defendants in regard to access to the ordinances is insufficient and unreasonable. Plaintiff was not allowed to view the ordinance books despite repeated attempts.   Plaintiff knows that other residents have had similar problems with getting access to the ordinances.  Defendant started putting its ordinances up on its website as they are being approved couple of years ago.  There is no reason that all could not be posted there if the clerk doesn't have time to supervise people with

ordinance books.  The entire practice is just another example of the overcontrolling and exclusive nature of the Victoria city government and is constitutionally inadequate.**(Plaintiff's Affidavit – Exhibit A), Plaintiff cannot present facts essential to fully document this paragraph  absent adequate time to obtain affidavits or take discovery and so states pursuant to Rule  FRCP 56(d).**

## Freedom of Assembly and Association

Defendant Dinkel told Chris Rogers to stay away from the Plaintiff for no Constitutionally acceptable reason.  Plaintiff's freedom to assemble with Chris Rogers was not allowed.   As for the right to petition the government, the right to petition assumes the right to receive a response.  Plaintiff complained to the city about various matters over the years and never received a substantive response.  The letters sent to the city outlining the grievances which led to this lawsuit were never answered.  **(Plaintiff's Affidavit – Exhibit A), Plaintiff cannot present facts essential to fully document this paragraph absent adequate time to obtain affidavits or take discovery and so states pursuant to Rule  FRCP 56(d).**

## Destruaction of Evidence

In Plaintiff's driver's license review hearing, the Defendant Dinkel testified that he the Plaintiff had not requested any type of medical care prior to arriving at the emergency room.  This is clearly not factual.  The Dash Cam CD#2 contains statements by Defendant Dinkel that make clear that Plaintiff had made the request.  This topic has been a big one, and not something that Defendant Dinkel would not have thought about before testifying.  He was willing to lie in Court to avoid the topic.  It is much of a stretch to assume that he might destroy evidence to do the same.  Plaintiff deserves the right to explore this concern in discovery.**(Plaintiff's Affidavit – Exhibit A), Plaintiff cannot present facts essential to fully document this paragraph  absent adequate time to obtain affidavits or take discovery and so states pursuant to Rule  FRCP 56(d).**

### Right to Counsel

Defendant Dinkel failed to advise the Plaintiff of her right to contact an attorney after the breathalyzer but before the blood test.  According to Dumler he should have done so.  Plaintiff was harmed as noted earlier. Dumler v. Kansas Dept. of Revenue, 302 Kan. 420, 354 P.3d 519 (July 24, 2015) (Johnson, J.) **(Plaintiff's Affidavit – Exhibit A), Plaintiff cannot present facts essential to fully document this paragraph  absent adequate time to obtain affidavits or take discovery and so states pursuant to Rule  FRCP 56(d).**

### Due Process

Plaintiff informed Defendant Dinkel and Defendant Mauch that she was having a problem with blood pressure and a lack of medication when they came over to confront the Plaintiff about her yard on or about June 14, 2014.     Plaintiff then developed and abscessed tooth which added to the problem.  Defendant Dinkel knew of these issues when he arrested the Plaintiff.   IT is well knows that extreme high blood pressure can cause strokes.   There was no emergency or compelling need to do the entire DUI investigation prior to addressing Plaintiff's medical needs.   Defendant Dinkel evidentally found it annoying or inconvenient and refused to help the Plaintiff, didn't document her condition on his police form, was very combative about requiring the Plaintiff to pay for it. At the very least, Plaintiff is entitled to have a jury hear the evidence and decide if Plaintiff's need for medical attention was such that the Defendant Dinkel should have provided it. **(Plaintiff's Affidavit – Exhibit A), Plaintiff cannot present facts essential to fully document this paragraph  absent adequate time to obtain affidavits or take discovery and so states pursuant to Rule  FRCP 56(d).**

### Municipal Liability

The City of Victoria  Police Department has no written policies or procedures, according to their response for those items in a discovery motion in the Plaintiff's early DUI hearings.   The Journal Entry from that hearing so stating is attached hereto as **Exhibit V,** wherin it states:  "The defendant is further

requesting all of the operating procedures for Victoria Police Department and current standard

operating procedures of all manuals and ordres by the Victoria Police Department.  The court is advised

these do not exist as it is a two man department and the court denies the request." This lack of

guidance with respect to the City's methods of policing invites arbitrary enforcement and lack or regard

for citizens civil rights.  If the only way that the city can be held liable is to show that it failed to follow

acceptable policies and procedures, but there are no written policies or procedures, then it would be

impossible to hold responsible for anything.  Defendants interpretation makes no sense and should be

disregarded.  **(Plaintiff's Affidavit – Exhibit A), Plaintiff cannot present facts essential to fully**

**document this paragraph  absent adequate time to obtain affidavits or take discovery and so**

**states pursuant to Rule  FRCP 56(d).**

## Qualified Immunity

Plaintiff clearly had the right to display a sign in her yard that was insulting to the church.  The

defendant's threatening and intimidating behavior in response as alleged by Plaintiff was  clearly

unlawful .  Plaintiff's right to express herself in that way is "clearly established".

Unless the City Defendants never heard of Fred Phelps, one would think that they would recognize the

clearly unlawful nature of attempts to chill Plaintiff's expression.  In this and in the other situations, the

individual defendants committed acts which were clearly in violation of Plaintiff's civil  rights and no

form immunity should be enjoyed by any of them.  At the very least, these are issues that should be

decided by a jury.  **(Plaintiff's Affidavit – Exhibit A), Plaintiff cannot present facts essential to fully**

**document this paragraph  absent adequate time to obtain affidavits or take discovery and so**

**states pursuant to Rule  FRCP 56(d).**

Defendants' counsel goes on to argue that the Individual Defendants should be excused from

liability because Plaintiff went out in her yard wearing men's cotton boxer shorts, which are

lightweight, cheap and come in a variety of colorful prints and pattern, and because she should have

been charged with kidnapping for trying to protect her grandson from being driven 90 miles by a

distraught and temporarily unfit mother.   This is illustrative of the City of Victoria's sensibilities.  In

any event, Plaintiff has alleged  and by her affidavit sworn to facts adequate to allow a jury to find that

her civil rights were violated.  Plaintiff has filed her own affidvait with this Response.  Unless Mayor

Unrein's affidavit is inherently more valuable than Plaintiff's affidavit, it should be up to a jury to

decide the facts of what actually happened.  **(Plaintiff's Affidavit – Exhibit A), Plaintiff cannot**

**present facts essential to fully document this paragraph  absent adequate time to obtain affidavits**

**or take discovery and so states pursuant to Rule  FRCP 56(d).**

The remaining issues brought up by the Defendants have been previously addressed in this

response.

CONCLUSION

As justified hereinabove, Lisa Boyd  requests that the Court deny the motion for summary judgment

Respectfully submitted,

/s/

_____
Lisa Boyd
Plaintiff Pro Se
807 Kansas Ave.
Walsenburg, CO  81089
(785) 259-9328
lisa.r.boyd@gmail.com

CERTIFICATE OF SERVICE

This will certify that the above and foregoing response to Defendant's Motion for Summary
Judgment was emailed to clerk for filing at KSD_Clerks_Topeka@ksd.uscourts.gov, to Allen
Glendenning at aglenden@scrf.com,  and to Jared Hiatt at jthiatt@cml-law.com this 1st day of May,
2017.