# M Gmail

Lisa Boyd <lisa.r.boyd@gmail.com>

## [FileSonic Helpdesk] Re: fraud charge on debit card (ticket #283619)
2 messages

**FileSonic Helpdesk** <helpdesk@filesonic.com>
Reply-To: FileSonic Helpdesk <helpdesk@filesonic.com>
To: Lisa R Boyd <lisa.r.boyd@gmail.com>

Thu, Mar 15, 2012 at 12:20 PM

## Please do not write below this line ##

 FileSonic.com

FileSonic Login

### Ticket #283619: fraud charge on debit card

Your request (#283619) has been resolved. To review the request, follow the link below:
http://helpdesk.filesonic.com/tickets/283619

**Carm, Mar 15 02:20 pm (EDT):**

Hello,

Thank you for your email. Please read through each of our help topics below carefully.

*********************************************************************************

Download problems:

All sharing functionality on FileSonic is now disabled. Users can only download files that they have personally uploaded.

*********************************************************************************

Affiliate program, earnings, statistics & payouts:

FileSonic no longer has an affiliate program and is no longer providing affiliate support. Users will not have access to view their dashboard, statistics, etc.

*********************************************************************************

Refunds and Cancellations:

If you wish to cancel your subscription, you may do so through the payment processor (Paypal, Credit card, Segpay, Alertpay or CCBill) you initially used to pay for your premium account.

******* Paypal ****************
If you have paid through PayPal please login into your PayPal account, find your transaction ID, view the recurring details and you will be able to cancel through there.

**PLAINTIFF'S EXHIBIT B-1**

******* Credit Card **************

If you have paid with credit card, you can cancel your recurring subscription using this link: http://www.filesonic.com/customer-support. Select credit card from the drop down menu and enter the required information. If you were receiving an application error previously, this has now been fixed.

******* Segpay **************

If you have paid through Segpay please cancel at this link: https://segpaycs.com/spsolo.aspx.

******* Alertpay **************

If you have paid through Alertpay, you may cancel your subscription by following these steps:

1. Login to your AlertPay account.
2. Click on "Profile".
3. Under "Financial", select "Subscriptions".
4. Select "Subscriptions Purchased" and find the subscription you wish to cancel. You can search by name, reference number or seller's email address.
5. Select the subscription, click "Cancel", then "Next".
6. Review details and click on "Finish".

******* CCBill **************

If you have paid through CCBill, please cancel at this link: https://support.ccbill.com/.

Thank you,
FileSonic Helpdesk

**Lisa R Boyd, Mar 14 06:00 pm (EDT):**

There was a charge on my debit card that was made and then refunded. i would like details if possible. The charge on my bank statement had an id number of 2004270000370 01/04 scpzg7b0r700
The refund (which I did not request, do you know who did) number was Visa Ref # 201274001235 01/12 - SCPZG7B0r700

Please tell me what you can or provide address if you require a subpoena

Thanks,

Lisa Boyd
1110 Cathedral
victoria, KS 67671
785-735-2879

---

www.FileSonic.com   |   This email is a service from FileSonic Helpdesk

Message-Id:BQAQ3Z0P_4f6233086d428_61b6147d26c406348b_sprut

---

**lisa boyd** <lisa.r.boyd@gmail.com>                           Thu, Mar 15, 2012 at 12:33 PM
To: FileSonic Helpdesk <helpdesk@filesonic.com>

I do not have login information,  I was never your actual customer.  The account was opened in my name in a fake transaction.  I am trying to find out who was the actual person who opened the account.  Do you have any information,

**PLAINTIFF'S EXHIBIT B-2**

such as what types of files were they storing?  I seem to be the victim of a smear campaign in that in the same month, some other person used same debit card info to purchase internet domain in my name with porn type name.  I am concerned there is potentially criminal content in whatever files were stored there in my name so I would like to be on record that I am not the actual owner of this information.  I would also like to know what information you have as far as the intial transaction and whatever you know about the person who signed up for this account.  IP number would be helpful?  I realize it is a proxy but it is a start, as is the information stored on your site.

Please give actual email response!!!  I do not want to go to a special place on your server.

[Quoted text hidden]

**PLAINTIFF'S EXHIBIT B-3**

 **Gmail**

Lisa Boyd <lisa.r.boyd@gmail.com>

## [Ticket ##175484820##] Your Skrill (Moneybookers) enquiry
4 messages

---

**www.moneybookers.com** <us-service@moneybookers.com>                    Thu, Feb 9, 2012 at 1:25 AM
To: lisa.r.boyd@gmail.com

Dear Lisa Boyd,

We are contacting you to follow up on our previous correspondence.

Further to our previous email message to you we are glad to inform you that the two payments you reported as
unauthorized for the amount of USD 21.50 each were successfully sent for refund to your credit/debit card. However
please note that it may take up to seven business days the respective amount to be credited to your card. Unlike
credit/debit card deposits, a refund to a credit/debit card is not an instant transfer.

In addition, please be kindly advised that we are still working on the other charges to be refunded back to your
credit/debit card. Once we have an update we will get back to you with a confirmation.

We hope you find this information useful. We are always available on your request, so please do not hesitate to
approach us should you have any questions.

Kind Regards,
Dave
The (Skrill) Moneybookers Team

---

 Moneybookers USA, Inc. 61 Broadway, New York, NY 10006, USA.

This email message is confidential and may contain legally privileged information. If you are not the intended recipient
you should not read, copy, distribute, disclose or otherwise use the information in this email.
Please also telephone (+1 800 238 9984) or fax (+1 509 271 5556) us immediately and delete the message from your
system. Email may be susceptible to data corruption, interception and unauthorised amendment, and we do not accept
liability for any such corruption, interception or amendment or the consequences thereof or your reliance on any
information contained therein if you are not the intended recipient.

---

**lisa boyd** <lisa.r.boyd@gmail.com>                                    Thu, Feb 9, 2012 at 10:12 AM
To: "www.moneybookers.com" <us-service@moneybookers.com>

Dave,
Thanks for these refunds.
Please advise what you can tell me about the person who received the
funds.  Can you give me a location, bank account or other identifying
info?  I would think you would like to be spared this hassle as much
as me, so what do we do about finding the punk that did this?

Thanks, Lisa
[Quoted text hidden]

---

**www.moneybookers.com** <us-service@moneybookers.com>                   Fri, Feb 10, 2012 at 9:35 AM
To: lisa.r.boyd@gmail.com

Dear Lisa Boyd,

Thank you for contacting Skrill (Moneybookers) Customer Service.

Further to your message, we would like to confirm that we shall be glad and are available to assist the authorities
engaged with your case in providing information regarding this issue and an eventual investigation. In case you

**PLAINTIFF'S EXHIBIT C-1**

forwarded the case to your local authorities, we should be able to provide them with all the information we have on file, once they contact us directly at security@moneybookers.com or by fax at +1 509 271 5556 with their official enquiry.

Please be advised as well that we have taken respective measures so that your card cannot be used in our system again.

We hope that you find the above information useful and apologize for any inconvenience caused.

Best Regards,
Dave
The Skrill (Moneybookers) Team
[Quoted text hidden]

---

**lisa boyd** <lisa.r.boyd@gmail.com>                                    Thu, Feb 23, 2012 at 6:02 PM
To: "www.moneybookers.com" <us-service@moneybookers.com>

Dear Dave:

I checked with my police department in Victoria, Kansas, today, and they inform, that they faxed a request for information to you on this matter, but to date have received no response.

Please advise where, and how these transactions were attempted and whatever other information you can provide, with IP addresses if possible, and any other details you have available.  I note you are licensed by the State of Kansas and assume that you would like to maintain that status.

Sincerely,

Lisa Boyd
1110 Cathedral
Victoria, KS  67671
[Quoted text hidden]

**PLAINTIFF'S EXHIBIT C-2**

3/19/2016    .            Gmail - Investigation request of civil rights violations by Lisa Boyd and Robert Bentham



Lisa Boyd <lisa.r.boyd@gmail.com>

## Investigation request of civil rights violations by Lisa Boyd and Robert Bentham

**lisa boyd** <lisa.r.boyd@gmail.com>                                Mon, Feb 11, 2013 at 3:31 PM
To: cprotect@ksag.org

February 11, 2013

Derek Schmidt
Office of the Attorney General/Biased Policing
120 SW 10th Ave., 2nd Floor
Topeka, KS 66612-1597

FAX: (785) 291-3699

Re:  Request intervention in State v. Lisa Boyd, Ellis County Kansas
and investigation request

Dear Attorney General Schmidt:

This is to accompany the Investigative Request form a scanned copy of
which is included as an attachment.  The following is a description of
the transaction(s) where I am complaining that my civil rights were
violated.

I have lived in Victoria, Kansas for the past 15 years.

Approximately 3 years ago, I was told by a Victoria resident that he
had seen an ordinance which he interpreted to mean that Victoria
zoning ordinances prohibited the building of a church or the holding
of church services by any church entity other than St. Fidelis, as the
only previously existing church in the city limits.  I was not really
persuaded that this ordinance existed, but I was curious enough to try
to find whatever my friend might have been referring to.  So, I went
to the city office and requested to see the city ordinances.  The
clerk, Mary Pfiefer, wanted to know which ordinance, specifically, I
wanted to see.  I of course did not have that information, so I asked
to see an index.  I was informed there was no such thing as an index.
I began to get the impression that she just didn't want to cooperate
with me and let me see the ordinances, so I gave up, for a time.  I
did make another request approximately 2 years ago, and got the same
response.  I asked to see them again last summer, and instead of
showing them to me after having 3 years to get them organized and/or
indexed, she instead trumped up a charge of disorderly conduct, and
solicited the cooperation of her fellow city office employee to make
an exaggerated report.  Whereupon, Chief Dinkel furthered the
conspiracy to deprive me of my civil rights to view the city
ordinances by having me arrested and taken into custody.    This
arrest was one of many unjustified contacts and visits by Chief Dinkel
which were designed to intimate me and harass me for the purpose of
convincing me that I should move from the city.

I need to digress a bit to explain why I believe that some persons who

**PLAINTIFF'S EXHIBIT D-1**

run the city of Victoria decided to attempt to make me miserable
enough to leave town.

I am not a Catholic.  The great majority of the town is Catholic.  I
am not a big fan of misogyny.  The culture of this town is highly
misogynistic.  I do live with a combat veteran of the U.S. Army and
Army Reserve, who tends to act bitterly at times about his military
experiences,  which attitude conflicts with the local cultural
admonition against complaining about things which are one's own fault,
such as what happens to a person dumb enough to enlist for military
service.  The Prussian Catholics (a/k/a Volga Germans) who dominate
the cultural mores of this community left Russia to emigrate to the
U.S.  because the Czarina was going back on a promise to exempt the
group from military conscription.   As such, Victoria has a cultural
bias against the military.  In addition to that centuries old cultural
history, there was an Air Force Base constructed 4 miles east of here
in WWII, which made the place a bit of a boom town, and brought with
it strippers, gambling, and other scourges which seem to accompany
military installations.  The local Germans and Japanese were not
favorite cultural groups in the U.S. during WWII for obvious reasons.
  The local Prussian/German residents resented having their culture
polluted by the Air Force members who were bombing their relatives
back in Germany, and who looked down on many  them because of their
German ethnicity.

Despite the fact that I have mostly German blood myself, my ancestors
emigrated from the actual Fatherland.  Not Russia.  Unbeknownst to me
when I moved here,
I am not a good fit to get along with most of the Russians who call
themselves Germans from around here.  Fifteen years ago, before I
fully appreciated that fact, I  dumped money into a house here that I
will never recover by selling it.   Years later, I also invested quite
a bit of money into a beauty salon which was intended to provide my
daughter, who is a hairdresser, a place to work, and I hoped down the
road, a bit of income for myself.  I am getting to the age where
capital is not so easy to come by and I really can't afford to be
driven away from investments I have made by a group of locals
dedicated to their ethnic Russian Catholic purity.

Based on my experiences of last summer I believe that certain
individuals in Victoria city government conspired to engage in a
course of action designed to drive Robert Bentham and myself out of
the city.  One or the other of the main two police officers in
Victoria came to my house approximately 20 times in first 8 months of
2012, with most of the visits occurring during the summer, after my
daughter made a decision to move with her son to Salina in August,
2012.  Until that point, some city employees including Mary Pfiefer,
the city clerk, and Ryan Hauck, a Victoria Police officer, were salon
customers of Sara.  They accepted Sara, apparently because she
couldn't help who her mother was.  And they were more than happy to
drive a wedge as deeply as possible.  When Sara made it known that she
was giving up on living here and leaving, the local cabal seemed to
let go the hounds and engaged in a calculated effort to harass Robert
and me to the point of leaving.

Sara's stated reason for leaving here was because she felt that the
people who run the town disapproved of Robert and myself so much that
she didn't believe her son would be able to attend school here with
any degree of  acceptance.  Based on reports I've heard from many
other people with experience with the local school, this is not at all
an unreasonable fear for any outsider, much less an outsider as

**PLAINTIFF'S EXHIBIT D-2**

disliked as I seem to be. Sara told me in July of 2012 that Cole Dinkel, the Police Chief, made statements which she interpreted to mean that she would get more business if she "found another babysitter" because most of the people here did not approve of me as a fit babysitter for a child.   This statement came shortly after I had to ask the local police to intervene in a domestic problem between Robert and myself, which involved what basically amounted to a shoving match, that I wasn't interested in seeing go unaddressed.  Sara told me that she had other customers who told her flatly that they would not do business with her if she included me in her daily life, due to gossip that was no doubt fueled by the city folks.  Sara acted on these pronouncements, and had been living in the back of the salon for a number of months and driving her son to Hays every day to take him to the Hays Children's Center for daycare.  Before that, I had been the primary caregiver for Gabriel, my grandson,  while she was at work.   He never seemed to be any worse for my care, but Sara seemed to be convinced that her ability to get customers depended on removing him from my influence.  Sara's mental state is not particularly stable, in that she seems to have some hormonal storms that skew her judgment to a large degree.   And when her worst delusional fears get fed by the local police chief and city clerk, my life isn't made any easier.

During the spring/summer of 2012, I received police visits for the following reasons:

I had a car trailer parked on 12th street beside my house, the back end of which was at least 30 feet from the intersection with Cathedral Street.   The trailer has been the subject of police visits by Cole Dinkel in the past.  Before, he came by and wanted it moved because it was not attached to a truck, but was blocked up to prevent it from rolling.  Nevertheless, that apparently is against some kind of city ordinance, and I was given a warning to keep the trailer attached to the truck if parked at the curb.  And even though there are numerous obvious instances of other residents who park trailers at the curb without being hooked up to a truck, we complied and hooked the trailer up to the truck.   Cole visited twice  in 2012 to tell me I needed to park the truck/trailer combo elsewhere even though it was legally parked on 12th Street.  He claimed that it presented some kind of visual obstruction, even though the trailer sits only about 3 feet off the ground, and presents no visual barrier.   These visits about the trailer were for the purpose of harassing me, and not about safe trailer parking.  Nevertheless, I complied, moved the trailer off the street and parked the trailer in my yard, where it remains.  I have a hard time knowing if the trailer is parked illegally, really, or if I am just being harassed about it, because it is impossible to get a look at the city ordinances, because Mary Pfiefer is apparently dedicated to keeping them all to herself.

In between the trailer visits, Cole Dinkel and Mary Pfiefer decided to ramp up the intimidation by soliciting a complaint and then ordering me off a vacant lot where I was attempting to get rid of a very bad infestation of bindweed.  The bindweed in this area is very entrenched in the older areas of town, and is not well controlled by the property owners because it is very hard to kill.  I had been trying every year to get the bindweed on my lot under control for over 10 years.  In 2011 I started using a herbicide on my lot which seemed to be quite effective.  I had an idea that I might be able to make some money by selling my services to others in town who suffer from the bindweed scourge.  I wanted to demonstrate the effectiveness of the herbicide, so I set out to see if I could control the weed on one of the worst

**PLAINTIFF'S EXHIBIT D-3**

infested blocks in town, which is directly to the west of me.  I got
permission from some of the residents of that block.  I wanted to
treat the empty lot so that it didn't reinfest the rest of the area.
There is a state statute that says that landowners have a duty to at
least attempt control of the bindweed.  I did look up ownership of the
lot before I went on it and saw that it was owned by an Illinois
resident.  The lot was being mowed, but not sprayed, by some local
kids.  I saw them there one day, and let them know that I had sprayed
it, and told them that if they ever saw that it was wet, they should
stay off it until it dried, as per the herbicide instructions.  They
seemed annoyed by that (outsider women here are not allowed to tell
males of any age how or when to do anything whatsoever).  A couple of
weeks later, I went to spray it again and Cole Dinkel rolled up and
told me that I had to get off the property.  He stated that the owner
had complained specifically about me being there.  He did not reveal
that the city clerk had elicited that complaint, but I was reasonably
suspicious that she had, so I set out to find out.   I managed to
track down the landowner, and he stated that the city clerk had called
him and told him that I was dumping waste oil on his property, and she
wanted to know if he wanted them to order me off the property, which,
understandably,  he did.  I told him I was just spraying bindweed, and
he told me that he did not understand that is what I was doing,
because the city clerk had called him and told him I was doing
something bad, but since he understood now it was okay with him if I
sprayed the property.  Another witness to this whole episode was the
Ellis county weed supervisor, who I called in the  midst of this
conflict to ask him to try to reason with Chief Dinkel about not
getting in the way of volunteer efforts to deal with noxious weeds.
He said that he would and I can only assume he did.  Chief Dinkel
seemed to get even more hostile after that.

Another visit from Chief Dinkel  late in the summer was due to a
miniature horse that had been grazing in the back yard for
approximately 3 hours.  The horse belonged to a relative of my
boyfriend Robert.  The horse had been neglected and was starving and
without water.  Robert rescued the horse and determined to find it a
home since his relative had abandoned it by refusing to feed it.  He
put it in our backyard where we had some grass and shade, rare
anywhere last summer due to the drought.  We had nowhere else to put
the horse at that moment, and it needed food and water.  Cole advised
us that despite those facts, we had to get rid of the horse by
sundown.  It did manage to survive the move, and the horse is now a
friend to a bunch of developmentally disabled persons who live in a
group home on a farm south of here.  What I want to note about this
episode is that Cole didn't offer to help us find a solution for the
starving neglected horse problem, he was only interested that the
horse leave by sundown, per the city ordinance, assuming there is one,
which is impossible to know, since no one is allowed to read them.

A major factor in the entire summer's drama was occasioned by city
clerk Mary Pfiefer's prospective daughter in law's soon to be
graduation from the Hays Beauty school, and Pfiefer's apparent desire
to provide her with a beauty shop all fixed up and ready to go.
When my daughter Sara announced that she was going to give up on the
salon and move back to Salina, I was distressed due to the money I had
invested in the business, along with improvements to the leasehold
that would be wasted.  I decided to try to carry on the business
without Sara, and set out to find someone who would sublease it or who
would work for me (or Sara and me if Sara decided she wanted to
cooperate).  So, in June or July I called the Hays Academy of Hair
Design and asked if they knew of anyone who would be interested.  They

**PLAINTIFF'S EXHIBIT D-5**

city clerk's office.     When I got there, Mary informed me that I
had to get the report from the police department. I decided that, as
long as I was there, I was going to ask about seeing the ordinances
again. I was inquiring about Maria initially. Mary overheard me asking
and came to the window. She was very rude about the fact that she did
not have time to sit with me while I looked at the ordinances. I
responded that it wasn't necessary for her to drop everything to
supervise me while I read them, and that I wasn't planning on going
anywhere with them. Her impatience seemed to get worse and she
demanded that I leave. I argued a bit about that, and said that she
had several years to get around to letting me view them, and I thought
that I had waited long enough. She picked up the phone and called
police. I turned around and left. I was met by Ryan as I was going
home. I pulled over, and he put me in handcuffs and sat me in the
patrol truck in the son in 105 degree heat with the windows rolled up
while he talked to Chief Dinkel for what seemed like 15 minutes. I
had to bang on the window to get his attention after the truck was
becoming extremely hot. He came and apologized for that, but stated
that Dinkel had directed him to arrest me and take me to Hays. Which
he did.

The upshot of all of this, is that there was no disorderly conduct on
my part. Mary was embarrassed that her underhanded tactics and
encouragements to others to engage in underhanded tactics were exposed
and she knew I knew what they were up to. She knew I had reason to be
mad because of actions that she had undertaken and which had piled up
to an extent impossible to deny. If she was afraid of me the day I
was arrested, it is not because of anything I did, it was about her
guilty conscience.

The final series of incidents had to do with a yard sign that I
erected in part to protest the cities harassment, and in part to
demonstrate that they have no problem trampling the civil rights of
anyone they don't like. I must say they cooperated beautifully with
this effort.

After I was wrongfully arrested, I decided that I was going to make a
very public  statement because they were not going to stop harassing
me otherwise.  It could be reasonably argued that I shot myself in
the foot, and maybe I did, but I also succeeded in demonstrating their
malice beyond doubt.  On a couple of occasions during the summer
visits from the police, I told Cole that if they didn't stop, I was
going to erect a yard sign that some people in the city were going to
find displeasing. I really didn't have any particular message in
mind. But my boyfriend Robert had something he had been wanting to
get off his chest for awhile. The day after I got back from jail, I
asked him what message he wanted to convey. Here is what he chose:

"Welcome to Victoria, Home of St. Fidelis, Patron Saint of Pedophiles."

In addition to having a first amendment right to make this
announcement, he had a personal factual basis. He attended school and
church here as a child and he says he was assaulted by a priest. He
has been making this claim as long as I have known him for twenty
years.

As you might imagine, it didn't take long for some residents to notice
the sign and call the police. Cole sent Ryan over, who brought out
his measuring stick and told me that  one of those mysterious
ordinances prohibited signage so close to the street. So, I complied
and moved it back a few feet. A few minutes later, Chief Dinkel

**PLAINTIFF'S EXHIBIT D-6**

showed up and parked in front of the sign, evidently to demonstrate to the residents that he was doing something about the problem. After he sat there for a long while, I asked him what the problem was, and he stated that he was there to protect us because he had received various threats to our safety because of the sign. He would not identify the persons who had made these threats to our safety, however. Various others were showing up, including a Sheriff's officer, Tom Garner, and the mayor, Curt Unrein. I was encouraged that we would then be having a conversation about what had gone on all summer long and was in hopes that the council would be made aware of the apparent effort to run us out of time for being a veteran family with some problems who aren't Catholics. So, I put the sign down for the evening. Cole said triumphantly, "that is the smartest thing you have ever done." The next day, it became apparent that my protest had fallen on unsympathetic ears, so the sign went back up.

My boyfriend Robert was trying not to get arrested so he stayed in the house during most of these conversations. He was photographing the incident, however, and saw Chief Dinkel getting agitated an moved toward me shaking his finger in my face. Robert came outside at which point Chief Dinkel ordered him back in the house. Robert did not immediately comply, and Chief Dinkel approached him and acted like he was going to get physical, at which point, Ryan Mauch and Tom Garner yelled at him that his "dash cam" was on, apparently as a warning not to get rough with Robert. He backed off at that point, and I talked Robert into going back into the house. Robert did take a couple of photos which I will email, which show Chief Dinkel, Officer Ryan Mauch and Mayor Curt Unrein on 12th street discussing the situation next to my house.

During one of these sign events, Cole stated "I'm not going to let you do that to my church." I figured that if they didn't allow me the peaceable enjoyment of my property, I could just as easily deny them theirs. But, my rights are not as right as the Volga Germans, apparently, and Cole Dinkel and Curt Unrein, committed acts which were intended to chill my free speech. Cole Dinkel threatened me by either falsely stating that there were people in town who had threatened to do me harm if I left the sign up, or truthfully stating it, and then jeapordizing my safety by failing to arrest or at least identify those persons who were making criminal threats. Curt Unrein and Councilwoman Jan Piesker were both made aware of that and refused to instruct Chief Dinkel to identify the person making threats. Jan Piesker had a sheriff's officer and Cole Dinkel come to my house to demand that I stop calling her in an attempt to resolve these conflicts. For the record, I've talked with her in past several years less that ten times, and she initally agreed to talk to the city council about the cities apparent disregard of veteran issues, but when things got too intense, she said her blood pressure was troubling her and that she was unable to do that. She is however, running again for a spot on the council, despite her precarious medical situation.

I would really appreciate it if you would not let them get away with this. Mary Pfiefer, Maria Drieling, Cole Dinkel, Curt Unrein and Jan Piesker have conspired to deny me of my civil rights. Please ask the Ellis County District Court to suspend the criminal prosecution of me for alleged disorderly conduct, then investigate my civil rights complaints in this matter, ask well as those of Robert Bentham, who has asked me to request the same, and to hold those guilty of violating our constitutional rights accountable for the same.

**PLAINTIFF'S EXHIBIT D-7**



**State of Kansas**
## Office of the Attorney General
### CONSUMER PROTECTION DIVISION
120 SW 10TH STREET, SUITE 430
TOPEKA, KANSAS 66612-1597
PHONE: (785) 296-3751
TOLL-FREE IN KANSAS: 1-800-432-2310

**DEREK SCHMIDT**
ATTORNEY GENERAL

## INVESTIGATIVE REQUEST

WEBSITE:
WWW.KSAG.ORG

---

INFORMATION ABOUT THE CONSUMER
(SIGNATURE ON BACK REQUIRED)

INFORMATION ABOUT THE COMPANY
YOU ARE REQUESTING WE INVESTIGATE

NAME: Mr. (Ms.) Mrs.  **Lisa Boyd**   DATE OF BIRTH: **3.26-57**

COMPANY NAME: **Various employees**

ADDRESS: **1110 Cathedral**   APT. #

ADDRESS: **and officals of the**

CITY, STATE, ZIP, COUNTY: **Victoria KS 67671**

CITY, STATE, ZIP: **City of Victoria, KS**

DAYTIME PHONE #: **785 735 2879**
REGISTERED ON NO CALL?   YES   NO

PHONE #: **Including Cole Dinkel, Mary Pfeifer, Mark Dreiling, Curt**

EMAIL ADDRESS: **lisa.r.boyd@gmail.com**

SALESPERSON: **Unrein and Jon Dreher.**
CONTACT PERSON:

---

INFORMATION ABOUT THE TRANSACTION

DATE OF TRANSACTION:                COUNTY/PLACE OF TRANSACTION:

DID YOU SIGN A CONTRACT?   DATE SIGNED:   DID YOU HAVE A VERBAL AGREEMENT?

PRODUCT OR SERVICE INVOLVED: **Please see attached Summary**

AMOUNT PAID: $_____   PAID BY: ___ CASH ___ CHECK ___ CREDIT CARD ___ LOAN ___ DIRECT DEPOSIT/TRANSFER

ARE YOU MAKING PAYMENTS ON A CONTRACT, CREDIT CARD, OR OTHER PAYMENT PLAN PURSUANT TO THIS TRANSACTION? _____ IF SO, LIST THE COMPANY NAME, ADDRESS, AMOUNT(S) PAID, & YOUR ACCOUNT NUMBER:

FIRST CONTACT BETWEEN YOU & THE COMPANY:
___ PERSON CAME TO MY HOME
___ I TELEPHONED THE COMPANY
___ I RESPONDED TO A RADIO/TV AD/MAILING
___ I WENT TO THE COMPANY'S PLACE OF BUSINESS
___ I RECEIVED A TELEPHONE CALL FROM THE COMPANY
___ OTHER (EXPLAIN)

WHERE DID THE TRANSACTION TAKE PLACE?
___ OVER THE PHONE
___ AT HOME
___ AT THE COMPANY
___ BY MAIL
___ INTERNET TRANSACTION
___ OTHER (EXPLAIN)

---

I AM A:
___ INDIVIDUAL
___ FAMILY PARTNERSHIP
___ CORPORATION
___ SOLE-PROPRIETOR
___ PARTNERSHIP
___ LLC (IF SO, ARE ANY MEMBERS OF THE LLC NON-FAMILY MEMBERS?) YES OR NO

HOW COULD THIS HARM BE REMEDIED?
___ REFUND $_____
___ SERVICE PREFORMED
___ PRODUCT DELIVERY
___ OTHER
SPECIFY SERVICE PREFORMED:

---

PLEASE COMPLETE BOTH SIDES

**PLAINTIFF'S EXHIBIT G-1**

## ACTION YOU HAVE TAKEN

HAVE YOU CONTACTED THE COMPANY?_____DESCRIBE RESULT OR EXPLAIN WHY YOU HAVE NOT CONTACTED THE COMPANY:

HAVE YOU FILED A COMPLAINT WITH THE BETTER BUSINESS BUREAU OR ANY OTHER AGENCIES?_____

WHAT RESPONSE HAVE YOU RECEIVED?

DO YOU KNOW OF OTHERS WITH SIMILAR EXPERIENCES WITH THIS SUPPLIER?_____

HAVE YOU SOUGHT THE ADVICE OF AN ATTORNEY REGARDING THIS TRANSACTION?_____ WHO IS THE ATTORNEY?

HAS LEGAL ACTION BEEN TAKEN BY YOU OR AGAINST YOU WITH REGARD TO THIS TRANSACTION?_____ IF SO, PLEASE DESCRIBE THE CURRENT STATUS OF ANY LEGAL ACTION:

ARE YOU CONSIDERING FILING AN ACTION IN SMALL CLAIMS COURT?

## DESCRIPTION OF TRANSACTION

PLEASE DESCRIBE THE TRANSACTION IN CHRONOLOGICAL ORDER (ADD ADDITIONAL PAGES AS NECESSARY).

*Please see emailed Summary*

## DOCUMENTATION OF THE TRANSACTION

PLEASE PROVIDE COPIES OF ALL DOCUMENTS RELEVANT TO THIS TRANSACTION, INCLUDING ADVERTISING MATERIAL, CONTRACTS, WARRANTY INFORMATION, RECEIPTS, LETTERS, CHECKS (FRONT AND BACK), PHOTOGRAPHS, BILLS, AND INVOICES, ETC. FAILURE TO PROVIDE ALL RELEVANT DOCUMENTS MAY CAUSE UNNECESSARY DELAY IN THE HANDLING OF YOUR REQUEST.

## VERIFICATION

I AM: _____ OV_____

_____ NON-ENGLISH SPEAKING

IN FILING THIS REQUEST, I UNDERSTAND AND AGREE THAT THE ATTORNEY GENERAL AND HIS STAFF ARE NOT MY PRIVATE ATTORNEYS, BUT INSTEAD REPRESENT THE STATE OF KANSAS IN ENFORCING LAWS DESIGNED TO PROTECT THE PUBLIC FROM DECEPTIVE AND UNCONSCIONABLE BUSINESS ACTS AND PRACTICES. I UNDERSTAND THAT KANSAS LAW LIMITS THE PERIOD OF TIME DURING WHICH I MAY FILE ANY PRIVATE LEGAL ACTION(S). I FURTHER UNDERSTAND AND AGREE THAT THE CONTENTS OF THIS REQUEST MAY BE FORWARDED TO THE BUSINESS OR PERSON THE REQUEST IS DIRECT AGAINST, MAY BE FORWARDED TO OTHER APPROPRIATE AGENCIES, AND WILL BECOME ACCESSIBLE TO OTHERS UNDER THE KANSAS OPEN RECORDS ACT. I HEREBY AUTHORIZE ANY PARTY TO WHOM THE ATTORNEY GENERAL DIRECTS THIS COMPLAINT TO RELEASE ANY AND ALL INFORMATION ABOUT THIS MATTER, INCLUDING ACCOUNT INFORMATION, TO THE KANSAS ATTORNEY GENERAL'S OFFICE. FINALLY, I DECLARE AND VERIFY UNDER PENALTY OF PERJURY AND THE LAWS OF KANSAS THAT ALL OF THE FOREGOING IS TRUE AND CORRECT TO THE BEST OF MY KNOWLEDGE.

_____        2-11-2013
SIGNATURE OF COMPLAINANT (REQUIRED)        DATE

**PLAINTIFF'S EXHIBIT G-2**

Complaint of Racial or Other Biased Based Policing

**Description of Incident.** Please describe in detail what happened, including any statements made, and why you believe the law enforcement officer unreasonably considered race, ethnicity, national origin, gender or religion in deciding to make the stop or other enforcement action. Use additional pages if necessary.

Please see email to cprotect.ksag.org from Lisa Boyd dated 2-11-13

See submitted Statement.

**I verify under penalty of perjury that the foregoing is true and correct.**

Executed on the 12th day of February , 20 13 .

Name: (printed) Lisa Boyd and Robert Bentham

Signature: _____

**If prepared by a person other than the complainant:**

Preparer's Name: (printed) Lisa Boyd

Signature: _____

3

**PLAINTIFF'S EXHIBIT G-3**



Lisa Boyd <lisa.r.boyd@gmail.com>

## CP-13-484

**lisa boyd** <lisa.r.boyd@gmail.com>
To: cprotect <cprotect@ksag.org>

Thu, Feb 28, 2013 at 1:41 PM

Dear Kathryn:

Thank you for your letter of 2-25-13.  I want to add something to my previous writings.

Last fall, I managed to find someone to take over the hair salon which I have leased on main street.
Stacy Williams is now attempting to recover the business on a percentage split arrangement.  She has not yet paid me enough to cover expenses, as the whole episode of last summer/fall took a major toll on what was left of the business, but she seems to be making good progress so I am hoping it will eventually recover.  Stacy and Carlin can be reached by calling Tresses Salon during 10-5, Wed thru Friday, at 785-735-2435.

Stacy and Carlin were witness to an incident which I believe involved Wilmer Dinkel, who is a jailer for the Ellis County Jail.  Wilmer is Cole Dinkel's father, a sheriff's dept employee, and the owner of a horse barn south of town.

A day or two after I erected the sign in the yard for the first time, Stacy and Carlin opened the shop for Stacy's first day of business.  Their opening day had been announced by a sign on the shop window so the community was apprised of the event.  On the morning they were to open, Stacy and Carlin found a fresh pile of horse manure directly in front of the shop.  I'm not certain if it was on the street at the curb, or on the sidewalk.  But, whereever it was located, Carlin was immediately of the impression that it was an "unwelcome" sign that had been deliberately placed there.  Carlin was unaware of Wilmer's connection to anything.   The only person in town who owns a horse that I ever see riding a horse is Wilmer Dinkel.
[Quoted text hidden]

**PLAINTIFF'S EXHIBIT H-1**

 Gmail                                      Lisa Boyd <lisa.r.boyd@gmail.com>

## Lisa Boyd/City of Victoria/Apple I-Tunes
1 message

**lisa boyd** <lisa.r.boyd@gmail.com>                          Mon, Mar 11, 2013 at 9:09 AM
To: cprotect <cprotect@ksag.org>

Attn: Kathryn Carter

Dear Kathryn:
I wanted to add something in regard to the above.  I should have
already noted that around a year ago I had a problem with a stolen
bank debit card.  I could not get Cole Dinkel to go over to the bank
to request a subpoena in that matter, or to follow up with a police
report.

I made a complaint about the issue to numerous agencies, but I don't
think I talked to the AG's office about the problem.  One of stolen
items on the debit card Apple I-Tunes, and I had another problem  a
debit card stolen to purchase I-Tunes again this month.  A checking
account I have for the Tresses Salon business with Sunflower Bank has
a debit card attached to it which card was appropriated by someone to
purchase I-Tunes through Apple's website in February and March of this
year.   This exact problem happened to me on my personal account at
Sunflower with a different debit card approximately a year ago,
wherein Cole refused to file a report or request a subpoena.   Apple
initially says they cannot identify the person who ordered the I-tunes
from the debit card reference number, then after pressing, Applie says
they will only release the info upon receipt of a subpoena.  This is
the same road I went down with Cole.  I was never able to find out who
used my debit card a year ago, because Cole would not follow up on my
complaint.

This email is for two purposes.  One is to further document my problem
with Cole.  Two, is that I think you should consider having the KBI
have their cybercrimes unit look into the issue with Apple.  The
problem that I would like them to consider is that Apple is taking
undue advantage of the situation and perpetuating it because they make
money off the crime.  Apple knows that people have a problem for one
reason or another getting a subpoena, so a large percentage of the
criminals go unidentified.  Parents hesitate to request investigations
to begin with because they fear that the person is related to them,
and they don't want the investigation to lead to a criminal complaint
against their child. Also, as with Cole, local police thinks its a
nuisance type of complaint and you have to be somebody they like to
get anything done on it.  I think Apple and some other companies
understand that people have trouble getting subpoenaes, , which is the
real reason they refuse to identify the recipient of goods off your
own credit card without a subpoena.  I am hoping you will accept this
email as a request for investigation on the Apple I-Tunes matter.  If
not, please advise what procedure I can follow.  I did complain
initailiy along with some other things to the Consumer Protection
Financial Board, (a federal agency), and the OCC, the federal outfit
that regulates banks.  Its been over a year and neither agency has
done anything.  So, if you have time, please follow this up.

Thanks,
Lisa

**PLAINTIFF'S EXHIBIT I-1**

 **Gmail**                                    Lisa Boyd <lisa.r.boyd@gmail.com>

## Lisa Boyd/City of Victoria
2 messages

**lisa boyd** <lisa.r.boyd@gmail.com>                    Sat, Mar 23, 2013 at 8:30 AM
To: cprotect <cprotect@ksag.org>

To: Kathryn Carter Special Agent/Trainer

Dear Kathryn:

We had an incident last week that brought to mind another incident I
need to reduce to writing.

A few years ago, 2009 or 2010, the salon (Tresses at 405 Main,
Victoria) was broken into and burglarized two times. Each time the
thief got around $150 in cash. I reported the incident. My
daughter and I were considered as victims of that crime in a criminal
case which resulted in the conviction of Chris Rogers, who lived here
in Victoria. I was an acquaintance of Chris when the burglary
occurred. It is my understanding that Chris was badly injured in an
accident and developed an opiate addiction. When his scripts ran out,
his addiction didn't, and he started stealing to pay for his habit.

When the Victoria Police were investigating the crime, they searched
Chris Roger's residence. At that time they found several hundred
dollars in cash and coins. Cole Dinkel told me that he was holding
that cash as evidence until the case was resolved. I informed Cole
that I considered that cash to be our stolen property. He responded
that it was no doubt commingled with money that was also stolen from
Brungardt Package (Liquor) store, and possibly other victims.

My daughter and I were notified of the opportunity to claim
restitution in his criminal case. We did not participate. Still, I
thought I had a claim to the stolen cash, if nobody else had
officially claimed it. So, I asked Cole about it several times. His
response as to what happened to the cash was vague. I thought I was
entitled to know what actually happened to the cash, because I
suspected it probably wasn't properly dealt with, because that is how
they are around here. Cole felt I had no right to know what happened
to it, and basically dared me to go ask somebody else to make him
account for it.

He never did account for it. So I am asking you to make Cole Dinkel
account for the cash that they recovered in the search of Chris Rogers
residence, as a part of this investigation.

What happened last week to bring this to mind, was that I needed some
mechanic work done. Chris Rogers (the salon thief) is an excellent
mechanic and he owed me $300. So, my boyfriend asked him if he would
do some work on my car and discount it heavily to account for the
money he owed me. He agreed to that, and came over to my house and
changed my power steering pump. He worked on it for several hours and
charged me $30. So, it seemed to me that he had made some headway
toward paying his debt. All was well. Chris apologized to me while
he was here for the burglary, I told him to find a better way. Gee,
it was a Hallmark Moment. He did seem to be in some awful pain,
however. Said he was supposed to be having a gall bladder operation,
but that he had been avoiding it. He also seems be in pain most of
the time from his accident injuries. He has an arm that is visibly

**PLAINTIFF'S EXHIBIT J-1**

atrophied, and walks with a limp.

After he left my house, he was stopped by Cole, who had the mayor, Curt Unrein, riding in the car with him.  Cole said he got a report that Chris was not driving correctly.  They did a field sobriety test which he passed for alcohol.  They took him to Hays and drew blood.  I don't know the results of that, but he was still  around a couple days later  so I assume it was negative for anything other than what he is prescribed.

During the course of that interaction, Cole, within earshot of Curt Unrein, asked Chris Rogers why he had a tool that looked like a crowbar in his trunk. Chris responded that the tool wasn't a crowbar, but some sort of mechanic tool, and that he had been using it to work on my car.  Cole basically scolded Chris for having worked for me.  He told Chris that he "should be careful of his associates", clearly in reference to Robert Bentham and myself.

This strikes me as outrageous.  I was giving an unemployed person, who owed me money due to a prior crime, an opportunity to make it good, and he did.   The Victoria Police Chief comes by and tells him that he shouldn't be doing that at all, and, since he did, he is going to pay for it with an afternoon of harassment.

The clear message from Chief Dinkel is that I am lower, in his mind, than an opiate addicted recently convicted thief.  But Chris is Catholic, so he gets points for that.

I think Cole should tell me where the money went.  I'm guessing it paid for a camera or something.

Sincerely,

Lisa Boyd

**PLAINTIFF'S EXHIBIT J-2**

06/20/14

| Hypertension |
| --- |
| Hays Medical Center |

**Printed:**
6/19/2014 18:12
**Time/Date Seen**
(if Different):

**Mode of Arrival:**
☐ EMS  ☑ Other

**Vital Signs:** Status: except:  BP 196/94  Pulse ___  R Rate ___  Temp ___
**Pulse Ox:** Normal Hypoxic  Not Applicable ___ % on  Room Air or O₂ @ ___ L/min
**Cardiac Monitor:** Rate: NSR Brady Tachy  Rhythm: Sinus Afib Junctional Ectopy: None PVCs PACs

**HISTORY:** HX from Patient Unobtainable due to: Dementia  Altered Mental Status  Extremis  Other:___
HX from: Patient  Family / Caretaker  EMS  Interpreter  Medical Records  LMP:___

**CHIEF COMPLAINT:** This is a 57 year old male / female who presents with a complaint of: Elevated Blood Pressure
DUI brought in for blood draw - ETOH.
Also c/o toothache.

**ONSET/DURATION** Started 1 Min Hours Days Weeks Ago  Still Present  Resolved  Worse Since:
**TIMING** Constant  Intermittent Episodes Lasting ___ Sec Min Hours Days Weeks
**SEVERITY** Reported BP PTA: ___
**CHARACTER** Unable to describe "just hurts"
**AGGRAVATING** Exertion  Position ___  Nothing
**ALLEVIATING** Rest  Position ___  Nothing
**ASSOCIATED SIGNS AND SYMPTOMS** Negative  Chest Pain  Vision Changes  Anxiety  Recent Stress  Headache  Numbness  Tingling
Weakness  Dizziness  SOB  Swelling
**RELATED HX** Similar Episode / Dx as: ___
Current Medication: ACEI ARB Beta Blocker Ca Channel Blocker Diuretic Other:___  Rx Non-Compliance

Cardiac Risk Factors  Negative  Prior MI / CAD  CHF  Diabetes  Elevated Lipids  Smoking  Hypertension  Family History

| **REVIEW OF SYSTEMS:** Negative | Pertinent Positives | **Additional Pertinent History:** |
| --- | --- | --- |
| Constitutional Neg Fever | Chills | **PCP / Managing Physician(s):** |
| Eyes Neg Photophobia | Blurred Vision | **Referred to ED / Clinic by:** PCP / Telephone Referral / Other: |
| ENT Neg Sore Throat | Ear Ache | **Previous Visit for Same Complaint to ED / Clinic / PCP / In-Patient Within** |
| CV Neg Palpitations | Chest Pain | **72 Hours /** ___ **Days** Dx / Rx: |
| Resp Neg SOB | Cough | **Site where BP Obtained:** Home  Medical Office  Job  Kiosk |
| GI Neg Vomiting | Diarrhea | Cuff Size: Regular  Large |
| GU Neg Dysuria | Hematuria | **Recent Change in Medication(s):** |
| MSkeletal Neg Arthralgia | Myalgia | |
| Skin Neg Rash | Bruising | |
| Neuro Neg Headache | Weakness | |
| Psych Neg Anxious | Depressed | |
| All other systems reviewed and negative: Yes No | | |

| **PAST MEDICAL HISTORY:** | Previously Healthy | DNR / Comfort Care Only | SURGICAL / IMMUNIZATION HISTORY |
| --- | --- | --- | --- |
| Endocrine DM I DM II | Hypothyroid Hyperthyroid Dyslipidemia | | **Immunizations:** Unknown  Tetanus UTD  Not UTD |
| CV CAD / MI HTN | CHF Afib DVT | | ● Pneumococcal  ● Influenza within 12 months |
| Respiratory COPD Asthma | Bronchitis Pneumonia PE | | |
| GI / GU PUD / GERD GI Bleed | Urosepsis Diverticulitis Gall / Kidney Stones Chronic Kidney Dx | | |
| Neuro / Psych TIA / CVA Migraine | Anxiety Depression Seizure Bipolar Disorder Schizophrenia PTSD | | |
| Cancer Lung Colon | Breast Prostate | | |
| Surgical Hx None Cardiac Cath | PTCA/Stent CABG Angioplasty Pacemaker Valve Replacement Aneurysm Repair Renal Surgery | | |

| **FAMILY HISTORY:** | Negative |
| --- | --- |
| Heart / HTN | |
| Diabetes | |
| Other: | |

| **SOCIAL HISTORY:** | Negative |
| --- | --- |
| Smoking ___ ppd x ___ yrs.  ● Patient Advised to Stop | |
| Cessation Counseling Time: 3+ min - 10 min / 10+ min. | |
| ETOH Drug Use | |
| Occupation: | |
| Lives: Alone  With Family  At Nursing Home | |

BOYD,LISA R
DOB: 03/26/1957  57  F  AGE: 06/19/14  ER ER
V00044985306                    M000076249

**PLAINTIFF'S EXHIBIT L-1**

LISA BOYD 744                                                                                    9/23/2014

**6/20/2014 3:49:00 PM**

*LISA BOYD, Gender: F, DOB: 3/26/1957, Encounter Date and Time: 6/20/2014 03:49PM,*
*Examiner: Tosha Garrison*
**Chief complaint**
The Chief Complaint is: Medications.
**Plan**
• amoxicillin 500 mg capsule. take 1 capsule (500 mg) by oral route every 8 hours. Dispense: 30 cap(s). Refill: 0
**Signoff Information**
      Electronically Signed By: TOSHA GARRISON on 06/20/2014 at 04:52 PM.

**6/20/2014 8:23:00 AM**

*LISA BOYD, Gender: F, DOB: 3/26/1957, Encounter Date and Time: 6/20/2014 08:23AM,*
*Examiner: Tosha Garrison*
**Chief complaint**
The Chief Complaint is: Abscessed tooth.
**History of present illness**
      LISA BOYD is a 57 year old female.
Pt is present for an abscessed tooth in the back of her mouth on the top. pt has been in pain for 3 days now and was seen in the ER
yesterday. pt's BP was very high then and was given bystolic while at the ER. other than that, pt denies taking any other
medications. Current Pharmacy:  USave

she notes she was in the ER yesterday for her tooth and was given pain injection and antibiotic but has not got it filled yet due to
being arrested.
She notes she used to be on bystolic but has been out of the medication for over a week.
She is present with staff from the jail. tg.
**Current medication**
      has pharmacy insurance coverage.
Albuterol  CFC free 90 mcg/inh aerosol with adapter SIG: 1 puff(s) to 2 puff(s) inhaled every 4 to 6 hours    PRN (as needed for
wheezing).
Lortab 5/500  500 mg-5 mg tablet  SIG: 1 tab(s) orally every 8 hours.
Pravastatin  40 mg tablet SIG: 1 tab(s) orally  once a day.
**Past medical/surgical history**
**Reported:**
      *Surgical / Procedural:* No prior surgery.
      *Habits:* Last saw a dentist 2012.
**Other:**
      Cervical Pap smear pt is aware she is overdue - refuses to renew at this time
**Diagnoses:**
      Hypertension.
      Chronic obstructive pulmonary disease.
      Headache syndromes.
      Fibromyalgia.
      Depression.
Polyemphysitis.
TIA 5 years ago.
**Procedural:**
      • Consultation with a specialist  - Rheumatology Clinic- Dr. Anderson-(joint pain)
**Personal history**
      *Behavioral:* Former smoker.
      Caffeine use 1 serving per day.
      *Alcohol:* Not using alcohol.
      *Drug Use:* Not using drugs.
      *Marital:* Single.
Last Pap Smear Date: 2000.
**Family history**
      2 children
Brother had horse shoe kidney
      Angina pectoris mother. (had by-pass)


**PLAINTIFF'S EXHIBIT M-1**

LISA BOYD 744                                                                                                    9/23/2014

Hypertension father
Bronchitis dad
Asthma son
Hiatal hernia brother
Arthritis father
Rheumatoid arthritis father, paternal aunt
Headache syndromes
Stroke syndrome father
Cancer mother breast cancer.
brother lunch cancer

**Paternal:**
Father died at age 95
**Maternal:**
Mother died at age 83.

## Review of systems
**Systemic:** No fever.
**Head:** Headache.
**Eyes:** Vision problems.
**Otolaryngeal:** Otolaryngeal symptoms tooth pain.
**Cardiovascular:** No chest pain or discomfort and no palpitations.
**Pulmonary:** No dyspnea.

## Physical findings
**Vital Signs:**

| Vital Signs/Measurements | Value | Date |
|---|---|---|
| Tympanic membrane temperature | 98.6 | 6/20/2014 |
| RR | 20 per min | 6/20/2014 |
| PR | 96 bpm | 6/20/2014 |
| Blood pressure | 182/124 mmHg | 6/20/2014 |
| Weight | 150 lbs | 6/20/2014 |
| Body mass index | 26.8 kg/m2 | 6/20/2014 |
| Height | 62.75 in | 6/20/2014 |

**Standard Measurements:**

| Standard Measurements: | Value | Date |
|---|---|---|
| Body surface area | 1.7 | 6/20/2014 |

**General Appearance:**
● General appearance: Well-developed and well nourished in no acute distress.
**Oral Cavity:**
*Teeth:* ● Dental abnormalities right 2nd molar with abscess. Tooth with dental caries. Pain noted.
**Lungs:**
● Lungs: Respirations are even and unlabored.  Chest has normal expansion.  Normal breath sounds bilaterally.  No rales, wheezes, or rhonchi.
**Cardiovascular:**
● System: Regular rate and rhythm, normal S1/S2, no audible murmurs, gallops, or rubs.
**Neurological:**
● System: Awake, alert, answering questions appropriately.  Oriented to person, place, and time.
**Laboratory Studies:**

| Pulmonary Tests: | Value | Date |
|---|---|---|
| Oxygen saturation | 98% percent | 6/20/2014 |

## Assessment
Combined systolic and diastolic elevation was observed.
● Periodontal abscess
## Therapy
● Medication List Reconciled.
Allergies Reviewed.
## Allergies and Adverse Reactions
Doxycycline. Comments: hives. Identified: Unknown.
## Counseling/Education
● Return to the clinic if condition worsens or new symptoms arise
## Plan
● Medication instruction She is encouraged to get her antibiotic rx filled
Follow-up visit prn
● Bystolic 10 mg tablet. take 1 tablet by Oral route 1 time per day. Dispense: 28 tab(s). Refill: 0

**PLAINTIFF'S EXHIBIT M-2**

February 11, 2015

**CERTIFIED MAIL RETURN RECEIPT REQUESTED**

City of Victoria
1005 4th Street
Victoria, Kansas 67671

Re: Notice of Claims and Demand regarding the harassment, targeting, defamation, detention, interrogation, arrest, and public mistreatment of Lisa Boyd by former Mayor Curtis Unrein, present Chief of Police Cole Dinkel, and numerous other City of Victoria and State of Kansas officials, Hays Medical Center and treating physician

Dear Victoria:

The City of Victoria does not, or did not until after I made an issue of it, have a big book of ordinances. They don't seem to want to be tied down to their own written rules, so they make what must be ordained very difficult to find. One must figure out what ordinance to request, then request it, without knowing what she is requesting. Mary, the clerk, will decide what you need to know, and and will deliver a photocopy of what she wants you to see for a small fee. Victoria prefers to make up its policies on the fly, as the moment seems to dictate. Borg like telepathy informs the proper course of action in any event. The city's mission is to protect the borg, and the older and more prestigious the borg the better the borg is to be protected. Everything else is lesser. The citizenry is the basilica. The city is the basilica. All is the basilica.

But more straigthtforwardly, this is about the fact that nearly twenty years ago I moved to Victoria, the boyhood home of my significant other, Robert, who is a combat veteran of the early 90's Iraq war. Robert has issues. I expected Robert's family and the town to do at least as much as me to care for their troubled veteran but instead I experienced from them intense hostility, rejection, exploitation and abuse.

The religious preference of the vast majority of the citizens of Victoria is Roman Catholic. The predominant ethnic heritage is Volga German, a culture that is misogynistic, exclusive, harsh, racist, abusive, exploitative and unforgiving.

Robert's mental state did not improve in this environment. The climate of the town, and Robert's inability to work and lack of any other income income added up to an entirely miserable situation. I was a stranger in a strange land and received hardly any support. Local people would look at me in bewilderment if I asked for a job, as if they could not believe that I was asking. Most people tried to pretend they didn't see me. At first I took it personally, but I came to find out that they treat most unimportant "outsiders" in this way and it wasn't anything personal. They don't overtly attack you, at least at first. They just pretend as if you are not there. In western Kansas, the "Victoria snub" is widely known. Also widely known is the funny (and illegal) way that Victoria has of "running people out of town". They will use whatever means they have at their disposal, including the police department, to purge those who they collectively, secretly decide must be cleansed from their midst.

The primary purpose of this letter is to provide formal notice regarding events occuring June 19, 2014, and before, involving myself and several employees of the City of Victoria and the State of Kansas. Certain events were the result of a civil conspiracy, on the part of City of Victoria and Ellis County Kansas personnel. During these events city and county employees engaged personally, and in league

**PLAINTIFF'S EXHIBIT N-1**

with others, to deprive me of my rights under 42 U.S.C. §1983, Title VI of the Civil Rights Act of 1964, the First, Fourth, and Fifth Amendments to the United States Constitution, the federal HIPAA Act, and Kansas Tort Law.

Please do not take the list of rights violations in this letter as exhaustive of the possible causes of action which may be relevant on these facts. Please accept this notice as an expression of my intent to pursue all litigation necessary to achieve a full vindication of all my rights.

The Kansas Tort Claims Act requires that certain notices issue in relation to some of these claims. My primary position is that the City of Victoria, the Sheriff of Ellis County and the State of Kansas' attorney general have been fully advised on these matters and have had actual notice of their bad acts which have resulted in my injury. Furthermore, nothing in this letter should be construed as an election of remedies under the Tort Claims Act. In an abundance of caution, however, please accept this as notice of the injuries and damages sustained by Lisa Boyd as the result of actions on the part of this letter's recipients and certain of their agents, acting individually and in concert.

No such notice is required with respect to the individuals involved, who also will be defendants if resolution is not reached.

### My first clue.  Regarding the yard, and building a retaining wall.

If you don't belong to the church, Victoria is pretty boring.  There is nothing to do that is not church related except for the park and the bar, where a female probably shouldn't go alone, more because of gossip than anything.  The first place where I lived in Victoria was a rental house belonging to Robert's step father, Kenneth Brungardt.  The back yard was a mudhole.  There was a dam build up at the property line in the back and a big hump in the front.  The middle where the house was sat in a hole where water collected.  I decided to move around some dirt so the water could pass buy.  A bunch of men with transits showed up and began staring at me while I shoveled dirt from the front so the water could drain.  Evidentally, the neighbor across the street didn't want the the water to drain onto the street in front of his house.  None of the men said anything.  They just stood across the street staring, occasionally pointing and gesturing.  Some of the gesturing seemed kind of angry.  I tried to ignore them.  This went on for what seemed like hours.  Finally a senior looking city person showed up and appeared to tell them that I wasn't doing anything wrong by attempting to drain the lot into the city drainage system.  The band of men dispersed, but their disapproval of me did not.

### Welcome to the Family! Thanks for helping our son in his time of need!  You're Evicted!

Kenneth Brungardt's first known overt act in an attempt to get rid of me was to evict me and his step son farmworker Robert from his rental house.  Robert moved there from my house in Salina, Kansas so that Robert could help Kenny with farmwork.  Reportedly, Kenny had recently been hospitalized with a heart issue.  Kenny was the Postmaster of Victoria and had a farm to deal with.  Kenny did not want me to come along to Victoria , but I didn't know that.  I got involuntarily divorced and thrown out of my house in Salina, Kansas, and was without a place to live.  As Robert had a great deal to do with my involuntary divorce, and since I had provided him with a place to live for several years, I assumed I could go stay with him.  Kenny claimed he had an issue with the fact that Robert and I were not married, and after a few months, served us with an eviction notice.  I had bought a house there in Victoria, a block or two away with the intention of working with Robert to  fix and sell it, as that

## PLAINTIFF'S EXHIBIT N-2

seemed to be an income producing activity he could accomplish, other than working for Kenny, who paid little better than slave wages. A few weeks after I bought the house on Cathedral, and while we were in the middle of gutting it, Kenny evicted us from his rental house and claimed it was justified because we had a place (the gutted house) to live. The fact that it was half gutted, and had no heating system, insulation or plumbing was not a problem for him. I had planned to pay for the remodeling in stages, and didn't have the funds at the time to make it even liveable. So, Robert and I had to move into a gutted house with no plumbing, money or job. We survived with one electrical outlet through the winter. I inherited some money and we set out to try to fix the house. That went on for awhile and I tried to ignore the town and "family" rejection long enough to make the house saleable. That effort drug on for years, as Robert worked for little money for Kenny, had serious health issues and was not all that motivated to work on the house. Kenny would ridicule Robert for working on it at all, since he didn't have ownership of it. Robert lived in it for nothing, and I paid for all the utilities, taxes and insurance, but that did not strike Kenny as a reason that Robert should go to any effort to work on it. Robert depends on Kenny for some sense of security. Kenny doesn't tolerate insubordination and his influence over Robert is substantial.

I lived with Robert in the wreck of a house and since no one would hire me, set out to become self employed. At times I would protest to Robert that Kenny wasn't compensating Robert well enough to pay for his share of our living expenses. Robert would counter that Kenny had promised that he, Robert, was going to inherit the farm property where Kenny's residence and barn is. His brother Rick was slated to inherit Kenny's rental properties. This story held but was told less frequently as the years went on. A few years ago, after a long period of years of very inadquate pay from Kenny to Robert with the farm inheritance story as an excuse, I asked Bertha Brungardt, Kenny's wife, if it was true that Robert was going to inherit the farm. She replied that the farm and and everything else was going into the "Brungardt Family Trust".

I made a few thousand dollars a year heirfinding, but most of what we lived on was money I had inherited, which unfortunately, did not last forever. As it became obvious that Robert would never get anything from the VA, and then it became obvious he would get nothing from Social Security either, I started getting noisier about the fact that Kenny was not doing his part to support Robert. Kenny didn't want to hear me, and he didn't like other people hearing me complain that Kenny should be financially supporting Robert beyond paying him menial wages for farm labor. The city didn't want to hear about it either. I was running out of money trying to support Robert while being self employed. Robert was providing no financial contribution, and I was getting no help anywhere.

Some years ago, around the time Cole Dinkel became police chief, he and various other city and county employees decided they were tired of dealing with me and embarked upon a civil conspiracy aimed at driving me from town.

Shortly after Cole Dinkel became Chief, I had a problem at Sunflower Bank with a debit card online theft that I wanted to get to the bottom of. I did quite a bit of work to get the details and to get the bank to understand what had transpired. I had a fairly good idea how the e-thieves were operating. So I contacted Congressman Huelskamp, whose aide had agreed to look into the matter. They needed for me to get a police report in order to proceed. Cole refused to go the bank to make a police report, and wouldn't explain why he wouldn't do it. So that was the end of it, and all my effort was wasted.

Cole made friends with my daughter Sara and set out to cause trouble between us. He told Sara that

PLAINTIFF'S EXHIBIT N-3

"people" had issues with her allowing me to care for Gabriel.  He hinted that she would get more business if she found another babysitter other than me.  Up to that point, I got paid $500 a month for babysitting from my former spouse, Gabriel's grandfather.  A year or so earlier, I had invited Sara to come live in Victoria and  I paid to remodel the building she still uses into an apartment and hair salon.  After Cole shamed her into replacing me, Sara started her children's Center in Hays for child care, instead, and drove him back and forth every day for babysitting.  And I lost years with my grandson.

The city penalized me for planting a xeriscaped,  no water required yard, even though they have extreme water problems and should have given me an exaltatory procamation.  Instead,  I got reprimanded frequently for having wildflowers higher than 12 inches in my yard.  By ordinance, nothing other than shrubbery is allowed to be that tall.  "Shrubbery" is not well defined.  My xeriscaping allows for very little mowing to preserve water without killing the plants.  Victoria has been in the middle of an epic crisis drought and water shortage,  but still they have no respect for my drought proofing and water conservation efforts, and instead used technical outdated violations of the "safety ordinances", to further their conspiracy to rid the town of me.

City Clerk Mary Pfeifer refused to allow me to read the city ordinances from beginning to end.  She would only copy specific ordinances or produce one at a time on a subject requested.  She wouldn't cooperate even after their city attorney instructed her to.  She said repeatedly over several days time, that she was too busy to cooperate with my requests to allow me to sit down and read the ordinances.

Police Officer Ryan Mauch arrested me at Mary Dinkel's request, because I got upset about her refusal to allow me to look at the ordinances, after many requests over several weeks.  I raised  my voice slightly, then I left city hall as requested.  Ryan stopped me in front of the church in 100 plus degree heat.  He put me in his truck-cage and left me there with the windows rolled up and no air conditioning while he stood several feet behind his truck and conferred with Cole at length on the phone.  He didn't seem to be paying any attention to me and didn't hear me yelling at him.  I was restrained in the truck and couldn't get out.  I finally got Officer Mauch's attention by beating on the back window.  The heat rose to what seemed to be well over 100 degrees in the truck before Ryan came back to the truck and started the air conditioning.  It was a frightening experience to say the least.  If there is a written protocol for leaving prisoners in a police vehicle in the sun in 100 degree heat without any a/c, I'm sure it was not followed on that day.

It was soon after the arrest over the ordinances that I became completely convinced that the city was actively attempting to run me off.  I felt compelled to respond in some way.  I told Robert that if he wanted to express an opinion he was free to do so by means of a legally posted sign on my corner lot two blocks on the way to the interstate from the church.  Evidentally, this is just about the most evil act a person can ever commit in Victoria.  Robert chose a message.  It was "Welcome to Victoria, home of St. Fidelis, Patron Saint of Pedophiles."  Or something similar.  He said he'd had some issue with a priest.  This created the expected stir.  I expected a conversation and brief exchange of views, followed by a new understanding.  What I got was a heightened resolve on the part of the city to get rid of me by whatever means necessary.  While standing outside my house talking to me about the sign with the Mayor and Cole Dinkel, Mayor Curtis Unrein said that 98% of the town was Catholic,  so I needed to not say bad things about the church if I wanted to continue to live there.  He and Cole warned me that there were death threats made against me and Robert and that we needed to remove the sign to resolve those threats.  Neither the Mayor or Chief would reveal who was making the criminal threats, however.  I asked Chief Dinkel to charge them with criminal threat and he ignored me.  Cole was obviously very

**PLAINTIFF'S EXHIBIT N-4**

upset by the sign, stated that it was the day of the annual High School Homecoming. The sign would have greeted many homecomers and Cole was really upset about it.  I said I'd take the sign down, in honor of homecoming.  Cole said,  "That's the smartest decision you ever made." Pictures of the threatening posture of Cole and the Mayor were taken.  All was relayed to the Kansas AG's office. Cole was presumably informed that he had gone too far and soon stopped harassing me.  I thought he would leave me alone after that. Still, I decided it was time to move away from Victoria. I did not get out fast enough. As soon as the statute of limitations to sue for the illegal sign harassment appeared to expire, they were right back at it with more.

Cole attempted to cultivate as informants, my sublessors of Tresses salon in 2012 and 2013, Stacy Williams and Megan Gramly. Stacy and Megan were running the salon in my daughter Sara's absence. Sara had  decided to move to Colorado due in part to Cole's interference between us and his harassment of me. Cole inquired of Stacy about my drinking habits and possible criminal activities and asked Stacy to inform on me to him, thereby eroding my ability to deal with Stacy and Megan as  tenants. After that, they knew they could rely on Cole to take their side in any dispute, which in fact happened. Stacy and Megan ended up paying me nothing for slightly less than than two year's occupancy.  Later, Cole asked Megan to keep a record or let him know of any contacts of them I made in an attempt to collect anything, in case he needed to help them charge me with harassment of them.

Cole gossiped about  me to many other people in Victoria, including Christopher Rogers, who was on parole for theft and drug violations in Ellis County, Kansas. I was trying to be a good Christian, and had forgiven Chris despite the fact that he broke into and robbed the hair salon (twice in one week) a couple of years before.  Rogers offered to work off the debt to me that he created stealing money from the salon.  I let Rogers do some mechanic work to work off the debt, which he is very good at.  When Rogers  left my house, Cole stopped him and asked  where he had been. Rogers told him that he had been working at my house.  Cole said to Rogers that he should not associate with me because  I was a "bad person" and would get him (Rogers), "into trouble".  This was despite the fact that Rogers had been court determined to have stolen money from me, for which I was never compensated.  Cole decided that Rogers didn't need to pay me back for his $240 Ellis County District Court documented theft plus destroyed back door damages, I guess, because Cole had decided that I was a "bad person"

Cole harassed me over a legally tagged  car trailer which was parked just like many other tagged trailers parked at curbside all over town, blocked and chained up to prevent movement, and not attached to a truck.  Neverthelss, Cole complained to me that there was an ordinance against doing that, so the trailer was moved to the back yard off the street.  Then Robert parked a car on the trailer. Robert and I were having issues over him squatting in the house. He was continuing to have health issues, but I was broke, and he was keeping me from the selling the house. Robert was getting surly, and he refused to get rid of the antique car.  Robert had possession  of my truck that was used to pull the trailer. I had no money to hire anyone to do anything about moving the trailer or the car off the trailer.    Cole wrote me a ticket even though he knew there was nothing I could do about it. Cole was aware I was having issues with Robert (fueled by Kenny) about the house, and Cole just didn't care. This incident happened shortly before the DUI arrest.

In spite of Chief Dinkel's determination to keep the city free of my wildflowers, Cole wouldn't do anything about the neighbor's chemical guy poisoning  my trees and vines with herbicide overspray. Numerous complaints and requests to talk to the apartment owner were ignored.   The maple tree died. Probably an apple and cherry as well.  Virginia Creeper seems to be able to withstand anything.

**PLAINTIFF'S EXHIBIT N-5**

Page 6

Cole threatened to ticket me for allowing a starving horse to graze off my grass during an extreme drought with no hay for one afternoon unless I got rid of the horse by dark. Robert is the one who showed up with the horse. I was the one who got threatened about it.

Cole lied to an investigator working for the Disability Determination Service of the Social Security Administration, telling him that Robert lived on "illicit income". Cole had no factual basis for that statement and just assumed that he or both of us must have illicit income because he didn't see either of us working at regular jobs. The truth is that our support came from my employment, self employment, and inheritance. Robert got enough money working for Kenny to cover his personal needs. I always paid the vehicle liability insurance and all the other expenses. Cole Dinkel made Robert's case so problematic with these lies that the judge said he did not want to proceed unless Robert had a lawyer. Robert couldn't get one. We showed up for the hearing and no one was there, Robert had no lawyer to tell him he had to make a phone call to confirm the hearing date. He got a notice and just thought he needed to show up. After waiting years for Social Security hearing, Robert will have to start over to try to get some social security income. He needs to have something to live on. I can't do it anymore.

There are more examples of the hostile intent and bad acts of various city and county employees, which will be presented at trial if necessary.

### The DUI, arrest and thereabouts

In early June of 2014, I was at my house in Colorado, waiting on Robert to fix the house in Kansas and make some money by working for Kenny. Robert and I had moved to Colorado the summer before, and planned to go back and forth until we were moved entirely and the house in Victoria was finished. Robert lived here during the winter of 2013, then returned to Kansas to finish the house and work for Kenny. The house needed to have some junk removed, and some interior paint and trim. For somebody healthy and motivated, this could have been done in two to four weeks. At week four, the house wasn't done, but he had been working for his Dad for money. By week eight the house wasn't done and I was broke and he still hadn't sent any money, so I packed up the animals, got in the car and headed that way.

Robert had given me all of $200 since the previous April. I paid much more than that for the truck insurance and his utilities during that time. And he'd been living in the house rent free. He said he had some form of cancer, so evicting him didn't seem to be an option. As it turns out, the lump they suspected might be cancer turned out to be material that was moving around from an old hernia repair, but it took the VA over a year to figure that out.

By June 15, 2014 I was almost completely out of cash and decided I would have to go see what I could do about the situation. Kenneth Brungardt had agreed to loan me some money against my unmortgaged house in Victoria. But, when I got there and asked him to write a check, he told me (via Robert) that I would have to give half of the house to Robert by deed and sign a mortgage, in addition to a note. I did not like Kenny's new plan and considered it to be abusive.

At the same time, the Victoria police had again ramped up harassment activities full scale. Either Chief Cole Dinkel or officer Ryan Mauch came by nearly every day for several days over one thing or another, and expected me to deal with whatever it was right then and there. There was an antique car in

**PLAINTIFF'S EXHIBIT N-6**

the back yard which had no tag. And it had been there for a few months. The car did not belong to me and they would not confront Robert about it. They always expected me to deal with Robert whatever the problem was whether I could do anything about it or not. And if it resulted in me yelling at Robert to fix whatever it was, they would threaten me with domestic violence, or disorderly conduct or whatever.

In addition to the antique car in the back yard and the overgrown grass, there was some trash in the back yard. Robert hadn't fixed the house or made enough money to give me any to help pay the bills. I was out of money and Kenny wasn't going to make good on his promise to lend me something against the house without making me give half to Robert, which would mean that I couldn't sell it without his consent to fund my self employment which I was counting on having when I got here as there are no jobs in Walsenburg, Colorado.

By June 19, 2014, the day I got the DUI, I had been without my blood pressure medication for several days. I mowed all the grass and agreed to clean up some flowers next to the street which were over 12" tall and technically out of compliance with the health and safety yard ordinance in Victoria. About June 17, the Victoria police officer Ryan Mauck told me that it was cleaned up enough, but then he got overruled by Cole, who said I had to get rid of more flowers.    Ryan said "I just got told that I am NOT the Health and Safety officer". Cole wrote out a citation and said that he would "tear it up right in front" of me if I got it cleaned up by the next day. There wasn't any running trimmer so I was doing all this weeding with a shovel. I knew my blood pressure was getting to problem levels and doing a lot of shoveling in the heat was asking for a stroke, and I told Cole that day (June 17) that I was out of medication and having blood pressure issues. I said that I needed to get back to Colorado, and I was asking him to call it good enough. He pointed out a few more things that were too tall and said that if I got rid of those it would be legal. About a week before that I asked Cole to walk with me and I showed him that over half of the yards along the street had non grass plants over a foot high and he wasn't threatening them with citations.

I had been planning to leave again for Colorado for many days and was delayed every day by some demand from the Victoria Police Department. I had given up getting any significant money out of Robert, and I thought I had everything taken care of to make the city happy by June 19, but the antique car remained in the back yard and Robert was not cooperating about moving it. I was dire need of blood pressure meds. I started having a toothache on the evening of the 18th and I told Robert that I really needed him to get some money that his Dad owed him so that I could see a dentist the next morning. By that time I had decided to go over to First Care and take care of the blood pressure problem while I was in Hays to see a dentist. (First Care Dentist requires money up front, First Care Medical does not). Robert was not cooperating with getting any money out of Kenny even for a dentist and the tooth pain just continued to worsen. The next morning there was no money coming, and the antique car wasn't getting removed. Things turned into a loud argument and he decided to call his Dad to get a ride out of there as I wouldn't let him take my truck.

A couple of hours before that, I decided to drink a beer or two to try to deal with the tooth pain. I did not have any pain meds. When it became obvious I was not going to get any money from Robert, I set out to try to find some charity help. So, I called around a little bit, and ended up with my last resort of calling St. Fidelis. I had heard some other non Catholic people say that they would help in such an instance on occasion. Despite our sign incident, they continued to give us gift boxes at Christmas, so I

**PLAINTIFF'S EXHIBIT N-7**

Page 8

assumed they had decided to forgive us.  I didn't want to ask them but I felt I didn't have a choice at that point.  I called and talked to Jan Brungardt.  She said that I would have to come over there in person in order to get any assistance.   It was near 3 o'clock and she said that she wouldn't be there much longer that day, so I would have to come there right away in order to get help that day. I thought I was safe to drive and legal, and I was in so much pain that I decided to drive over there yet that day.   I didn't think I was unfit to drive.

When I exited the church office I saw Kenny Brungardt's truck pulling up to the four way stop in front of St. Fidelis church.  He had obviously come to get Robert, so that Robert wouldn't have to move the antique car out of the backyard or work on the yard.  So, instead of getting in my car, I walked over and gestured to Kenny that I needed to talk to him.  I was going to tell him myself that I just had to get help from the church because Robert wouldn't get any money from him so I could see a dentist.  I didn't think I was out of line asking for that because of many factors, not the least of which was that I have been taking care of Robert financially for over 20 years.  I have given him a place to live and food to eat and a truck to drive for most of all that time.  This despite some horrible periods that probably should have ended the relationship, but I never could do that for some reason.  Kenny knew that I had a problem abandoning Robert and he exploited that fact to force me to financially support him, so Kenny wouldn't have to.

At the four way stop by the church, Kenny wouldn't stop to talk to me so I could ask him for money to see a dentist.  When he started to pull away from the stop sign I sat down on his trailer and rode there for a few blocks.  I decided it seemed a dumb thing to do so I got off at Robben Oil.  I walked to the salon.  I asked Stacy Williams for a ride to my car.  She gave me one, but I think may have called Cole first, as he had requested, to tell him I smelled like beer.

I barely got in my car to drive two blocks home when Cole pulled behind me.  I continued on down the road and pulled into the alley behind my house to back around and get the car going the right direction to park.  As I was backing up to straighten the car to the curb, Cole appeared before me and motioned me to stop.  The back wheel was on the curb as I had been moving it back to straighten it out.  I stopped moving the car when Cole made eye contact with me and motioned me to stop.  Later he wrote it up as if I left the car like that because I didn't notice it, and not because he ordered me to stop moving it.

Cole confronted me about the yelling and what not.  I told him that I was in some extreme pain, and was continuing to have a blood pressure issue, and I needed medical attention.  I told him I was getting no help from Robert or Kenny, and I needed to see a doctor.  Cole didn't care about all that, he needed to do a DUI investigation.  He could have called the Victoria EMT's to come take my blood pressure, but he didn't.  First, I had to wait twenty minutes to "blow"  It registered o .010. .  He said we had to go to the Sheriff's office first and blow in the DUI machine.  Once there he said he wasn't taking me for medical treatment unless I agreed to pay for it.  I told him I didn't have the money to pay for it or I would have gone to see a dentist without asking the church.  He continued to refuse to take me.  I said I wanted to challenge the Breathalyzer results with a blood test because it looked like that was the only way I was going to get a ride to the ER.   The dash cam video on the way contains audio from Cole, reminding me that I had to pay for whatever  I was getting done there.  I told Cole a few days later that the audio from the sheriff's office might cause him some problems since he should have gotten me medical care sooner and that he was wrongfully acting as the hospital collection agency before he would agree to take me there.  Some weeks later I tried to get the audio and video, but the hard drives on the machine recording events in the DUI checklane at the Sheriff's office had failed for some reason.  I believe they may have been destroyed deliberately, and I asked the Sheriff to

**PLAINTIFF'S EXHIBIT N-8**

investigate.  He initially said he would, but then he said that there was no way to tell how it had happened.  In addition to the statement on dash cam video, Cole states in his police report and the probable cause affidavit that he made me agree to pay the hospital bill before he transported me to the ER.

At the ER they gave me a script for an antibiotic, a dental block for pain in the form of a shot, and a blood pressure pill.  My pressure measured 220/115 by their report when I got there.   In addition to a lack of blood pressure drugs in my system, my blood pressure was pushed up by the intense pain from my impacted tooth and fear of being in jail.   It was not much reduced from there when they released me to go to jail.  The doctor was negligent for releasing me before it was clear that the medication was working.  He might also have been able to help me with my later shy kidney problem if he been a little more attentive.  Plus he gave me a dental block for pain, but he knew I was off to jail and must have known that it would be wearing off about 4 a.m.  The next morning at my dental appointment my blood pressure was still registering in the 220/115 area.   It may have been worse than that during the night.

In jail I was put in with a woman who was had a crack cocaine addiction she was withdrawing from.  She said I would have to sleep under the welded in bed frame which is about a foot off the floor.  She said I would have to sleep underneath that so she wouldn't have to trip over me if she woke up in the middle of the night.  She was having a hard time with withdrawl.  She was stabbing her pillow while exclaiming that she was really wanting to kill someone.  I couldn't sleep in that situation, and I was having a hard time with my shy kidney issue, so I couldn't urinate normally.  I was attempting to force urine out of my bladder by straining because of the intense pain of a full bladder. I saw stars.  The next day I noticed that my vision was noticably worse.

The hospital sent records sent to me some weeks after the arrest which contained discharge orders .  Those orders instructed me or my caretakers to  continue to take my blood pressure periodically and get further help if it remained elevated.  The jail did not do that.  The Sheriff's office denied having received the discharge summary from Cole Dinkel when we returnied to the jail from the ER.  I do not remember ever seeing the discharge summary that day.  It may be that the hospital never actually gave it to Cole, or he didn't give it to the jailer, or the jailer ignored it.  Whatever happened, nobody paid any attention to my blood pressure, as doctor ordered, all night.   Whoever neglected to get that paper in the right hands was negligent and directly responsible for my damages.

My difficulty urinating while in jail was due to a longstanding problem known as a "shy kidney".  When in close proximity to others or under stress I have trouble urinating.  My eye doctor says that I have evidence of ruptured blood vessels in my eyeballs which explains my post jail loss of vision.  Prior to jail I had difficulty with multiple images and some blurriness,  but needed to use only the beginning strength of reading glasses.  Now the strongest reading glasses don't clear up the blur very well, and I experience a lot of eye strain.  That leads to migraines and more visual disturbances.  The high blood pressure in jail and the lack of adequate medical attention has damaged my eyesight and affected my ability to produce income.

The city has failed to develop written procedures to avoid violating the rights of persons while engaged in the process of law enforcement and other city functions.  This failure extends to their lack of procedures with regard to allowing persons to view ordinances, to refrain from chilling free speech, to deal evenhandedly with trailer parking problems, and to protect residents from being overheated while constrained in parked police vehicles, among other things.

**PLAINTIFF'S EXHIBIT N-9**

Psage 10

Cole Dinkel's refusal to provide me with timely medical care and the subsequent inadequate care I received caused me irreparable permanent damage. Cole Dinkel, and therefore the city, violated my rights of due process when he refused to provide medical care in a timely manner, and without delaying for a great length of time until I agreed to pay for it. The city, county, the doctor and the hospital are liable for the damages to my eyesight, my pain and suffering and for diminishing my ability to maintain a livelihood.

According to sources that I hope are correct, the statute of limitations does not begin to run in an action such as this, until the last bad act of the the last bad actor involved in the civil conspiracy. Prior to the June 19, 2014 incidents which were part of the same conspiracy, I suffered damages from being forced to move away from Victoria, from being denied the quiet enjoyment of my property, from losing more than a years worth of commercial rents due to Cole's interference with my tenants at Tresses Hair Salon, and damage to my my reputation due to Cole's incessant gossiping such as telling Rogers that I wasn't a fit person to be around. The conspirators' malfeasance deprived me of the companionship of my family and has forced me from my home. While it is difficult to assign a dollar value to such things, that is what is required in this letter, and so therefore, I am hereby demanding that the city pay me damages of $1,000,000 which I suffered as the result of the civil conspiracy engaged in by several city employees, the illegal purpose of which was to force me to leave Victoria and never return. Absent payment of $1,000,000 or a negotiated settlement be advised that I intend to file a civil action for damages in state or federal court, within the next several months. I hope the city will avoid that by negotiating a settlement of these issues with me.

Sincerely,


Lisa Boyd

807 Kansas Avenue

Walsenburg, CO  81089

785-259-9328 or 719-369-6561.



**PLAINTIFF'S EXHIBIT N-10**

June 7, 2016

Victoria City Clerk and Victoria City Council
City of Victoria, Kansas
1005 4th Street
Victoria, Kansas 67671
Fax # 785.735.2260

**Notice of Claim of Lisa Boyd to the City of Victoria**

To the Governing Body of the City of Victoria, Kansas:

       This notice is to file claim for damages caused by agents of the City of Victoria, Kansas to the claimant, through this service to its clerk and governing body.   Claimant sent a previous notice to the city which was not complete, which was said by the city attorney Don Hoffman to be incomplete and not constituting a validly submitted claim, and which the city of Victoria has not formally acknowledged to pay, refuse or otherwise address.   Claimant therefore elects to replace the previous correspondence with this notice of claim.

**The name and address of the claimant and the name and address of the claimant's attorney, if any;**

       Lisa Boyd, 807 Kansas Ave., Walsenburg, CO 81089.  Claimant does not have an attorney.
Claimant's  previous address was 1110 Cathedral, Victoria, Kansas 67671.

**A concise statement of the factual basis of the claim, including the date, time, place and circumstances of the act, omission or event complained of;**

       Beginning in 2010 and continuing thereafter, employees of the city of Victoria, Kansas conspired to deprive the Claimant of lawful access to the city ordinances, thereby violating claimant's right to due process and free speech.   Repeated reasonable requests by claimant to view the ordinances were refused. The clerk, Mary Pfeifer, answered claimant's objection to being denied access to the ordinances by  having Victoria Police Department officer Ryan Mauch arrest the Claimant for alleged disorderly conduct. Mauch arrested Claimant and transported her to the Ellis County Sheriff's office after consulting with Chief Cole Dinkel.   Charges were never filed against Claimant by the Ellis County attorney's office. There was no lawful basis for the arrest.   At the stop which preceded the arrest, officer Ryan Mauch locked the claimant in the police pickup with the windows up in the sun and no air conditioning in over 100 degree heat for a lengthy  period.  The temperature in the pickup reached a dangerous level and claimant was overheated and fearing for her life by the time Officer Mauch finished talking on the phone with Chief Cole Dinkel and returned to the pickup.  This improper treatment of a prisoner was negligent, a violation of claimant's civil rights, and the result of a failure by the city to properly train its officers with regard to restraining prisoners without killing them.  The city also  failed to properly train its law enforcement officers in many other situations hereafter described.
       City of Victoria employees Cole Dinkel, Ryan Mauch and former mayor Curtis Unrein conspired to chill the claimant's constitutional right to free speech by informing the claimant that unidentified persons in the community had expressed to them their desire to kill the claimant because of a message critical of St. Fidelis Church on a sign posted in claimant's yard.  Dinkel, Mauch and Unrein informed Claimant of these threats, but would not identify the persons making the threats, and refused after request by claimant to identify the persons making the threats or to  protect the claimant from said threats. Claimant was advised by Dinkel, Mauch and the City Mayor, that in order to protect her own  life, the sign would need to be removed by the claimant from her yard.

**PLAINTIFF'S EXHIBIT O-1**

Lisa Boyd, Noitice of Claim, Pg. 2

Between 2011 and 2013, these same employees engaged in a conspiracy to force the claimant to leave the city, by directing or by actively participating in purported law enforcement activities, the true purpose of which was to intimidate the claimant.

On June 19, 2014 Chief Cole Dinkel, violated claimant's constitutional right to due process while in police custody by refusing to provide Claimant with medical care as requested by claimant, absent an agreement by the Claimant to pay for the medical care.

On June 19, 2014 Chief Dinkel violated Claimant's medical privacy rights guaranteed by HIPPA, and obtained protected information from claimant's medical record from Hays Medical Center without a warrant as required by law.

On June 19, 2014 Chief Cole Dinkel violated claimant's constitutional right to due process by failing to provide the jail with discharge orders pertaining to claimant resulting from a trip to the emergency room of Hays Medical Center upon transferring custody of the claimant to the Ellis County Sheriff. Claimant suffered damage to her eyesight resulting from blood pressure spikes in jail that went unnoticed by jail personnel due to their lack of being given the discharge orders by Chief Dinkel.

Chief Dinkel violated claimant's rights to due process by destroying evidence related to the June 19, 2014 DUI arrest of the Claimant, in collusion with one or more Ellis County Sheriff's employees. The exact date of the event is unknown to claimant but is believed to have occurred within a few weeks of October 22, 2014. On that date, Claimant obtained an order in her DUI case in District Court allowing her to obtain a copy of the audio/video recording made of claimant at the Sheriff's office on June 19, 2014. Shortly thereafter, claimant requested a copy of the recording from the Sheriff's office. A week or so later, Claimant was informed by the Sheriff's office that despite having two backup hard drives, the DUI audio/video recording machine in the Sheriff's office was just then found to have been damaged to the point that the information on it was unrecoverable. The recording would have helped claimant in her DUI criminal and driver's license trials. Claimant has cause to believe that the machine was deliberately tampered with by Ellis County Jailer Wilmer Dinkel and/or some other Ellis County Sheriff's employee as a result of collusion between Wilmer Dinkel and/or some Ellis County employee or employees and Victoria Police Chief Cole Dinkel. In late summer or early fall of 2014, Claimant had a conversation with Chief Cole Dinkel that claimant was going to get a copy of the recording, which would prove Cole Dinkel had been dishonest among others things, and would give claimant the evidence needed to win at trial. Claimant asked the Sheriff to investigate the cause of the machine failure. He said he would, and later stated that it was impossible to determine how the problem occurred. Claimant contacted the machine manufacturer who said the failure could have happened as a result of a reformatting or similar command that was easy for anyone with administrative privileges to the machine to make happen, and there would be no way to detect that was the cause of the failure. The manufacturer said the type of failure that affected the machine was "rare" unless done deliberately. Claimant asked the Kansas Attorney General to investigate, but they said they could not investigate unless the investigation was requested by the Sheriff. The AG's office stated that claimant's only avenue to demand further investigation was to file a civil lawsuit and avail claimant's self of the discovery process.

Another attempt to destroy or damage evidence was made by Chief Dinkel, sometime after June 19, 2014. An electronic recording purporting to be a dash cam video of transport of the claimant to jail and to and from Hays Medical center was delivered to the claimant by court order but could not be played. The Ellis County attorney was able to recover and render the information playable after some difficulty. The Victoria Police Department has a pattern and practice of destoying or damaging dash cam video recordings, and there are other instances unrelated to the claimant which appear to demonstrate Chief Dinkel's deliberate intent to destroy evidence.

The above described acts by agents of the City of Victoria, under color of law, amount to deprivation of my civil rights under 42 USC 1983, Title 6 of the Civil Rights Act of 1964, the rights to free speech and due process afforded by the United States Constitution, the federal HIPPA act and are a basis for damages grounded in Kansas Tort Law.

**PLAINTIFF'S EXHIBIT O-2**

Lisa Boyd, Noitice of Claim, Pg. 3

**The name and address of any public officer or employee involved, if known;**
The residence address of Police Chief Cole Dinkel is 1204 Squires Ave, Victoria, KS
The residence address of City Clerk Mary Pfeifer is 12539 Fairground Road, Victoria, KS
The residence address of Victoria Police officer Ryan Mauch is 806 Cedar St, Victoria, KS
The residence address of former Mayor Curtis Unrein is 1214 Fern St , Victoria, KS

**Concise statement of the nature and the extent of the injury claimed to have been suffered and  a statement of the amount of monetary damages that is being requested.**
Claimant states actual damages resulting from the acts of city employees as follows:
Expenses related to having to move from city of Victoria - $80,000
Loss of eyesight resulting in reduced ability to produce income for 10 years to age 68 - $500,000

Claimant states non-pecuniary losses resulting from the acts of city employees as follows:
Emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, loss of enjoyment of property, interference with family relationships and other non pecuniary losses  - $500,000 for each occurrence as follows:

Repeated refusal to provide access to city ordinances
False arrest for "disorderly conduct" after voicing objection to illegal withholding of ordinances.
Locking claimant in police vehicle in extreme heat with no air conditioning for extended period.
Refusal of law enforcement to take action on criminal threats to kill claimant as reported by Mayor
Unrein, Cole Dinkel and Ryan Mauch
Use of reports of  threats by area residents to kill claimant to chill claimant's speech and force claimant to move away from community
Refusal to provide timely medical care
Attempt to extort payment for medical care that City of Victoria was obligated to provide
Violation of HIPPA rights by obtaining medical record from Hays Medical Center without a warrant
Attempt to destroy evidence (dash cam recording recovered by Ellis County. Atttorney)
Collusion with Sheriff's office employee to destroy DUI check lane video

The total amount of money hereby demanded by claimant from the City of Victoria. Kansas is therefore $5,580,000.00 in US. Dollars.  Any offer of settlement will be considered. Claimant is of the understanding that no case can be filed against the city on this claim prior to 120 days from the filing of this complete notice, or the city's denial of the claim, whichever is first.    The statute of limitations may be near as to the individuals, however, and is not tolled by the filing of this notice.  Therefore, if I am unable to reach a settlement with the City of Victoria prior to June 16, 2016, I intend to file suit against former Mayor Unrein and the individual employees named herein in U.S. District Court in Topeka, Kansas for the above described damages in addition to $1,000,000 in punitive damages from each of them.  In any event, if settlement is not reached within 120 days of the filing of this notice, I intend to file suit for damages and civil penalties in  U.S. District Court against the City of Victoria as above described.

Sincerely,



Lisa Boyd
807 Kansas Ave.
Walsenburg, CO  81089
785-259-9328
lisa.r.boyd@gmail.com

**PLAINTIFF'S EXHIBIT O-3**

# City of
# Victoria

May 29, 2014

Lisa Boyd
1110 Cathedral
Victoria KS 67671

1005 4th Street
P.O. Box 87
Victoria, KS 67671-0087
Phone (785) 735-2259
Fax (785) 735-2260

RE: Property legally described as SUB 190 J GOETZ ADDITION BLK 02 LOT 07 & 08, commonly known as 1110 Cathedral, Victoria, Ellis County, Kansas.

## NOTICE TO COMPLY

You are hereby notified that you are in violation of Chapter VIII, Article 4, Section 8-401 through 8-407 of the HEALTH AND WELFARE ORDINANCE of the City of Victoria.

You are asked to clear your lots and pieces of ground within the city limits of the existing weeds and high growth, within ten (10) days after receiving this notice.

You may request a hearing before the Governing Body within five (5) days of the receipt of this notice.

Failure to do so will result in the City proceeding with cutting of the weeds and the cost of cutting, including a reasonable administration fee will be assessed to you.

If payment of the charges is not forthcoming, same will be added to the property tax as a special assessment.

No further notice will be given prior to removal of weeds during the current calendar year.

Contact the City Clerk at (785) 735-2259 if there are any questions regarding this order.

_____
Cole Dinkel, Chief of Police

_____
Mary Pfeifer, City Clerk



## PLAINTIFF'S EXHIBIT P-1

# City of
# Victoria

1005 4th Street
P.O. Box 87
Victoria, KS 67671-0087
Phone (785) 735-2259
Fax (785) 735-2260

May 29, 2014

Lisa Boyd
1110 Cathedral
Victoria KS 67671

RE:  Property legally described as SUB 190 J GOETZ ADDITION BLK 02 LOT 07 &
08, commonly known as 1110 Cathedral, Victoria, Ellis County, Kansas.

**Notice to Comply**

You are hereby notified that you are in violation of chapter VIII, Article 1, Section 8-101
through 8-112 and Chapter VIII, Article 3, Section 8-301 through 8-313 of the HEALTH
AND WELFARE ORDINANCE of the City of Victoria.

You are asked to clear your lots and pieces of ground within the city limits of inoperable
vehicles within ten (10) days of the receipt of this notice.

Failure to do so will result in the city filing a complaint with the municipal court of the
city and upon conviction you could be fined in an amount not to exceed $100 per day or
be imprisoned not to exceed 30 days or both.

If payment of these charges is not forthcoming, same will be added to the property tax as
a special assessment.

Contact the City Clerk at (785) 735-2259 if there are any questions regarding the order.

_____               _____
Cole Dinkel, Chief of Police               Mary Pfeifer, City Clerk

**PLAINTIFF'S EXHIBIT Q-1**

## ARTICLE 4.  WEEDS

8-401.  WEEDS TO BE REMOVED.  It shall be unlawful for any owner, agent, lessee, tenant, or other person occupying or having charge or control of any premises to permit weeds to remain upon said premises or any area between the property lines of said premises and the centerline of any adjacent street or alley, including but not specifically limited to sidewalks, streets, alleys, easements, rights-of-way and all other areas, public or private.  All weeds as hereinafter defined are hereby declared a nuisance and are subject to abatement as hereinafter provided.  (Code 1970, 9-201; Code 1992)

8-402.  DEFINITIONS.  Weeds as used herein, means any of the following:
(a)  Brush and woody vines shall be classified as weeds;
(b)  Weeds and indigenous grasses which may attain such large growth as to become, when dry, a fire menace to adjacent improved property;
(c)  Weeds which bear or may bear seeds of a downy or wingy nature.
(d)  Weeds which are located in an area which harbors rats, insects, animals, reptiles, or any other creature which either may or does constitute a menace to health, public safety or welfare;
(e)  Weeds and indigenous grasses on or about residential property which, because of its height, has a blighting influence on the neighborhood. Any such weeds and indigenous grasses shall be presumed to be blighting if they exceed 12 inches in height.
(Code 1992)

8-403.  PUBLIC OFFICER; NOTICE TO REMOVE.  The mayor with the consent of the council shall designate a public officer to be charged with the administration and enforcement of this ordinance.  The public officer or an authorized assistant shall notify in writing the owner, occupant or agent in charge of any premises in the city upon which weeds exist in violation of this ordinance, by mail or by personal service, once per calendar year.  Such notice shall include the following:
(a)  That the owner, occupant or agent in charge of the property is in violation of the city weed control law.
(b)  That the owner, occupant, or agent in charge of the property is ordered to cut the weeds within 10 days of the receipt of notice.
(c)  That the owner, occupant or agent in charge of the property may request a hearing before the governing body or its designated representative within five days of the receipt of notice.
(d)  That if the owner, occupant or agent in charge of the property does not cut the weeds, the city or its authorized agent will cut the weeds and assess the cost of the cutting, including a reasonable administrative fee, against the owner, occupant or agent in charge of the property.
(e)  That the owner, occupant or agent in charge of the property will be given an opportunity to pay the assessment, and, if it is not paid, it will be added to the property tax as a special assessment.

8-12

**PLAINTIFF'S EXHIBIT R-1**

(f)    That no further notice shall be given prior to removal of weeds during the current calendar year.

(g)    That the public officer should be contacted if there are any questions regarding the order.

If there is a change in the record owner of title to property subsequent to the giving of notice pursuant to this subsection, the city may not recover any costs or levy an assessment for the costs incurred by the cutting or destruction of weeds on such property unless the new record owner of title to such property is provided notice as required by this section.
(Code 1970, 9-202; Code 1992)

8-404.      ABATEMENT; ASSESSMENT OF COSTS. (a)  Upon the expiration of 10 days after receipt of the notice required by section 8-403, and in the event that the owner, occupant or agent in charge of the premises shall neglect or fail to comply with the requirements of section 8-401, the public officer or an authorized assistant shall cause to be cut, destroyed and/or removed all such weeds and abate the nuisance 3created thereby at any time during the current calendar year.

(b)    The public officer or an authorized assistant shall give notice to the owner, occupant or agent in charge of the premises by restricted mail of the costs of abatement of the nuisance.  The notice shall state that payment of the costs is due and payable within 30 days following receipt of the notice.

(c)    If the costs of removal or abatement remain unpaid after 30 days following receipt of notice, a record of the costs of cutting and destruction and/or removal shall be certified to the city clerk who shall cause such costs to be assessed against the particular lot or piece of land on which such weeds were so removed, and against such lots or pieces of land in front of or abutting on such street or alley on which such weeds were so removed.  The city clerk shall certify the assessment to the county clerk at the time other special assessments are certified for spreading on the tax rolls of the county.
(K.S.A. 12-1617e; Code 1970, 9-202; Code 1992)

8-405.      RIGHT OF ENTRY.  The public officer, and the public officer's authorized assistants, employees, contracting agents or other representatives are hereby expressly authorized to enter upon private property at all reasonable hours for the purpose of cutting, destroying and/or removing such weeds in a manner not inconsistent with this article. (Code 1992)

8-406.      UNLAWFUL INTERFERENCE.  It shall be unlawful for any person to interfere with or to attempt to prevent the public officer or the public officer's authorized representative from entering upon any such lot or piece of ground or from proceeding with such cutting and destruction.  Such interference shall constitute a code violation.  (Code 1992)

8-407.      NOXIOUS WEEDS.  (a)  Nothing in this article shall affect or impair the rights of the city under the provisions of Chapter 2, Article 13 of the Kansas Statutes Annotated, relating to the control and eradication of certain noxious weeds.

8-13

**PLAINTIFF'S EXHIBIT R-2**

UNIFORM NOTICE TO APPEAR AND COMPLAINT                    VICTORIA POLICE DEPARTMENT

Case No. __H-155__                    Arrest No. _____

STATE OF KANSAS
COUNTY OF ELLIS
CITY OF VICTORIA

The City of Victoria against
The Undersigned, Being Duly Sworn, Upon His Oath Deposes and Says:

On the _____ day of _____ , 20 ____ at _____ (Time)

Name: BOYD D/ BEHNHAM
Lisa Robert

Street/RFD: 1110 Cathedral
City: Victoria                    State: _____                    Initial: 674

Birth Date: 02/05/ / 06/05/65

Driv. Lic. State: _____

Upon a Public Highway, Street or Other Place within the Limits and Jurisdiction Aforesaid Then and There
Commit the Following Offense:

(Operate) a Vehicle to Wit: Veh. Lic. No. _____
State _____    Make _____    Model _____    Color _____
BY: ☐    Alleged speed _____ mph legal speed _____ mph

| Fail to Yield Right of Way | Drove Left of Center | Disobeyed Stop Sign |
| Illegal Registration | Driver's License Violation | Equipment to wit: |

Operate a Vehicle While Under the Influence of Alcohol and/or Drugs

Other Violations:                          Oblem. Veh. ☐
                                           HAZMAT ☐
                                           Infraction ☐
                                           Misdemeanor ☐
Other Violations (non-traffic):            Accident ☐
                                           Warning ☐

All in Violation of Section (s) _____
of City Ordinance of Victoria, Kans., amended, in such case made and Provided.

Officer's Signature: _____                    No. 701

Court Appearance: _____ AM _____ Day of July 14 20 ____ 6:15 ____

Address of Court: Victoria Municipal Court at City Building 1005 4th St. Victoria, KS
I Promise to Appear in Said Court at said Time and Place.

Signature _____

Bond Posted    ☐ Cash    ☐ D.L.    ☐ Bond Card No. _____

Amount $ _____                    Location _____

I, the above officer, served a copy of the infraction cited upon the defendant.    ☐

White - Complaint       Yellow Copy - Disposition Report       Blue Copy - Police Record
                                                              Buff Copy - Notice to Appear

**PLAINTIFF'S EXHIBIT S-1**

**READ CAREFULLY**

Except in cases involving certain types of offenses, you may pay the prescribed fine by mail. If you pay the fine by mail, you must sign the appearance, plea of guilty and waiver of your right to a hearing by the court by a jury, which is set forth below, and mail this citation with your remittance. If you appear in person before the Violations Bureau or the court, be sure to bring this citation with you.

COURT ADDRESS

**VICTORIA MUNICIPAL COURT**
1005 4th St.
P.O. Box 87
Victoria, KS 67671
(785) 735-2259
(785) 735-4206

*By July* *mouse cat onto trailer*

*Must Appear on 7/7/2014 6:45 pm*

Guilty ☐
No Contest ☐
Amount of Fine . . . . . . . . . . . . . . . . . . . . . . . .
Amount of Court Costs . . . . . . . . . . . . . . . . . . .
Total Amount of Fine and
Court Costs to be Remitted
PLEASE MAKE CHECK PAYABLE TO THE CITY OF VICTORIA

**APPEARANCE, PLEA OF GUILTY AND WAIVER**

I, the undersigned do hereby enter my appearance on the complaint of the violation charged on the other side of this citation. I have been informed of my right to trial, that my signature on the plea of guilty will have the same force and effect as a judgement of the court, and that this record will be sent to the licensing authority of this state (or of the state where I received my license to drive.) I do hereby PLEAD GUILTY or NO CONTEST to said violation as charged and WAIVE my rights to a hearing by the court or a jury, and agree to pay the penalty prescribed for the violation.
SIGNATURE _____

Your failure to appear in court at the time specified on this Notice to Appear may result in a warrant being issued for your arrest and will result in suspension or revocation of driving privelages.

**ALL TRAFFIC FINES FOR VIOLATIONS OF STATE LAW ARE PAID INTO THE GENERAL FUND OF THE CITY OF VICTORIA.**

THIS ~~Plaintiff's~~ ..TO APPEAR SERVES AS A RECEIPT
~~Exhibit~~ ..BOND POSTED.

..RTESY - PROTECTION

**PLAINTIFF'S EXHIBIT S-2**

UNIFORM NOTICE TO APPEAR AND COMPLAINT                     VICTORIA POLICE DEPARTMENT

Case No. **14-194**   Docket No. _____   Arrest No. _____

STATE OF KANSAS
COUNTY OF ELLIS
CITY OF VICTORIA

The City of Victoria against
The Undersigned, Being Duly Sworn, Upon His Oath Deposes and Says:

On the **17th** day of **June** **14**, **10:20** (Time)

| 8 | O | Y | D |   |   |   |   |   |

Name (Last)

**Lisa** (First)     **R** (Initial)

Street Address **807 Kansas**

City **Walnsburg**     State **CO**     Zip **81089**

| 0 | 3 | 2 | 6 | 1 | 9 | 5 | 7 |

Date

Dri. Lic. No. **KS - K018C1931**

Birthplace(s) #. **1410 Cathedral   Victoria, KS**

This is a Public Highway, Street or Other Location in the City, County and State Aforesaid Then and There
___ the Following Offense:

Operated a Motor Vehicle Mfr. Lic. No. _____

Mfr. _____ Yr. _____ Make _____ Model _____ Color _____

DID: ☐  Alleged Speed _____ mph legal speed _____

City Code: **8.404**

All in violation of Section (s) _____
of City Ordinance of Victoria, Kansas _____ in each case made and Provided

Officer's
Signature **CDM**     No. **740**

Court Appearance **7th** Day of **July** **14** **6:45** (Time)
Address of Court, Victoria Municipal Court at City Building, Victoria KS
I Promise to Appear in Said Court at said Time and Place.

Signature _____

Bond Posted   ☐ Cash   ☐ D.L.   ☐ Bond Card No. _____

Amount $ _____     Location _____

I, the above officer, served a copy of the infraction cited upon the defendant.   ☐

White - Complaint        Yellow Copy - Disposition Report

**PLAINTIFF'S EXHIBIT T-1**

**READ CAREFULLY**

Except in cases involving certain types of offenses, you may pay the prescribed fine by mail. If you pay the fine by mail, you must sign the appearance, plea of guilty and waiver of your right to a hearing by the court by a jury, which is set forth below, and mail this citation with your remittance. If you appear in person before the Violations Bureau or the court, be sure to bring this citation with you.

**COURT ADDRESS**

**VICTORIA MUNICIPAL COURT**
1005 4th St.
P.O. Box 87
Victoria, KS 67671
(785) 735-2259
(785) 735-4289

**Plaintiff's Exhibit**

Guilty ☐
No Contest ☐
Amount of Fine . . . . . . . . . .
Amount of Court Costs . . . . . . . . . .
Total Amount of Fine and
Court Costs to be Remitted

PLEASE MAKE CHECK PAYABLE TO THE CITY OF VICTORIA

**APPEARANCE, PLEA OF GUILTY AND WAIVER**

I, the undersigned do hereby enter my appearance on the complaint of the violation charged on the other side of this citation. I have been informed of my right to trial, that my signature on this plea of guilty will have the same force and effect as a judgement of the court, and that this record will be sent to the licensing authority of this state (or of the state where I received my license to drive.) I do hereby PLEAD GUILTY or NO CONTEST to said violation as charged and WAIVE my rights to a hearing by the court or a jury, and agree to pay the penalty prescribed for the violation.

SIGNATURE

Your failure to appear in court at the time specified on this Notice to Appear may result in a warrant being issued for your arrest and will result in suspension or revocation of driving privelages.

**ALL TRAFFIC FINES FOR VIOLATIONS OF STATE LAW ARE PAID INTO THE GENERAL FUND OF THE CITY OF VICTORIA.**

THIS COPY OF THE NOTICE TO APPEAR SERVES AS A RECEIPT FOR ANY BOND POSTED.

**SERVICE - COURTESY - PROTECTION**

**PLAINTIFF'S EXHIBIT T-2**

14-190 - Lisa Renee Boyd - Accused/Suspect                    2

807 Kansas St
Walsenburg CO 81089

Description

| Person Descriptors | | | | |
|---|---|---|---|---|
| Photo | | | | |
| Height: | 502 | Weight: | 150 | Build |
| Ethnicity | Not of Hispanic Origin | Complexion | | |
| Hair Color: | Brown | Hair Length | | Hair Style |
| Facial Hair | | Teeth | | |
| Speech | | R-L Handed | Right | |
| Eye Color: | Hazel | Eye Appearance | | ☐ Glasses |
| Place of Birth | Kansas | | | |
| ○ Resident   ● Non-Resident | | Country of Citizenship | | |
| FBI#: | | State ID#: | | |
| Marks, scars, outstanding features | | | | |
| Tattoos | | Physical/Mental Condition | | |
| NCIC Caution: | | Sobriety | ☐ Sober ☐ HBD ☒ Intox ☐ Drugs | |

Arrest Details

n14

**PLAINTIFF'S EXHIBIT U-1**

IN THE DISTRICT COURT OF ELLIS COUNTY, KANSAS

STATE OF KANSAS,                                      Plaintiff

vs.                                                  No. 14CR-345

LISA RENEE BOYD,                                     Defendant.

JOURNAL ENTRY OF DISCOVERY MOTION

NOW, on this 22nd day of October, 2014, the above captioned matter comes on for hearing. The State appears by Thomas J Drees, Ellis County Attorney. The defendant appears in person and pro se.

WHEREUPON, the court reviews the papers and pleadings filed herein and finds that we are set for a hearing on the defendant's Motion for Discovery. The court first inquires of the defendant if she wishes to have counsel. She advises she does not wish to hire counsel at this time, but does wish to have counsel appointed to represent her. The court goes through the defendant's resources. The court finds the defendant does not qualify for court-appointed counsel on this misdemeanor case because she is the owner outright of two (2) residences, one in Victoria, Kansas, and one in Walsenburg, Colorado, and has approximately $2,000.00 cash in savings.

WHEREUPON, the defendant wishes to proceed with her Motion for Discovery pro se. The court advises the defendant of what she is entitled to receive pursuant to Kansas Statute and case law.

WHEREUPON, the court goes through the defendant's requests paragraphs A through F in her motion filed September 23, 2014.

1.   As to paragraph A, the State advises the court that all police reports have been turned over, there are no field notes of the officer, the officer's narratives have been turned over, there are no e-mails between law enforcement and the State in this matter.

2.   As to paragraph B, the recordings of law enforcement from in-car video from the ride from Victoria, Kansas to the law enforcement center and the ride from the law enforcement center to the hospital for further blood testing have been turned over to the defendant. The video of the defendant taking the field sobriety tests at the law enforcement center is available to the defendant through the Sheriff's Office upon her remitting the $25.00 fee to the Sheriff's Office for said copying of the video for her. The State advises there are no 911 calls or police dispatch tapes, as the calls from the public were to the Victoria Police Department directly.

3.   As to paragraph C of the discovery motion, the defendant is requesting the calibration and testing logs concerning the Intoxilyzer 8000. The State has requested these documents from the Sheriff Office. They will be mailed to the defendant within the week.

**PLAINTIFF'S EXHIBIT V-1**

JOURNAL ENTRY OF DISCOVERY MOTION
14CR-345
Page 2

4.    As to paragraph D of the defendant's request, the Victoria Police Department, nor Chief Dinkel have the field sobriety testing manuals upon which he was trained. Those are Standard National Institute of Traffic Safety Administration, which is available to the defendant either on-line or through ordering said manuals. The defendant is to obtain those on her own. The defendant is further requesting all of the operating procedures for Victoria Police Department and current standard operating procedures of all manuals and orders by the Victoria Police Department. The court is advised these do not exist as it is a two (2) man department and the court denies the request.

5.    As to request paragraph E, the defendant is requesting the operator's manual of the Intoxylizer 8000. The State has a copy which is available for counsel to review and photocopy requested pages at a fee of $0.25 per page. The defendant advises she does not wish to pay for entire manual, some two-hundred (200) pages. The defendant will make an appointment to review the manual outside of the Ellis County Attorney's Office, it will not leave the building, and the defendant may request the pages she wants copied at $0.25 per page through the Ellis County Attorney's Office.

6.    As to paragraph F is a repeat of paragraph C, and those documents will be provided within the week to the defendant.

WHEREUPON, the court schedules a **Bench Trial** in this matter for the **6th** day of **January, 2014**, beginning at **1:30 p.m.**, before the Honorable Edward E. Bouker, District Judge

IT IS SO ORDERED.

_____
HON. EDWARD E. BOUKER
District Judge

SUBMITTED BY:

ORIGINAL SIGNED
BY PROSECUTOR

THOMAS J DREES #14176
Ellis County Attorney
1204 Fort
Hays, KS 67601

Cc:    Lisa Boyd, 807 Kansas Avenue, Walsenburg, Colorado 81089
        Lisa Boyd, 1110 Cathedral, Victoria, Kansa 67671

## PLAINTIFF'S EXHIBIT V-2