IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

LISA BOYD,

Plaintiff,

vs.                                                Case No. 16-4106-SAC

CITY OF VICTORIA, KANSAS;
ELLIS COUNTY, KANSAS; MARY
PFEIFER; COLE DINKEL;
WILMER DINKEL; RYAN MAUCH;
CURTIS UNREIN; SHERIFF ED
HARBIN; and UNKNOWN ELLIS
COUNTY, KANSAS EMPLOYEES.

Defendants.

MEMORANDUM AND ORDER

The case comes before the court on the following summary

judgment motions that are ripe for decision:  the defendants City of Victoria,

Mary Pfeifer, Cole Dinkel, Ryan Mauch and Curtis Unrein (ECF# 32)

("Victoria defendants") and the defendants Ellis County, Sheriff Ed Harbin,

Wilmer Dinkel and unknown Ellis County employees (ECF# 39) ("Ellis County

defendants"). The pro se plaintiff Lisa Boyd has filed responses to both

motions, (ECF## 47 and 58), and the defendants have replied respectively

(ECF## 59 and 60).

Ms. Boyd brings this lawsuit alleging 16 counts for relief

pursuant to 42 U.S.C. §§ 1983 and 1985 and pursuant to state tort law.

ECF# 1. The factual setting for her complaint, as alleged, is that Ms. Boyd

moved to the small town of Victoria, Kansas, sometime in 1998, and she soon came to believe she was the target of a civil conspiracy intent to drive her into leaving Victoria. ECF# 1, ¶¶ 24 and 26. Ms. Boyd alleges the defendants enforced laws against her, made statements to her and about her, and also conducted themselves as to oppose her interests all done in an effort to discourage her from staying there. She alleges that her arrest on June 19, 2014, for driving under the influence ("DUI"), as the culmination of the defendants' efforts.

The defendants seek summary judgment on several different grounds. They characterize Ms. Boyd's suit as an unsuccessful financially-motivated attempt to transform "a series of unsatisfactory encounters with the citizens, officials and employees of the city of Victoria between 2006 and 2014" into a plot to drive her away "because she did not share the religion of many of her neighbors." ECF# 33, p. 1. The defendants argue the facts show that many of encounters resulted from calls for help made either by her or her family. *Id.* p. 2. The defendants raise several legal defenses and argue deficiencies in the evidence that prevent the plaintiff from recovering as a matter of law.

**SUMMARY JUDGMENT STANDARDS**

"Summary judgment is appropriate only if 'the movant shows that there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law.'" *Tolan v. Cotton*, ––– U.S. ––––,

134 S.Ct. 1861, 1866, 188 L.Ed.2d 895 (2014)(quoting Fed. R. Civ. P. 56(a)). A factual dispute is "material" only if it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby*, 477 U.S. 242, 248 (1986). A "genuine" factual dispute requires more than a mere scintilla of evidence in support of a party's position. *Id.* at 252.

The moving party has the initial burden of showing "the absence of a genuine issue of material fact," and, if carried, the non-moving party then "must bring forward specific facts showing a genuine issue for trial as to those dispositive matters for which [it] carries the burden of proof." *National American Ins. Co. v. American Re-Insurance Co.*, 358 F.3d 736, 739 (10th Cir. 2004) (internal quotation marks and citation omitted). At the summary judgment stage, the court is not to be weighing evidence, crediting some over other, or determining the truth of disputed matters, but is only to be deciding if a genuine issue for trial exists. *Tolan*, 134 S. Ct. at 1866. The court performs this task with a view of the evidence that favors most the party opposing summary judgment. *Id.* Summary judgment may be granted if the nonmoving party's evidence is merely colorable or is not significantly probative. *Liberty Lobby*, 477 U.S. at 250–51. Essentially, the inquiry is "whether the evidence presents a sufficient disagreement to require submission to the jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.* at 251–52.

The Court will not consider statements of fact, or rebuttals thereto, which are not material or are not supported by competent evidence. Fed. R. Civ. P. 56(c)(1)(A), 56(e)(2), 56(e)(3). "[O]n a motion for summary judgment, it is the responding party's burden to ensure that the factual dispute is portrayed with particularity, without depending on the trial court to conduct its own search of the record." *Cross v. The Home Depot*, 390 F.3d 1283, 1290 (10th Cir. 2004) (internal quotation and citation omitted). The Court is "not obligated to comb the record in order to make [Plaintiffs'] arguments for [them]." *See Mitchell v. City of Moore, Okla.*, 218 F.3d 1190, 1199 (10th Cir. 2000). The court's local rule, D.Kan. Rule 56.1, provides:

> All facts on which a motion or opposition is based must be presented by affidavit, declaration under penalty of perjury, and /or relevant portions of pleadings, depositions, answers to interrogatories, and responses to requests for admissions. Affidavits or declarations must be made on personal knowledge and by a person competent to testify to the facts stated that are admissible in evidence. Where facts referred to in an affidavit or declaration are contained in another document, such as a deposition, interrogatory answer, or admission, a copy of the relevant excerpt from the document must be attached.

To be effective, summary judgment affidavits "must be based on personal knowledge and set forth facts that would be admissible in evidence at trial; conclusory and self-serving affidavits are not sufficient." *Murray v. City of Sapulpa*, 45 F.3d 1417, 1422 (10th Cir. 1995) (quotations and citation omitted). To be viable, the summary judgment affidavits must provide evidence for which the content would be admissible even if the form would not be admissible. *Adams v. American Guarantee and Liability Ins.*

*Co.*, 233 F.3d 1242, 1246 (10th Cir. 2000) (Inadmissible hearsay evidence may not be used in summary judgment). "So it is that, although evidence presented in the form of an affidavit at summary judgment can be converted in form into live testimony at trial, the content or substance of the affidavit must be otherwise admissible, and any hearsay contained in a summary judgment affidavit remains hearsay, beyond the bounds of the court's consideration." *Johnson v. Weld County, Colo.*, 594 F.3d 1202, 1210 (10th Cir. 2010).

"To defeat a motion for summary judgment, evidence, including testimony, must be based on more than mere speculation, conjecture, or surmise." *Bones v. Honeywell Int'l, Inc.*, 366 F.3d 869, 875 (10th Cir. 2004). "In a response to a motion for summary judgment, a party cannot rest on ignorance of facts, on speculation, or on suspicion and may not escape summary judgment in the mere hope that something will turn up at trial." *Conaway v. Smith*, 853 F.2d 789, 794 (10th Cir. 1988)(citation omitted). "[A]t the summary judgment stage, statements of mere belief in an affidavit must be disregarded." *Argo v. Blue Cross and Blue Shield of Kansas, Inc.*, 452 F.3d 1193, 1200 (10th Cir. 2006) (internal quotation marks and citation omitted).

The plaintiff submits an affidavit that sweepingly states, "statements of fact made by Plaintiff in her Response to the City's Motion for Summary Judgment . . . are true and correct." ECF# 47-1, p. 4; ECF# 58, p.

7. She also submits a number of exhibits, and her citations to them are frequently broad and vague. The court will accept as statements of fact only those that can be read as statements of fact, because they are based on the plaintiff's personal knowledge with supporting detail and are not based on speculation, opinion or argument. "The Tenth Circuit has held that merely placing evidence in the record on summary judgment without pointing the Court to it is insufficient: 'it is the responding party's burden to ensure that the factual dispute is portrayed with particularity, without . . . depending on the trial court to conduct it's own search of the record.'" *Ney v. City of Hoisington, Kan.*, 508 F. Supp. 2d 877, 883 (D. Kan. 2007) (quoting *Cross v. The Home Depot*, 390 F.3d 1283, 1290 (10th Cir. 2004)), *aff'd sub nom. Ney v. City of Hoisington, Kansas*, 264 Fed. Appx. 678 (10th Cir. 2008)(unpub.) "If a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact . . ., the court may: (1) give an opportunity to properly support or address the fact; (2) consider the fact undisputed for purposes of the motion; (3) grant summary judgment if the motion and supporting materials—including the facts considered undisputed—show that the movant is entitled to it; or (4) issue any other appropriate order." Fed. R. Civ. P. 56(e).

Being pro se, Ms. Boyd's filings are liberally construed, but the court will not act as her advocate. *James v. Wadas*, 724 F.3d 1312, 1315 (10th Cir. 2013). Nor will the court "sift through the record to find support

6

for" her arguments. *Phillips v. James*, 422 F.3d 1075, 1081 (10th Cir. 2005),

Nor will it "fashion . . . [her] arguments" when her "allegations are merely

conclusory in nature and without supporting factual averments." *United

States v. Fisher*, 38 F.3d 1144, 1147 (10th Cir. 1994) (citation omitted).

Ms. Boyd repeatedly states that she "cannot present facts

essential to justify her opposition absent adequate time to obtain affidavits

or take discovery and so states pursuant to Rule FRCP 56(d)." ECF## 47

and 58. An opposing party who wants the motion either deferred or denied

"must file an affidavit that explains why facts precluding summary judgment

cannot be presented" and that also identifies "the probable facts not

available and what steps have been taken to obtain these facts."

*Abdulhaseeb v. Calbone*, 600 F.3d 1301, 1310 (10th Cir.)(citation omitted),

*cert. denied*, 562 U.S. 968 (2010); *see also Garcia v. U.S. Air Force*, 533

F.3d 1170, 1179 (10th Cir. 2008)("A party may not invoke Rule 56(f) by

simply stating that discovery is incomplete but must state with specificity

how the additional material will rebut the summary judgment motion."). Ms.

Boyd's blanket statement of needing more time lacks the required

explanation and detail.

In their motions, the defendants have blended their arguments

to incorporate even challenges to pleading based on Rule 12(b)(6). In

addressing those arguments, the court applied the following. The court

accepts as true "all well-pleaded factual allegations in a complaint and

view[s] these allegations in the light most favorable to the plaintiff." *Smith v. United States*, 561 F.3d 1090, 1098 (10th Cir. 2009), *cert. denied*, 558 U.S. 1148 (2010). This duty to accept a complaint's allegations as true is tempered by the principle that "mere labels and conclusions, and a formulaic recitation of the elements of a cause of action will not suffice; a plaintiff must offer specific factual allegations to support each claim." *Kansas Penn Gaming, LLC v. Collins*, 656 F.3d 1210, 1214 (10th Cir. 2011) (quoting in part *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (internal quotation marks omitted)). To withstand a Rule 12(b)(6) motion, "a complaint must contain enough allegations of fact, taken as true, to state a claim to relief that is plausible on its face." *Al–Owhali v. Holder*, 687 F.3d 1236, 1239 (10th Cir. 2012) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). Thus, "a plaintiff must offer sufficient factual allegations to 'raise a right to relief above the speculative level.'" *Kansas Penn Gaming*, 656 F.3d at 1214 (quoting *Twombly*, 550 U.S. at 555). "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully.'" *Iqbal*, 556 U.S. at 678 (quoting Twombly, 550 U.S. at 556). "'A claim has facial plausibility when the [pleaded] factual content . . . allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.'" *Rosenfield v. HSBC Bank, USA*, 681 F.3d 1172, 1178 (10th Cir. 2012).

**STATEMENT OF FACTS**

Ms. Boyd moved to Victoria, Kansas in 1998, and Cole Dinkel became Victoria Police Department's ("VPD's") Chief of Police ("Chief") in May of 2008. Over the years, Chief Dinkel in his official capacity has had numerous contacts with the plaintiff Ms. Boyd. For example, in June of 2010, he investigated a reported burglary and theft at the plaintiff's shop which resulted in a confession by the perpetrator. In September of 2010, the plaintiff's adult daughter made a disturbance call reporting that the plaintiff had been hit by the plaintiff's boyfriend, Bentham. Chief Dinkel went to the plaintiff's home and saw her bruises, but the plaintiff refused to tell him what had happened. Several days later, the plaintiff told Chief Dinkel what had happened, but she said she did not want Bentham to be arrested, but only removed.

In November of 2011, the VPD received multiple calls of fighting between the plaintiff and Bentham which ended in Bentham's arrest. When released, Bentham was ordered not to have contact with the plaintiff, but the plaintiff continued to contact Bentham even after she was told to stop. The VPD received information that the plaintiff was harassing Bentham, threatening to get him, and speaking ill of him. The VPD also received a report from another citizen who complained that the plaintiff had entered his residence without permission to rant about Bentham. The plaintiff does not effectively controvert this statement.

The plaintiff reported credit card fraud in February of 2012. After VPD Officer Ryan Mauch's investigation of it, the VPD understood the plaintiff had been refunded the money. The plaintiff's evidence does not controvert Chief Dinkel's averments that the plaintiff did not subsequently contact the VPD about this credit card debt and that he never refused to take from the plaintiff a report of identity theft.

In June of 2012, the plaintiff's adult daughter, Sara, contacted the VPD with a report that the plaintiff would not leave Sara's hair salon. The incident resolved with the plaintiff leaving and no action being taken. On September 6, 2012, a citizen reported to the VPD that there was apparent drug activity in the plaintiff's yard. Officer Mauch made contact with the plaintiff and Bentham. Finding no evidence of drug activity, no further action was taken.

The City of Victoria maintains one "hard copy" of its ordinances in several volumes, none of which may be removed from the city office. Upon a citizen's request to see certain ordinances, the relevant ones are identified and produced for viewing. The affidavit of City Clerk Mary Pfeifer states that the plaintiff was never refused access to the city ordinances. The plaintiff refers to several instances when Pfeifer effectively denied her requests to "see **all** of the ordinances" at the same time. ECF# 47, ¶ 30 (bolding added).

On September 6, 2012, plaintiff went into the City Clerk's office, "slammed her hands on the counter and began rambling and complaining loudly, yelling and behaving in what the clerk and assistant perceived to be a bizarre, aggressive, and threatening manner." ECF# 33, ¶ 31. The plaintiff referred to herself as crazy. Frightened and alarmed, the City Clerk called the VPD, and the plaintiff then left. The plaintiff's unsupported and unexplained use of "controverted" and her statements concerning her subjective intent do not effectively controvert these statements of fact. The defendant VPD Officer Ryan Mauch stopped the plaintiff as she was driving from the city hall and arrested her for disorderly conduct. After the plaintiff was booked and released on an OR bond, the officer gave her a ride home.

Later that same day, a hand-lettered sign appeared in the plaintiff's front yard that read, "St. Fidelis-Always Faithful to Pedophiles." In her complaint, the plaintiff alleges that after her disorderly conduct arrest she allowed her boyfriend Bentham to put up this sign in her yard, because he wished to express his opinion on this subject. At paragraphs 88 and 89 of her complaint, the plaintiff alleges that in regard to this incident she "hoped that some feather ruffling might stop or slow the city's harassment activities," but she "was mistaken in this hope." ECF# 1. The VPD received calls about the plaintiff's sign. VPD Officer Mauch instructed the plaintiff to remove the sign from the city's right of way, and when the plaintiff promised to comply, Mauch left. Chief Dinkel stopped by later, and he too discussed

the situation with the plaintiff and Bentham. Citizens were noticing the sign and objecting to it. Dinkel recalls Ms. Boyd saying the town disliked her to which he replied that the sign did not help. The plaintiff's statement does not effectively controvert any of the material facts here.

According to Chief Dinkel, the plaintiff began alleging harassment and demanding money from the city for it. She also threatened to replace her St. Fidelis sign if the city did not pay her. Chief Dinkel told the plaintiff that she was free to replace her sign and that he could not stop her. The plaintiff's blanket statement of "controverted" is insufficient. Because this statement addresses what the plaintiff purportedly said at a particular point in time, the plaintiff offers nothing to show how her controverting evidence is unavailable.

On September 11, 2012, the owner of the shop which the plaintiff leased asked the VPD to provide a civil standby as he served an eviction notice on the plaintiff. Chief Dinkel performed this duty, and no arrests were made. Later that same day, the plaintiff contacted a city council member and Mayor Unrein in regards to this eviction, and Chief Dinkel received citizen phone calls complaining that the plaintiff had re-erected her St. Fidelis sign. Chief Dinkel went to the plaintiff's house and they discussed the situation. He did not request or order her to remove the sign, and he told her that he was there to protect her and her property. The plaintiff eventually removed the sign.

On June 16, 2013, Chief Dinkel received a citizen's complaint that the plaintiff had gone to a residence and yelled at the citizen in front of his children and had left harassing messages on his cell phone. Chief Dinkel spoke with the plaintiff and mediated the issues between the citizen and the plaintiff. During this event, Chief Dinkel observed the plaintiff engage in disorderly conduct by coming outside in boxer shorts and then yelling and cursing. Chief Dinkel repeatedly warned the plaintiff who went back inside without any further action being taken.

On July 3, 2013, the plaintiff's adult daughter called 911 to report that the plaintiff was not allowing her and her 6-year-old son to leave the plaintiff's home. Chief Dinkel responded and saw the plaintiff physically blocking the young boy from leaving the yard and joining his mother. The plaintiff accused her daughter of being an unfit mother. Chief Dinkel allowed the daughter and her son to leave, and he took no action against the plaintiff.

On July 17, 2013, Chief Dinkel responded to a citizen call that the plaintiff was violating the City's water use restrictions. Chief Dinkel explained the restrictions, and the plaintiff accepted the warning. No further action was taken.

In June of 2014, Bentham as occupant of the plaintiff's house was served with a warning letter that the lawn vegetation violated the city's environmental code. On June 17, 2014, Chief Dinkel followed up on the

warning letter and saw that the yard still did not comply. He discussed the situation with the plaintiff who demanded to see the governing ordinance. So, Chief Dinkel went with the plaintiff to City Hall where he made a copy of the ordinance for her. The plaintiff complained that other yards in Victoria were also in violation of this ordinance, and Chief Dinkel responded that they were being addressed too. The plaintiff's statements to Chief Dinkel included the comment that the citizens of Victoria were Nazis.

On June 19, 2014, Chief Dinkel received multiple calls from citizens complaining that the plaintiff was highly intoxicated and was screaming at Bentham in front of the church. Another report came in that the plaintiff was yelling obscenities at three juvenile boys who were riding bikes in the area. Chief Dinkel went to the area and spoke with the boys who confirmed the reported complaint. He then observed the plaintiff driving her vehicle. She made a turn without using a turn signal and then stopped at her home leaving one wheel up over the curb. When Chief Dinkel made contact with her, the plaintiff was loud, belligerent, and used obscene language. Chief Dinkel smelled a strong odor of alcohol on the plaintiff. The plaintiff consented to taking a preliminary breath test, and the blood alcohol result was .117. Chief Dinkel arrested the plaintiff and took her to the Law Enforcement Center in Hays. At the Center, the plaintiff agreed to a breath test, and the results were .104. The plaintiff then insisted on a blood test, and Chief Dinkel informed the plaintiff that additional testing would be at her

expense. The plaintiff was taken to the Hays Medical Center ("hospital"), and the blood test results were .084. While at the hospital, the plaintiff also asked for and received treatment and medication for a toothache and blood pressure problem. Upon her release from the hospital, Chief Dinkel took the plaintiff to the jail where she was booked in at 7:40 p.m. The plaintiff has not effectively controverted any of the above facts. The plaintiff asserts the hospital gave her prescriptions for pain medication, antibiotic, and blood pressure medication which were not filled by the jail or county personnel.

Staff at the Ellis County jail did not observe the plaintiff to be suffering from any serious or life-threatening health while she was detained from the evening of June 19 through her release the next morning on June 20 shortly after 11:00 am. Other than complaining about a toothache, she did not advise staff of any serious medical issues or health conditions. While the plaintiff denies filling out and signing an intake form indicating no serious current health problems, the plaintiff does not controvert what the staffers observed regarding her condition. The plaintiff denies being given an opportunity to advise staff of her medical conditions. Nonetheless, it is uncontroverted that on June 20th before she was taken to court and released on bond, jail staff transported the plaintiff to an urgent care center across the street around 8:15 a.m. based on the plaintiff's complaints of a toothache. While at this urgent care center, she again took medication for her blood pressure, was encouraged to get her antibiotic prescription filled,

was to have her blood pressure monitored while incarcerated, and was to follow up with dental care following her release. She was returned to her jail cell at 9:10 a.m. on June 20, transported to district court at 11:10 a.m., and was bonded out at approximately 11:23 a.m.

When the plaintiff was booked into jail, she was placed in a cell with another female detainee due to the high number of female detainees on June 19th. The cell contained a toilet, sink, bed, and sufficient space for two detainees. The plaintiff believes the cell was too small for two beds with sufficient space to travel from bed to toilet. The jailers aver the plaintiff never told them about her trouble with urinating or with her cellmate. The plaintiff says her verbal requests were ignored during the night, but that she raised her issues the next morning with the jailer who took her to the urgent care center. The plaintiff's cellmate began screaming in pain and was taken to the hospital at 2:45 a.m. on June 20th with complaints of kidney stones. The cellmate was treated for this condition at the hospital and was returned to the jail cell around 6:10 a.m. The plaintiff was taken to court around 11:00 a.m. and released before noon.

The plaintiff entered a diversion agreement in which she admitted to unlawfully operating a vehicle on June 19th with a breath alcohol level of .104 such that she was incapable of driving safely. The plaintiff admits the Ellis County Attorney's office assisted her in obtaining the proper operation of videos she received from the VPD. As far as the video of

her DUI arrest, Wilmer Dinkel did not erase, destroy or tamper the video and did not conspire to do the same. The lost video from the DUI check lane was caused by the mechanical failure of two hard drives, not human error or manipulation.

Chief Dinkel has not solicited anyone to act as an informant on the plaintiff's activities and has never looked for some excuse to arrest the plaintiff. The plaintiff's exhibits do not controvert these facts, nor does her affidavit which only recounts what she "is alleging" and does not appear to be based on personal knowledge. ECF# 47, p. 13, ¶ 109. Chief Dinkel did not advise Victoria residents that plaintiff was a bad person or that the plaintiff was someone likely to get them into trouble. The plaintiff's affidavit lacks the content and the specificity required by Rule 56(d) to controvert this statement. Chief Dinkel avers that he did not treat the plaintiff differently from other citizens who had violated city ordinances. The plaintiff avers that her yard "was cited on numerous occasions" when other citizens who were in violation did not receive citations. ECR# 47, pp. 13-14. Chief Dinkel avers that he did not destroy any evidence concerning the plaintiff and did not ask or collude with anyone else to destroy evidence. The plaintiff's affidavit fails the requirements of 56(d) concerning this latter statement.

## Summary of Complaint

The plaintiff's *pro se* complaint is 34 pages in length with 304 numbered paragraphs. ECF# 1. Her factual allegations coming under the

title of "Nature of the Case" comprise the numbered paragraphs of 24

through 188. *Id.* at pp. 3-20. Interspersed among the factual allegations are

the following bolded headings:

> -Chief Cole Dinkel and city clerk Mary Pfeifer engaged in defamatory activities toward Plaintiff and interfered with Plaintiff's family and business relationships. (p. 4).
> -Mary Pfeifer, the Victoria City Clerk repeatedly refused to provide Plaintiff access to the Victoria city ordinances, stating that she didn't have time to "supervise" Plaintiff while (sic) was reading them. Chief Cole Dinkel, Mayor Unrein and Mary Pfeifer employed the "mystery ordinances" against Plaintiff in furtherance of their conspiracy to drive Plaintiff from town. (p. 7).
> -Chief Cole Dinkel, Mary Pfeifer and Ryan Mauch conspired to falsely arrest Plaintiff for "disorderly conduct" after Plaintiff lawfully exercised her first amendment right to object to years of illegal denial of access to the city ordinances. (p. 8).
> -Officer Mauch locked Plaintiff in a police vehicle in extreme heat with no air conditioning for an extended period while talking on his cell phone with Mary Pfeifer and Cole Dinkel. (p. 9).
> -Defendants Cole Dinkel, Curtis Unrein and Ryan Mauch refused to take action on criminal threats to kill Plaintiff as communicated to Plaintiff by Mayor Unrein, Cole Dinkel and Ryan Mauch; These defendants used reports of threats by area residents to kill Plaintiff (sic) to chill plaintiff's speech, force Plaintiff to remove the sign from her yard and ultimately to move away from the community. (p. 10).
> -A year later, Plaintiff returned to Victoria to deal with the house there, and unwisely developed an impacted tooth while having no money for a dentist in Kansas. (pp. 11-12).
> -Chief Cole Dinkel refused to provide timely medical care, and the city had no procedures in place to assure that arrestees' medical needs were reasonably assessed and acted upon. (pp. 12-13).
> -Cole Dinkel forced Plaintiff (an indigent person on Medicaid) to agree to pay for medical care that the City of Victoria was in fact obligated to provide, as a condition to transport of the Plaintiff to the Emergency Room at Hays Medical Center. (p. 14).
> -Chief Cole Dinkel failed to advise Plaintiff of her right to consult with an attorney after Plaintiff consented to and performed a breathalyzer test. (p. 15).
> -Three and only three pieces of recorded evidence in the DUI "investigation." Three separate technical maladies. What are the odds? (p. 16)

-Other Ellis County Jail Issues—Inadequate Medical Care (p. 17); Physical Disability Accommodation (p. 18); Failure to protect prisoners from other prisoners (p. 18); Pattern of failure to provide prescription medications (p. 20).

These headings reveal the plaintiff's intended organization of her factual allegations. The plaintiff's complaint then consists of the following claims for relief under federal law:

> Count One:  42 U.S.C. § 1983.  First Amendment—Freedom of Religion claim. Allegations are that she was "deliberately discriminated against" for not being of the Roman Catholic faith, that as a result she "was denied access to community, association, and a venue for informal dispute resolution," that disparaging comments were made about her, and that "because the religious discrimination was overwhelming and intractable," she "suffered damages related to moving expenses, lost enjoyment of her property and disruption of her family relationships." (¶¶ 191, 192, 197, 199).
> Count Two:  42 U.S.C. § 1983. First Amendment—Freedom of Speech claim. Allegations are that she was denied free expression of opinions on her property, including those critical of the Roman Catholic church, that she was threatened with violence due to her speech and lack of respect for local church, and that as a result she felt "she had to move out of Victoria" and she "suffered damages related to moving expenses, lost enjoyment of her property and disruption of her family relationships." (¶¶ 203-205, 208-209).
> Count Three:  42 U.S.C. § 1983. First Amendment—Freedom of Press claim. Allegations are that defendants denied her "requests for information," that is, access to and examination of the ordinances which the city must publish, that this denial resulted in the denial of her opportunity and constitutional right to publish the ordinances, and that she was unable to defend herself from fines for violating ordinances. (¶¶ 213-215, 217).
> Count Four:  42 U.S.C. § 1983.  First Amendment—Freedom of Assembly claim. Allegations are that the defendants "discouraged other city residents from associating with the Plaintiff" causing the plaintiff to feel "isolated and lonely for most of the 15 years that she lived in the town. (¶¶ 223, 227).
> Count Five:  42 U.S.C. § 1983. Sixth Amendment—Fair Trial claim. Allegations are that the defendants deprived her of a constitutional right to a fair trial in the DUI prosecution and driver's license proceedings by destroying evidence that would have benefitted her

and would have resulted in no prosecution and no conviction. (¶¶ 233-235).

Count Six:  42 U.S.C. § 1983 Sixth Amendment—Right to Counsel Claim. Allegations are that she was denied the right to counsel, as Chief Dinkel failed to allow her to contact an attorney after she took the breathalyzer test and Ellis County failed to appoint her an attorney in her district court appeal from the driver's license administrative hearing.

Count Seven:  42 U.S.C. § 1983 Fourteenth Amendment—Due Process and Eighth Amendment claim. Allegations are that the conditions of her jail confinement (placed in a cell with another person, not provided adequate medical care in jail, denied the filling of her prescriptions, not given blood pressure checks, and not provided circumstances for emptying bladder) violated the Eighth Amendment and that the defendant Sheriff Harbin violated her due process rights by discriminatorily subjecting her to these jail conditions.

Count Eight:  42 U.S.C. § 1983 Fourteenth Amendment—Due Process claim. Allegations are that the defendants conspired by causing her to be arrested for disorderly conduct without evidence to sustain an arrest, by deliberately destroying evidence, and by demanding her to pay for emergency medical services as a condition of transportation.

Count Nine:  42 U.S.C. § 1983 Fourteenth Amendment—Unenumerated Rights—Right to Privacy claim. Allegations are that the defendants deprived the plaintiff of her constitutional right to maintain privacy in her family and personal affairs by talking about the plaintiff among themselves and other town residents and by cultivating informants who reported on the plaintiff's life with tenants and family.

Count Ten:  42 U.S.C. § 1983 Conspiracy to Deprive Constitutional Rights claim. Allegations are that the defendants conspired to "use their positions of authority whenever possible in the most punitive way possible given whatever opportunities arose, for the purpose of frightening, intimidating and impoverishing the Plaintiffs, all for the ultimate purpose of driving the Plaintiff out of town and to thereby to deprive Plaintiff of her constitutional rights.

Count Eleven:  42 U.S.C. § 1985(3) Conspiracy to Deprive Constitutional Rights claim. Allegations are that the defendants conspired to deprive the plaintiff of her constitutional rights as alleged above.

Counts 12 through 16 allege claims for relief under state law.

## Statute of Limitations—§§ 1983 and 1985 Claims

The defendants first argue that all of the plaintiff's federal claims, except for those based on the DUI arrest in June of 2014 and/or the related events occurring subsequently, are barred by the statute of limitations. The plaintiff filed her complaint on June 16, 2016. The complaint fails to set out the dates for many of the alleged events. The headings indicate the different events are generally being alleged in chronological order. The defendants' motions, however, effectively establish the dates for most of the alleged actions and events. The plaintiff does not controvert or challenge the dates established in the defendants' motions. Consequently, only those federal claims based on the events occurring with and after the plaintiff's DUI arrest appear to come within the applicable two-year limitations period. The plaintiff's response appears to date other events as occurring on June 16th and after. Notably, she refers to a traffic stop in which Chief Dinkel told Chris Rogers that the plaintiff was a "bad person." The plaintiff offers nothing but her hearsay statement in support of this event. The plaintiff also alleges Chief Dinkel harassed her and issued her a municipal ordinance violation for the condition of her yard. The plaintiff alleges this issuance of a violation shows harassment because Chief Dinkel did not confront Bentham who was the "primary resident" of her house. This allegation fails to state a claim for relief for it does not support any inference of improper or illegal motive behind the otherwise lawful enforcement of a municipal ordinance. The plaintiff does not deny she is liable for the

ordinance violation as she admits being present and being the owner of the property.

The governing statute of limitations in § 1983 actions is the state statute of limitations for personal injury actions. *See Hardin v. Straub*, 490 U.S. 536, 539 (1989); *Brown v. Unified Sch. Dist. 501, Topeka Pub. Schs.*, 465 F.3d 1184, 1188 (10th Cir. 2006). "For conspiracy claims under § 1985(3), courts have also applied the forum state's personal-injury statute of limitations." *Lyons v. Kyner*, 367 Fed. Appx. 878, 881-82 (10th Cir. Feb. 10, 2010) (citations omitted); *see Robinson v. Maruffi*, 895 F.2d 649, 653-54 (10th Cir. 1990). For Kansas, this is the two-year limitations period in K.S.A. § 60-513(a)." *Brown*, 465 F.3d at 1188. The accrual of a § 1983 claim, however, is a matter of federal law and occurs "when the plaintiff has a complete and present cause of action." *Wallace v. Kato*, 549 U.S. 384, 388 (2007). For § 1983 claims arising from police actions being taken, the Tenth Circuit presumes accrual "when the actions actually occur." *Beck v. City of Muskogee Police Dep't*, 195 F.3d 553, 558 (10th Cir. 1999) (quoting *Johnson v. Johnson County Comm'n Bd.*, 925 F.2d 1299, 1301 (10th Cir. 1991)). "The limitations period for a § 1985(3) action 'runs from the occurrence of the last overt act resulting in damage to the plaintiff.'" *Lyons,* 367 Fed. Appx. at 882 (quoting *Bell v. Flower*, 99 F.3d 262, 270 (8th Cir. 1996)). The Tenth Circuit has explained the conspiracy limitations period in this way.

> [I]t runs separately from each overt act of the conspiracy that
> allegedly caused injury, *see Scherer v. Balkema*, 840 F.2d 437, 439

(7th Cir. 1988); *see also Robinson*, 895 F.2d at 655 (indicating that conspiracies involving "discrete claims of [constitutional] wrongs, despite their being averred as a continuing wrong," accrue when the plaintiff is injured). Consequently, O'Connor "may recover only for the overt acts that [he] specifically alleged to have occurred within the limitations period." *Scherer*, 840 F.2d at 439 (quotation and ellipses omitted).

*O'Connor v. St. John's College*, 290 Fed. Appx. 137, 141 (10th Cir. 2008)(unpub.), *cert. denied*, 556 U.S. 1108 (2009).

As far as police/state actions taken or overt acts committed within the two-year limitation period, the plaintiff's complaint does not allege any until ¶ 117 on page 12. These factual allegations concern her DUI arrest as well as the circumstances surrounding the processing of her arrest and her subsequent treatment while being held after the arrest. Thus, all the factual allegations supporting counts one through four and nine are outside the statute of limitations, and these counts are subject to summary judgment. Only those overt acts that fall within the limitation period properly remain the subject of the conspiracy counts of 10 and 11. Though alleged to have started outside the limitations period, the conspiracy claim may remain viable if the accrual date of the later overt acts are within the limitation period. *See Hunt v. Bennett*, 17 F.3d 1263, 1266 (10th Cir.), *cert. denied*, 513 U.S. 832 (1994).

## Conspiracy Claims under §§ 1983 and 1985

A conspiracy claim under § 1983 requires pleading not only a conspiracy but also the conspiracy's action in depriving the plaintiff of a

constitutional right. *Dixon v. City of Lawton*, 898 F.2d 1443, 1449 (10th Cir. 1990)("[T]he essence of a § 1983 claim is the deprivation of the right rather than the conspiracy."). The delayed accrual of a conspiracy claim until later overt acts is conditioned upon the plaintiff alleging "specific facts showing agreement and concerted action" among the defendants, because "[c]onclusory allegations of conspiracy are insufficient to state a valid § 1983 claim." *Hunt v. Bennett*, 17 F.3d at 1266 (internal quotation marks and citation omitted). There is no doctrine of continuing violations applicable to § 1983 actions. *Mercer-Smith v. New Mexico Children, Youth and Families Dept.*, 416 Fed. Appx. 704, 712 (10th Cir. Mar. 21, 2011). On this count, the plaintiff's complaint alleges:

> The Defendants reached an agreement amongst themselves to use their positions of authority whenever possible in the most punitive way possible given whatever opportunities arose, for the purpose of frightening, intimidating, and impoverishing the Plaintiff, all the ultimate purpose of driving the Plaintiff out of town and to thereby to deprive Plaintiff of her constitutional rights.

ECF# 1, ¶ 277.

In the same vein as § 1983, the Supreme Court recognizes that § 1985 does not create rights. *Great Am. Fed. Sav. & Loan Ass'n v. Novotny*, 442 U.S. 366, 376 (1979)(emphasis omitted). Section 1985 is a "purely remedial statute, providing a civil cause of action when some otherwise defined federal right—to equal protection of the laws or equal privileges and immunities under the laws—is breached by a conspiracy . . . ." *Id*. Section 1985(3) prohibits two or more persons from conspiring "for the purpose of

depriving, either directly or indirectly, any person . . . of the equal protection of the laws, or of equal privileges and immunities under the laws." 42 U.S.C. § 1985(3). A claim asserted under 42 U.S.C. § 1985(3) requires: "(1) the existence of a conspiracy (2) intended to deny [plaintiff] equal protection under the laws or equal privileges and immunities of the laws (3) resulting in an injury or deprivation of federally-protected rights, and (4) an overt act in furtherance of the object of the conspiracy." *Murray v. City of Sapulpa*, 45 F.3d 1417, 1423 (10th Cir. 1995) (citing *Griffin v. Breckenridge*, 403 U.S. 88, 102–03 (1971) (further citation omitted)). A conspiracy claim under § 1985 "requires at least a combination of two or more persons acting in concert and an allegation of a meeting of the minds, an agreement among the defendants, or a general conspiratorial objective." *Brooks v. Gaenzle*, 614 F.3d 1213, 1227–28 (10th Cir. 2010) (citations omitted), *cert. denied*, 562 U.S. 1200 (2011). Mere conclusory allegations of conspiracy cannot state a valid claim under § 1985. *Hogan v. Winder*, 762 F.3d 1096, 1114 (10th Cir. 2014). For both § 1983 and § 1985 conspiracies, the Tenth Circuit has held that "a plaintiff must allege specific facts showing an agreement and concerted action amongst the defendants because conclusory allegations of conspiracy are insufficient to state a valid § 1983 claim." *Brooks*, 614 F.3d at 1228 (internal quotation marks and citations omitted). For a § 1985(3) claim, a plaintiff also must allege a "racial, or perhaps otherwise class-based, invidiously discriminatory animus behind the conspirators' actions."

*Griffin v. Breckenridge*, 403 U.S. 88, 102 (1971) (relating to § 1985(3));

*Smith v. Yellow Freight System, Inc.*, 536 F.2d 1320, 1323 (10th Cir. 1976)

(relating to § 1985(2)). Class-based discrimination means "classifications on

. . . race, sex, religion or national origin." *Brown v. Reardon*, 770 F.2d 896,

905-06 (10th Cir. 1985) (alteration in original). The plaintiff's complaint

alleges under her § 1985 count that, "As described more fully above, each of

the Defendant conspired, directly or indirectly, for the purpose of depriving

Plaintiff of her constitutional rights." ECF# 1, ¶ 283.

Plaintiff's conspiracy claims cannot survive summary judgment.

First, for the reasons discussed later, the plaintiff is unable to show the

denial of a constitutional right. Second, to bring a conspiracy claim, the

plaintiff must allege more than conclusory allegations and make an effort to

provide some details and facts showing an agreement and concerted action

among the defendants. *Tonkovich v. Kansas Bd. of Regents*, 159 F.3d 504,

533 (10th Cir. 1998). There must be enough specific factual allegations

making it reasonable to infer the defendants were conspiring with one

another. *Id.*; *Brooks*, 614 F.3d at 1228 (allegations of inconsistencies or

parallel action or inaction "does not necessarily indicate an agreement to act

in concert."). The plaintiff's complaint and her memoranda utterly fail to

come forward with specific factual allegations or evidence to show an

agreement or concerted action. What is offered by the plaintiff shows no

more than the expected and regular communications occurring between city

officials. Their actions toward the plaintiff, individually and together, show no more than the expected and regular response to complaints coming from citizens or from the plaintiff's own family. The plaintiff offers no reasonable inferences of an agreement or combined action by the defendants, and her allegations are no more than speculation and conjecture on her part. Third, the plaintiff fails to allege any recognized class-based discrimination for purposes of her § 1985(3). She stops with alleging that she is not Roman Catholic in a small community that is largely Roman Catholic. The plaintiff is alleging she is part of a class that chooses not to be part of the defendant's group. Following the Supreme Court's lead in *Bray v. Alexandria Women's Health Clinic*, 506 U.S. 263, 269 (1993), the court questions the plaintiff's speculative extension of § 1985(3) "which unquestionably connotes something more than a group of individuals who share a desire to engage in conduct that the § 1985(3) defendant disfavors." In this case, the plaintiff is alleging no more than the desire to not engage in conduct that the § 1985(3) defendants favor, that is, participating in the Roman Catholic church. In sum, the plaintiff does not make a § 1985(3) claim out of the defendants enforcing the municipal ordinances, the citizens complaining about the plaintiff's behavior, or the defendants discharging their lawful official duties in a manner lacking apparent conspiratorial or discriminatory motives. The plaintiff provides no evidence to support her allegations other than speculative and conclusory musings. They do not suffice to create a

genuine issue for trial. The record here contains no evidence that defendants shared a mutual understanding or reached a meeting of the minds about threatening or forcing plaintiff to leave Victoria. Without such evidence, the court must grant summary judgment against plaintiff's conspiracy claims (counts 10 and 11) under 42 U.S.C. §§ 1983 and 1985(3).

### Counts I and II—Freedom of Religion and Speech

Count one alleges the plaintiff suffered discrimination for not being of the Roman Catholic faith and was denied "her constitutional right to a free choice of religious belief." ECF# 1, pp. 21-22. The Court construes this claim as alleging a violation of the Free Exercise clause. To establish such a claim, the plaintiff "must show that the government has placed a burden on the exercise of [her] . . . religious beliefs or practices" and must state a claim that the "exercise of religion is burdened if the challenged action is coercive or compulsory in nature." *Fields v. City of Tulsa*, 753 F.3d 1000, 1009 (10th Cir.) (internal quotation marks and citation omitted), *cert. denied*, 135 S. Ct. 714 (2014).

The plaintiff's complaint and evidence does not state a viable First Amendment claim. The plaintiff's only evidence associated with the Roman Catholic faith of the community is related to her signs disparaging Roman Catholic priests that she put up in her yard. The signs resulted in citizens making complaints and the officers visiting with her. There is no evidence that the officers coerced the plaintiff into conduct contrary to her

religious beliefs or that burdened her from practicing her religion. The citizens complaining of the sign is not state action. The allegations of the officers' responses to the complaints and potential threats show a concern for community safety that was met by a display of their presence. The evidence simply does not show that the officers' presence in itself was coercive or compulsory conduct. The court finds no plausible Free Exercise claim to be alleged here.

Count two alleges the plaintiff was denied her constitutional right to communicate her opinions on her property as she was threatened with violence for putting up a sign that was critical of the Roman Catholic church. A First Amendment retaliation claim outside of an employment context requires a plaintiff to allege and show:

> (1) that the plaintiff was engaged in constitutionally protected activity; (2) that the defendant's actions caused the plaintiff to suffer an injury that would chill a person of ordinary firmness from continuing to engage in that activity; and (3) that the defendant's adverse action was substantially motivated as a response to the plaintiff's exercise of constitutionally protected conduct.

*Leverington v. City of Colorado Springs*, 643 F.3d 719, 729 (10th Cir. 2011) (internal quotation marks and citation omitted). While conceding the plaintiff's sign was protected speech, the defendants argue that their actions did not chill the plaintiff's speech but protected the plaintiff's speech. The plaintiff alleges the defendants threatened her, but the uncontroverted facts show the defendants simply responded to citizens' complaints and maintained the peace by their presence. Not only were the defendants'

action not adverse to the plaintiff, but they were beneficial to her. When the plaintiff voluntarily chose to take down the sign, the officers ended their surveillance of the situation. Indeed, the plaintiff alleges she posted the sign with the expectation of antagonizing the community, so the defendants' actions taken to preserve the peace were expected, reasonable, proportional, and not adverse. What the plaintiff recounts as Chief Dinkel's statements and handling of the plaintiff's sign and her other so-called "performance art" fails to show adverse action that would chill a person of ordinary firmness from continuing to engage in that activity. The plaintiff fails to show any violation of her constitutional rights in counts one and two as alleged and shown.

## Count 3—Freedom of Press

The plaintiff explains her freedom of press claim as based on her being denied full access to the municipal ordinance books. This is not a viable legal basis for such a claim. "[T]here is no constitutional right, and specifically no First Amendment right, of access to government records." *Lanphere & Urbaniak v. State of Colo.*, 21 F.3d 1508, 1512 (10th Cir.), *cert. denied*, 513 U.S. 1044 (1994). Even assuming an actionable right here, the uncontroverted facts are that the plaintiff was not denied access to the ordinances, but she was subject to the same uniform procedure used by the City in requiring a citizen's request to see certain ordinances and in then providing the relevant volume for viewing. Copies of the ordinances could be

made and taken with the citizen. The plaintiff is essentially asserting a constitutional right to see a hard copy of all ordinances simultaneously. There is no allegation here that the plaintiff did not receive constitutional effective notice of any ordinances. The plaintiff's preference to see all the ordinances at the same time without supervision as opposed to the clerk's procedure of serial production upon specific request does not assert a claim of constitutional significance.

### Count 4—Freedom of Assembly and Association

The plaintiff explains this claim is based on Chief Dinkel telling a resident of Victoria "to stay away from the Plaintiff for no Constitutionally acceptable reason" which violated the "[p]laintiff's freedom to assemble with Chris Rogers." ECF# 47, p. 29. She also alleges her right to petition was denied because the City failed to respond substantively to her complaint letters. The plaintiff has not alleged anything that resembles a restriction upon a right to assemble peaceably in a public place or a right to petition the government for redress of grievances. The right to assemble "is a collective or group right, rather than the right of a single individual." *Brown v. City of Maize, Kan.*, 2009 WL 872905, at *6 (D. Kan. 2009). The plaintiff's allegations do not invoke any right to have meetings, marches, pickets, or the like. "The right to petition government does not create in the government a corresponding duty to act." *Scroggins v. City of Topeka, Kan.*, 2 F. Supp. 2d 1362, 1375 (D. Kan. 1998)(internal quotation marks and

citations omitted). The plaintiff's allegations do not show that she was deprived of her right to petition the city government for redress of grievances.

The defendants liberally construe the plaintiff's complaint as alleging a claim for interference with her constitutional right of expressive association. The court recognizes the following as a proper summary of the controlling law:

> Included among the protections the First Amendment guarantees, the Supreme Court has recognized "a First Amendment right to associate for the purpose of speaking, which [it has] termed a 'right of expressive association.'" *Rumsfeld v. Forum for Academic & Institutional Rights, Inc.*, 547 U.S. 47, 126 S.Ct. 1297, 164 L.Ed.2d 156 (2006) (quoting *Boy Scouts of Am. v. Dale*, 530 U.S. 640, 644, 120 S.Ct. 2446, 147 L.Ed.2d 554 (2000)). *See Grace United Methodist Church v. City of Cheyenne*, 451 F.3d 643, 658 (10th Cir. 2006) ("In addition to freedom of speech, the First Amendment also implicitly protects the corresponding freedom to expressive association."). The First Amendment protects associational rights in two distinct ways: (i) it "protects against unjustified government interference with an individual's choice to enter into and maintain certain intimate or private relationships"; and (ii) it ensures "the freedom of individuals to associate for the purpose of engaging in protected speech or religious activities." *Bd. of Dirs. v. Rotary Club of Duarte*, 481 U.S. 537, 544, 107 S.Ct. 1940, 95 L.Ed.2d 474 (1987). *See Grace United Methodist Church v. City of Cheyenne*, 451 F.3d at 658.
> . . . .
> . . . Indeed, there is no independent First Amendment right of expressive association; the First Amendment protects the freedom of association only in certain circumstances. *See City of Dallas v. Stanglin*, 490 U.S. 19, 23, 109 S.Ct. 1591, 104 L.Ed.2d 18 (1989) ("While the First Amendment does not in terms protect a 'right of association,' our cases have recognized that it embraces such a right in certain circumstances."). Although an opportunity "might be described as 'associational' in the common parlance," it does not necessarily follow that it involves "the sort of expressive association that the First Amendment has been held to protect." *City of Dallas v. Stanglin*, 490 U.S. at 24, 109 S.Ct. 1591. Although "[i]t is possible to

find some kernel of expression in almost every activity a person undertakes ... such a kernel is not sufficient to bring the activity within the protection of the First Amendment." *City of Dallas v. Stanglin*, 490 U.S. at 25, 109 S.Ct. 1591.

*A.M. ex rel. Youngers v. New Mexico Dept. of Health*, 117 F. Supp. 3d 1220, 1243–44 (D.N.M. 2015). The court agrees with the defendants that the plaintiff's claim alleges some generalized right to associate that does not fall within the First Amendment's protection. Even assuming the allegations about Chief Dinkel's comments were true, they amount to nothing more than conversational advice, and they carry no remote possibility of having denied the plaintiff of any constitutional right.

## Count 5—Destruction of Evidence

The plaintiff alleges the defendants acted individually and jointly in conspiracy by destroying evidence concerning her DUI arrest "that would have benefited Plaintiff at trial and in the driver's license proceeding" and that "[a]bsent this misconduct, the prosecution of Plaintiff could not and would not have been pursued." ECF# 1, ¶¶ 234, 235. The plaintiff's complaint includes these factual allegations:

155. Chief Cole Dinkel destroyed evidence by deliberately failing to switch his microphone input from his car microphone to his personal microphone unit while interviewing Plaintiff outside of the police vehicle. Evidence of that exchange would have helped Plaintiff at trial because Chief Cole Dinkel refused to provide medical care and made other statements which would have helped Plaintiff's criminal and driver's license cases.
. . . .
160. Chief Cole Dinkel colluded with Wilmer Dinkel and/or some other county employee to destroy the DUI check lane video taken of Plaintiff

on June 19, 2015 by destroying the DUI audio video recording machine.

. . . .

163. Plaintiff believes that Chief Dinkel informed his father, Wilmer Dinkel of the situation, and then Wilmer Dinkel destroyed or had someone else erase the hard drives on the DUI audio/video machine which wiped out the recording of the Plaintiff along with that of many other county arrestees.

ECF# 1. The defendants argue these conclusory allegations are divorced from the facts that no body mic recording was made, that the videos produced by the County Attorney included some unreadable portions, and that an equipment manufacturer said such malfunctions were rare. The defendants characterize the plaintiff's allegations of the defendants destroying evidence as being "entirely conjectural and speculative." ECF# 33, p. 29. As already noted above, the plaintiff has not controverted either Chief Dinkel's averment or Wilmer Dinkel's averment that they did not destroy any evidence concerning the plaintiff and they did not ask, conspire, or collude with anyone else to destroy evidence. In response, the plaintiff argues the existing recording shows she requested medical care, but Chief Dinkel still testified in the "driver's license review hearing" that the plaintiff did not request medical care prior to arriving at the hospital. ECF# 47, p. 29. From this, the plaintiff asks the court to assume that because Chief Dinkel was "willing to lie" about this topic at the hearing then it would be no "stretch to assume that he might destroy evidence" to cover himself on this topic. *Id.* In reply, the defendants say that the recording shows the plaintiff

requested additional blood work not medical care and that the plaintiff has no material facts from which to infer the destruction of evidence.

On a § 1983 claim, the due process right to a fair trial encompasses a duty "to disclose and preserve impeachment/exculpatory evidence." *Morgan v. Gertz*, 166 F.3d 1307, 1310 (10th Cir. 1999)(citations omitted). "Under *Youngblood* [*Arizona v. Youngblood*, 488 U.S. 51, 109 S.Ct. 333, 102 L.Ed.2d 281 (1988)], a defendant can establish a due process violation if he can show that (1) the government failed to preserve evidence that was 'potentially useful' to the defense; and (2) the government acted in bad faith in failing to preserve the evidence." *Riggs v. Williams*, 87 Fed. Appx. 103, 106 (10th Cir.) (citation omitted), *cert. denied*, 541 U.S. 1090 (2004). "Supreme Court authority makes clear that when dealing with lost or destroyed evidence, 'unless a criminal defendant can show bad faith on the part of the police, failure to preserve potentially useful evidence does not constitute a denial of due process of law.'" *Snow v. Sirmons*, 474 F.3d 693, 716 (10th Cir. 2007) (quoting *Youngblood*, 488 U.S. at 58)(emphasis deleted). "The Court therefore imposed the requirement that the defendant show bad faith on the part of the police when potentially exculpatory evidence is lost or destroyed." *Id.*; *See United States v. Fletcher*, 801 F.2d 1222, 1224-25 (10th Cir. 1986) ("Absent evidence of police or prosecutorial bad faith or misconduct, [relief is] warranted only if the missing evidence possesses an exculpatory value that was apparent before the evidence was

destroyed."). "[T]he inquiry into bad faith must necessarily turn on the police's knowledge of the exculpatory value of the evidence." *Riggs v. Williams*, 87 Fed.Appx. at 106 (internal quotation marks and citation omitted). Thus, the "mere fact that the government controlled the evidence and failed to preserve it is by itself insufficient to establish bad faith." *Id.* (quoting *United States v. Bohl*, 25 F.3d 904, 910 (10th Cir. 1994)).

As the defendants' motion shows, the plaintiff has no evidence or factual basis for alleging that there was evidence destroyed. Nor does the plaintiff explain how any evidence that she requested medical care earlier than the hospital would have been exculpatory in her DUI prosecution or in the administrative driver's license proceedings. Consequently, the plaintiff's claim is nothing more than conjecture and speculation on whether there is missing evidence, whether it was exculpatory, and whether there was any bad faith on the defendants' part. The plaintiff fails to allege a claim for relief, as she is essentially asserting a constitutional right for the police to create exculpatory evidence. She has no authority for such a right. As for the recordings allegedly not preserved or destroyed, the plaintiff does not allege any exculpatory value in the recordings. Indeed, the plaintiff admittedly alleges in her complaint that she "unwisely drove two blocks to the church while under the influence of alcohol (for pain) and eventually blew .011 in the county breathalyzer." ECF#1, ¶ 116.The simple fact that the defendant controlled evidence and the plaintiff's simple hope that the

defendants would have some exculpatory evidence are insufficient to make a

claim of bad faith destruction of evidence.

## Count 6—Right to Counsel

The plaintiff's complaint reads in pertinent part:

> 141. Plaintiff was entitled under Kansas law to consult with an attorney as soon as the breathalyzer test was completed or refused.
> 142. Plaintiff requested from Cole Dinkel to be allowed to contact an attorney prior to chemical testing and was informed by Defendant Cole Dinkel that Kansas law did not allow for that.
> 143. Defendant Cole Dinkel failed to further advise Plaintiff that she was entitled to an attorney after she completed chemical testing.
> 144. Plaintiff was therefore deprived of access to counsel from the time of completing the breathalyzer test at the sheriff's office until much later in the evening.
> . . . .
> 243. Defendant Cole Dinkel failed to allow plaintiff to contact an attorney immediately after the Plaintiff complied with the breathalyzer test.
> 244. The Defendant Ellis County failed to appoint an attorney for the Plaintiff in a district court appeal of the driver's license administrative hearing, even though those proceedings are thought to be complex even for attorneys.

ECF# 1. From the complaint, it appears, as the defendants argue, the

plaintiff is alleging that she requested counsel before any chemical testing

but did not request counsel thereafter, that Chief Dinkel did not advise her

about contacting counsel after the chemical testing, that the plaintiff asked

for additional testing which was provided at the hospital, and that she was

given a chance to contact counsel after being returned from the hospital.

The Victoria defendants argue these allegations do not state a claim for

denial of counsel but only the failure to advise her of "a right she did not yet

have." ECF# 33 p. 30. The plaintiff responds  that the Chief Dinkel failed to

advise her of the right to counsel after the breathalyzer but before the blood test as required by the Kansas Supreme Court decision of *Dumler v. Kansas Dept. of Revenue*, 302 Kan. 420, 354 P.3d 519 (2015). The Ellis County defendants note that they did give the plaintiff an opportunity to consult her attorney, but the plaintiff complains that it was not until she was returned to the jail and her attorney already "retired for the evening." ECF# 58, p. 5. They also argue that the plaintiff had no Sixth Amendment right to legal representation in the administrative proceedings, and the plaintiff does not respond to this argument. In reply, the defendants note the right in *Dumler* is purely a creature of state statute.

The plaintiff's complaint alleges a denial only in not being advised of a right to counsel after the breathalyzer test and failure to appoint counsel in her driver's license administrative proceedings. Section 1983 "is not itself a source of substantive rights, but a method for vindicating federal rights elsewhere conferred by those parts of the United States Constitution and federal statutes." *Baker v. McCollan*, 443 U.S. 137, 144 n.3 (1979). "[T]he Sixth Amendment right to counsel applies only to criminal proceedings." *Smith v. Sec. of New Mexico Dept. of Corrections*, 50 F.3d 801, 821 (10th Cir. 1995) (citing *see Maine v. Moulton*, 474 U.S. 159, 170 (1985)); see *Beaudry v. Corrections Corp. of Am.*, 331 F.3d 1164, 1169 (10th Cir. 2003)("[P]laintiffs have no Sixth Amendment right to counsel in a civil case."), *cert. denied*, 540 U.S. 1118 (2004). Nor does the plaintiff have

a cognizable claim under § 1983 based upon a defendant's violation of a state statute. *Gaines v. Stenseng*, 292 F.3d 1222, 1225 (10th Cir. 2002). Because the plaintiff alleges only a violation of the Kansas statutory right recognized in *Dumler* and alleges no violation of a constitutional right, she brings no cognizable claim for § 1983 relief.

### Count 7—Due Process-Conditions of Confinement

The plaintiff's complaint alleges her constitutional right to be free from cruel and unusual punishment was violated in several different ways. She was placed in a cell that could not accommodate more than one person sleeping "off the floor" and that her cellmate was mentally instable and threatened the plaintiff. She had medical issues that were not attended to while in jail, including failure to follow discharge orders from the hospital emergency room by not filling prescriptions and by not taking blood pressure checks. She was not provided help for emptying her bladder. The plaintiff alleges injuries that include emotional distress, intense pain, and loss of vision.

The defendant notes the uncontroverted evidence establishes that the plaintiff was treated at the hospital before she was booked into the jail and was released from custody less than sixteen hours later. During her brief period of custody, the plaintiff did not inform the defendant staff of any serious health problems, and the staff did not observe the plaintiff to be suffering from any serious medical conditions. When the plaintiff did

complain of a toothache, the staff took her to the urgent care facility where she received additional blood pressure medication. In sum, the plaintiff received medical care twice within a 24-hour period, and there is no medical evidence of any diagnosis of a serious medical need that went untreated. The jail staff denies knowledge of any alleged bladder condition, and there is no evidence of this being a serious medical condition. The defendants deny that the double bunking of the plaintiff for less than 16 hours does not rise to a constitutional violation. The cellmate's threatening gestures do not sustain an Eighth Amendment claim, and even if they did, the plaintiff failed to notify the defendants as to show deliberate indifference. The plaintiff responds that the defendants did not answer her calls for assistance during her incarceration. In reply, the defendants point out that the plaintiff's complaint alleges that she received a "dental block" at the hospital but that it "wore off in the early morning hours of June 20th" and she did not receive treatment. ECF# 1, ¶ 167. The defendants also note that the plaintiff was alone in her cell from 2:45 am through 6:10 am., as her cellmate was at the hospital being treated.

The treatment and conditions of incarceration are subject to Eighth Amendment scrutiny which "imposes duties on these officials, who must provide humane conditions of confinement; prison officials must ensure that inmates receive adequate food, clothing, shelter, and medical care, and must take reasonable measures to guarantee the safety of the inmates."

*Farmer v. Brennan*, 511 U.S. 825 832 (1994) (internal quotation marks and citations omitted). The due process rights of a pretrial detainee parallel the Eighth Amendment rights of an inmate. *Lopez v. LeMaster*, 172 F.3d 756, 759 (10th Cir. 1999); *see City of Revere v. Massachusetts General Hosp.*, 463 U.S. 239, 244-45 (1983). "To prevail on a conditions of confinement claim under the Eighth Amendment, an inmate must establish that (1) the condition complained of is sufficiently serious to implicate constitutional protection, and (2) prison officials acted with deliberate indifference to inmate health or safety." *DeSpain v. Uphoff*, 264 F.3d 965, 971 (10th Cir. 2001)(internal quotation marks and citations omitted). To meet the first requirement, "the inmate must show that he is incarcerated under conditions posing a substantial risk of serious harm." *Id.* For the second requirement, deliberate indifference is "more than mere negligence" but equal to "recklessness, in which a person disregards a risk of harm of which he is aware." *Id.* at 972. The plaintiff's allegations fail to show that the conditions of her 16-hour confinement in jail rise were sufficiently serious as to implicate constitutional protection. Even assuming such allegations, the plaintiff's complaint utterly fails to allege facts sufficient to infer deliberate indifference on the defendants' part. The plaintiff has failed to controvert the conclusive facts and rebut the compelling legal arguments that the defendants have made for dismissal of these claims.

To prevail on a medical care claim, "deliberate indifference to serious medical needs of prisoners constitutes the 'unnecessary and wanton infliction of pain' . . . proscribed by the Eighth Amendment." *Estelle v. Gamble*, 429 U.S. 91, 104 (1976). The Tenth Circuit has applied the rule from *Estelle* to "pretrial detainees" holding that they are "'entitled to the degree of protection against denial of medical attention which applies to convicted inmates.'" *Estate of Booker v. Gomez*, 745 F.3d 405, 429 (10th Cir. 2014) (quoting *Garcia v. Salt Lake Cnty.*, 768 F.2d 303, 307 (10th Cir. 1985)). A "due process standard" applies that "protects pretrial detainees against deliberate indifference to their serious medical needs." *Id.* The following is the law governing the plaintiff's claim:

> To state a denial of medical care claim, a plaintiff must satisfy "both an objective and a subjective component." *Mata v. Saiz*, 427 F.3d 745, 751 (10th Cir. 2005) (quotations omitted). First, the detainee must "produce objective evidence that the deprivation at issue was in fact sufficiently serious." *Id.* (quotations omitted). "[A] medical need is sufficiently serious if it is one . . . that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Id.* (quotations omitted); *see also Sealock v. Colorado*, 218 F.3d 1205, 1209 (10th Cir. 2000) (same).
>
> Second, under the subjective component, the detainee must establish deliberate indifference to his serious medical needs by "present[ing] evidence of the prison official's culpable state of mind." *Mata*, 427 F.3d at 751. He must show that the prison "official acted or failed to act despite his knowledge of a substantial risk of serious harm." *Farmer v. Brennan*, 511 U.S. 825, 842, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994). "The Supreme Court [has] cautioned that 'an inadvertent failure to provide adequate medical care' does not rise to a constitutional violation." *Martinez v. Beggs*, 563 F.3d 1082, 1088 (10th Cir.2009) (quoting *Estelle*, 429 U.S. at 105–06, 97 S.Ct. 285). But "[w]hether a prison official had the requisite knowledge of a substantial risk is a question of fact subject to demonstration in usual ways, including inference from circumstantial evidence." *Gonzales v.*

> *Martinez*, 403 F.3d 1179, 1183 (10th Cir.2005) (quoting Farmer, 511 U.S. at 842, 114 S.Ct. 1970).

*Estate of Booker*, 745 F.3d at 430. The plaintiff's allegations and evidence do not present a question of fact over the seriousness of the plaintiff's medical needs in light of the care and treatment that she received during the 16 hours of confinement. She arrived that evening having been treated and medicated for her needs, and the next morning she received additional medical treatment and was released before noon. These same uncontroverted facts prevent any plausible allegation that the defendants acted with deliberate indifference to her medical needs.

### Count 8—Due Process

Under this count, the plaintiff materially alleges:

263. As described more fully above, all of the Defendants, while acting individually, jointly, and in conspiracy, as well as under color of law and within the scope of their employment, deprive Plaintiff of her constitutional right to due process.

264. In the manner described more fully above, the Defendants deliberately violated the constitutional rights of Plaintiff by deliberately destroying evidence, causing the Plaintiff to be arrested for disorderly conduct with no basis in fact for the arrest, and by demanding that Plaintiff agree to pay for emergency medical services as a condition of transporting his prisoner, to the Emergency Room for medical treatment.

ECF# 1. In opposing dismissal/summary judgment, the plaintiff argues this due process claim is based on the officers processing her DUI arrest while failing to provide medical care and medication for her abscessed tooth and high blood pressure. Specifically, the plaintiff complains the defendants investigated her DUI rather than addressing her medical needs and then

43

refused to help her. As for any allegation concerning the lawfulness of her arrest, the plaintiff has not controverted facts establishing that she committed driving violations leading to the traffic stop, that there was a strong odor of alcohol on the plaintiff, and that the breath testing results showed significant levels of alcohol. The plaintiff has admitted in her complaint to unlawfully driving under the influence.

The same deliberate indifference standard governs the plaintiff's lack of medical care claim here. The plaintiff's allegations fail to show a medical need so obvious that "a lay person would easily recognize the necessity for doctor's attention." *Estate of Booker*, 745 F.3d at 430. The plaintiff's alleged medical needs had not forced her to seek immediate medical care for them prior to the traffic stop and arrest. In fact, they had not kept her from driving a vehicle while she was admittedly under the influence of alcohol. The plaintiff's subjective complaints of seriousness are not enough under the circumstances to establish the objective component or to provide the defendants with the requisite knowledge for the subjective component.

### Count 9—14th Amendment—Right to Privacy

The plaintiff alleges here:

> 270. In the manner described more fully above, the Defendants deliberately violated Plaintiff's constitutional right to privacy by discussing Plaintiff amongst themselves and with other townspeople, including Plaintiff's family and business associates, with the intention of harming the Plaintiff's income, family relations, and social relations, commonly known as "meddling."

271. For no justifiable law enforcement purpose, Defendant Cole Dinkel cultivated as informants and discussed the Plaintiff's life with Plaintiff's tenants and family, which had a direct and negative impact on all of their decisions and attitudes in regard to the Plaintiff.

ECF# 1.  The defendants recognize that the constitutional right to privacy includes the interest of informational privacy and protects "the individual interest in disclosure of personal matters." *Whalen v. Roe*, 429 U.S. 589, 599-600 (1977). "An individual is thus protected from disclosure of information where the individual has a legitimate expectation . . . that it will remain confidential." *Aid for Women v. Foulston*, 441 F.3d 1101, 1116 (10th Cir. 2006)(internal quotation marks and citation omitted).  "The legitimacy of this expectation depends, at least in part, upon the intimate or otherwise personal nature of the material which the state possesses." *Sheets v. Salt Lake County*, 45 F.3d 1383, 1387 (10th Cir.) (internal quotation marks and citation omitted), *cert. denied*, 516 U.S. 817 (1995).

At most, the plaintiff alleges the defendants may have meddled in her life by talking about her and her life with family and business associates. The complaint fails to allege and the plaintiff does not offer proof that the defendants disclosed personal and confidential information held by the City about which she had a legitimate expectation of privacy. The plaintiff's complaint does not allege interests or actions that implicate a constitutional right to privacy when it is based on nothing more than a public employee giving his opinions about others without disclosing confidential material. Because the plaintiff did not respond to the defendants' arguments

for dismissal of this count, the court also grants here the defendants' motion as uncontested.

## Municipal Liability

For each of her federal claims of relief, the plaintiff includes the conclusory allegation that, "The misconduct described in this Count was undertaken pursuant to the policy and practice of the City of Victoria in the manner described more fully above." ECF#1, ¶¶ 201, 211, 220, 231, 239, 247, 262, 267, 274, 281, and 286. In some of these cited paragraphs, the plaintiff also names Ellis County, Kansas. The defendant City contends the plaintiff's complaint fails to allege a specific policy, to identify the policy, or to allege the facts indicating the existence of a policy. Instead, the plaintiff simply repeats this formulaic, conclusory allegation. The plaintiff limits her response to saying that in her DUI proceedings she requested a copy of all operating procedures governing the City's police department and learned there were none for this two-man department. From this, the plaintiff characterizes the City as inviting "arbitrary enforcement" and disregard of citizen's rights. Finally, the plaintiff concludes, "If the only way that the city can be held liable is to show that it failed to follow acceptable policies and procedures, but there are no written policies or procedures, then it would be impossible to hold (sic) responsible for anything." ECF# 47, p. 31. In reply, the defendants note that the lack of written policies does not relieve the plaintiff from proving a policy and practice.

To prove a § 1983 municipal liability claim, a municipal employee must have committed a constitutional violation, and "a municipal policy or custom was the moving force behind the constitutional deprivation." *Jiron v. City of Lakewood*, 392 F.3d 410, 419 (10th Cir. 2004) (citations omitted). The above rulings show the plaintiff has not alleged or is not able to prove a constitutional violation. The Tenth Circuit has said the following as to policy or custom:

> A municipal policy or custom may take the form of (1) a formal regulation or policy statement; (2) an informal custom amounting to a widespread practice that, although not authorized by written law or express municipal policy, is so permanent and well settled as to constitute a custom or usage with the force of law; (3) the decisions of employees with final policymaking authority; (4) the ratification by such final policymakers of the decisions—and the basis for them—of subordinates to whom authority was delegated subject to these policymakers' review and approval; or (5) the failure to adequately train or supervise employees, so long as that failure results from deliberate indifference to the injuries that may be caused.

*Bryson v. City of Oklahoma City*, 627 F.3d 784, 788 (10th Cir. 2010) (internal quotation marks and citations omitted), *cert. denied*, 564 U.S. 1019 (2011). The court agrees with the defendants that the plaintiff has failed to allege any viable basis for a municipal policy or custom.

### Decline to Exercise Supplemental Jurisdiction

Under 28 U.S.C. § 1367(c), the Court may decline to exercise supplemental jurisdiction if it has dismissed all claims over which it has original jurisdiction. *See Arbaugh v. Y & H Corp.*, 546 U.S. 500, 514 (2006). The Court considers the nature and extent of pretrial proceedings, judicial

economy, convenience and whether fairness would be served by retaining jurisdiction. *Anglemyer v. Hamilton Cty. Hosp.*, 58 F.3d 533, 541 (10th Cir. 1995). In the usual case, the balance of factors points toward declining to exercise jurisdiction over the remaining state law claims. *McWilliams v. Jefferson Cty.*, 463 F.3d 1113, 1118 (10th Cir. 2006). The Court finds no compelling reasons to exercise supplemental jurisdiction to decide the merits of plaintiff's state law claims. This ruling on the federal law claims is occurring early in the litigation. The magistrate judge stayed discovery pending a ruling on the dispositive motions. ECF# 46. Under these circumstances, the court declines to exercise supplemental jurisdiction.

IT IS THEREFORE ORDERED that the Victoria defendants' motion for summary judgment (ECF# 32) and the Ellis County defendants' motion for summary judgment (ECF# 39) are granted as to all federal claims for relief (Counts 1-11) which are dismissed with prejudice, and the court declines to exercise supplemental jurisdiction over the plaintiff's state law claims for relief (Counts 12-16) which are dismissed without prejudice.

Dated this 18th day of August, 2017, Topeka, Kansas.

s/Sam A. Crow
Sam A. Crow, U.S. District Senior Judge